UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

In Re: TikTok, Inc. Minor Privacy Litigation

Case 2:25-ml-03144-GW-RAO

**DECLARATION OF DOUGLAS FORREST**

I, Douglas Forrest, state and declare as follows:

1. I am the Senior Vice President, eDiscovery Analytics & Strategy, at International Litigation Services ("ILS"), which is located in Irvine, California (www.ilsteam.com). I have been retained as a consultant for the Humbert Plaintiffs in this action. The facts stated in this declaration, except as otherwise explicitly noted, are within my own personal knowledge and, if called as a witness to testify, I could and would competently testify to the facts contained in this declaration.

2. I make this declaration in support of the Humbert Plaintiffs' Opposition to Defendants' Ex Parte Application for Temporary Suspension and Clarification Of Preservation Order ("Plaintiffs' Opposition"). In preparing this declaration I reviewed, *inter alia*:

   a. Declaration of Noreen Yeh (April 30, 2025) ("Yeh Declaration");
   b. The Court's April 28 Minute Entry (ECF 11);
   c. Plaintiffs' Opposition.

I. **QUALIFICATIONS**

3. I am a graduate of Stanford Law School, where I was a Note Editor of the Law Review. I was admitted to the bar in 1977 (I currently have retired status), and, after practicing

1

law at Breed, Abbott & Morgan and Cravath, Swaine & Moore, I developed expertise in computer technology and software design, programming, and implementation, both generally and with respect to litigation support and e-discovery.

4. As an attorney at Cravath, I relied on *Aquarius*, the first large-scale implementation of computerized litigation support, which was implemented on the IBM antitrust cases.

5. As Director of Litigation Services at Legal Information Technology, Inc. ("LIT"), I was instrumental in introducing imaging, coding, and search technology for discovery to Am Law 200 law firms, and I pioneered the practice of integrating imaging with legacy search systems such as BRS.

6. As a systems architect, application designer and programmer, I created case management, litigation support and document repository systems and applications (including *WIDE*, and *LIT CaseWorks for Lotus Notes*, developed for LIT), SaaS (Software as a Service) knowledge management applications (including *LexisNexis Total Alerts* and *LexisNexis Clipper* developed for Ozmosys (https://www.ozmosys.com/)), and e-discovery and production operation systems for Doar (https://www.doar.com/). The software that I designed, programmed, and implemented to produce *LexisNexis Total Alerts*, *LexisNexis Clipper, LexisNexis Legal Industry Monitor, Thompson Elite Daily Docket, and Institutional Investors' Mutual Fund Daily, Hedge Fund Daily and Compliance Daily*, traversed thousands of web sites and extracted thousands of URLS from those sites daily.

7. I have decades of experience in designing and programming databases.

8. At ILS, I direct e-discovery analytics and strategy, providing technical advice, expertise and drafting and other assistance to counsel.

9. I have advised, consulted, or acted as a declarant or affiant with respect to ESI in many cases, including:

a. *In re: Glucagon-like Peptide-1 Receptor Agonists (GLP-1 RAS) Products Liability Litigation,* MDL No. 3094 (E.D. Pa.)*;*

b. *In re: Uber Technologies, Inc. Passenger Sexual Assault Litigation*, MDL No. 3084 (N.D. Cal.);

c. *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047 (N.D. Cal.);

d. *In Re: StubHub Refund Litigation*, Case No. 4:20-md-02951-HSG (N.D. Cal.);

e. *In Re: Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (N.D. Cal.);

f. *In Re: Philips Recalled CPAP, Bi-Level Pap, and Mechanical Ventilator Products Litigation*, MDL No. 3014 (W.D. Pa.);

g. *Nichols v. Noom Inc.,* No. 20-CV-3677 (LGS) (KHP), 2021 WL 948646, (S.D.N.Y.);

h. *In re: Ethiopian Airlines Flight ET 302*, Lead Case: 1:19-cv-02170 (N.D. Ill.) (Boeing 737 Max Crashes);

i. *In Re: 3M Combat Arms Earplug Product Liability Litigation*, MDL No. 2885 (N.D. Fla.) ("3M Combat Arms MDL");

j. *In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2672 (N.D. Cal.) ("VW Clean Diesel MDL");

k. *In Re: Intel Corp, CPU Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2828 (D. Or.);

l. *In Re: Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2777 (N.D. Cal.);

m. *Lafferty v. Alex Jones* (Conn. Super. Ct.);

n. *Soto v. Bushmaster Firearms International* (Conn. Super. Ct.) (Sandy Hook parents);

o. *In Re: Takata Airbags Product Liability Litigation*, MDL No. 2599 (S.D. Fla.);

p. *In Re: Testosterone Replacement Therapy Products Liability Litigation*, MDL No. 2545 (N.D. Ill.);

3

q. *In Re JCCP 4771, Zoloft Birth Defect Cases*, (Cal. Super. Ct.);

r. *Da Silva Moore v. Publicis Groupe & MSL Group,* No. *11* Civ. 1279 (ALC)(AJP) (S.D.N.Y.) (seminal TAR case).

10. I have served as a speaker or panelist on many CLE webinars including *Balancing the Needs of Requesting and Producing Parties: Getting E-Discovery Right* (RAND Institute for Civil Justice Conference, October 3-4, 2023) ("RAND Conference"), *An Analysis of Today's Mass Tort Landscape Agenda* (HarrisMartin MDL Conference, March 27, 2019), *Current Mass Torts from E-Discovery Through Exit Strategies - Navigating "Game-Changing" Dynamics* (HarrisMartin MDL Conference, November 26, 2018),*The Mass Tort Litigation Landscape - A Critical Analysis Agenda* (HarrisMartin MDL Conference, September 26, 2018), *The State of E-Discovery in 2018: Analysis & Review* (West LegalEdCenter, September 27, 2018), *Lessons Learned from Recent eDiscovery Disasters* (West LegalEdCenter, February 26, 2018), and *Top ESI Mistakes Made in Mass Tort Disputes* (West LegalEdCenter, September 14, 2017).

11. I was an advisor on and assisted in setting up the RAND Conference.

12. I am a member of the drafting team for forthcoming commentary of the Sedona Conference Working Group 1 (https://thesedonaconference.org/wgs/wg1) on *Commentary on Discovery of Collaboration Platforms Data*.

## II. **OPINIONS**

13. The Yeh Declaration is the only evidence submitted by Defendants in support of their motion. While all the systems at issue would be TikTok's own systems and there must be TikTok personnel who are actually knowledgeable about such systems and could address any alleged issues based on their own direct knowledge, TikTok has not submitted any declarations or evidence from anyone with firsthand knowledge.

14. As discussed *infra,* Ms. Yeh does not have any relevant firsthand or personal knowledge on any relevant issues. And, notably, the declaration does not contain even a suggestion that:

    a. TikTok couldn't stop at least some, if not all, deletions immediately.

    b. To the extent that there are any considerations in halting deletion of *just* the Underage User Data, that there would be any difficulty or burden in temporarily halting deletion of all TikTok user data for a very limited time or that specific legal requirements would be violated by such a halt.

    c. A stay of 30 days vs a more limited stay, say of 2-3 days, is required to locate TikTok personnel who know what be required to halt deletion of the Underage User Data and for TikTok to halt such deletions (which may turn out to be a relatively simple matter), especially as these would all be TikTok's own proprietary systems fully under TikTok's control. Every additional day of delay is critical because, as Ms. Yeh states, "TikTok deletes data from thousands of identified under-13 accounts every day." Yeh Declaration ¶ 10.

15. Ms. Yeh's declaration describes herself as an eDiscovery Analyst at TikTok who previously worked for law firms in the eDiscovery and litigation support departments. Yeh Declaration ¶ 1. Ms. Yeh does not claim to have any technical experience as a programmer, or a system analyst, or a system architect, or a systems administrator, or a database administrator.

16. Ms. Yeh's declaration states that she has "become familiar with [TikTok's] systems and practices related to user data." Yeh Declaration ¶ 1.

17. While halting deletion of user data would require stopping the execution of any programs which delete user data, either by modifying the schedules under which such programs are run (for example, by changing the times that deletion programs would next run)[1] or modifying the programs that actually perform the deletions, Ms. Yeh's declaration does not assert any firsthand knowledge or even familiarity with TikTok's scheduling options, TikTok's programming resources and expertise, the programming and code used in TikTok's systems, TikTok's change control systems, or TikTok's programming departments.

---

[1] For example, Unix-based systems such as Linux have a *cron* command which is "a job scheduler on Unix-like operating systems. Users who set up and maintain software environments use cron to schedule jobs (commands or shell scripts), also known as cron jobs, to run periodically at fixed times, dates, or intervals. It typically automates system maintenance or administration…. The actions of cron are driven by a **crontab** (cron table) file, a [text] file that specifies shell commands to run periodically on a given schedule.

Each line of a crontab file represents a job, and looks like this:

  * * * * * <command to execute>

# | | | | |
# | | | | day of the week (0–6) (Sunday to Saturday;
# | | | month (1–12)     7 is also Sunday on some systems)
# | | day of the month (1–31)
# | hour (0–23)
# minute (0–59)" *cron,* https://en.wikipedia.org/wiki/Cron (accessed on May 1, 2025) (links and footnotes removed). The schedule to run a command can be changed just by changing the specification of the run times and a program can be disabled from being run by cron by removing or commenting out the command to run the program.

Microsoft operating systems have similar functionality.

18. Ms. Yeh's declaration states that based on her knowledge and experience, "additional time is required to investigate the TikTok systems and processes to determine the nature and extent of Underage User Data that can be preserved and whether and how it can be preserved with proper access control and processing limitations." Yeh Declaration ¶ 11. Ms. Yeh's declaration provides no evidence why, even if additional time is needed, that the additional time needed is 30 days, especially when every day of delay may spoliate evidence, as, as noted *supra*, "TikTok deletes data from thousands of identified under-13 accounts every day." Yeh Declaration ¶ 10.

19. Ms. Yeh's declaration also does not distinguish between the time required to identify the TikTok personnel who could address the topics that she discusses and the time required to implement a total or even a partial fix once such personnel are identified.

20. Ms. Yeh's declaration states, as an example that she "is not aware of any mechanism to simply pause deletion of all Underage User Data." Yeh Declaration ¶ 12. That is not evidence that such mechanisms do not exist or could not be quickly spun up, e.g., by changing the frequency or schedule that all deletion programs are run or even just those programs that TikTok uses in "its typical practice … to use the account user's identifiers … to locate and delete nearly all data associated with the account." Yeh Declaration ¶ 9.

21. The Yeh declaration states that "User data is generally stored in hundreds of thousands of tables, where Underage User Data is comingled with other user data" (Yeh Declaration ¶ 12), implying that the sheer number of tables presents some difficulties. Ms. Yeh does not describe the nature of these tables, i.e., are there hundreds of thousands of unique tables or are many or most of these simply distributed copies of a much smaller set of tables? Does

TikTok lack methods of managing these tables in a consolidated way? Ms. Yeh's declaration does not say.

22. The Yeh declaration states that "Obtaining a fulsome understanding of how user identifiers are used to scan[2] for and locate Underage User Data will require investigation with multiple TikTok teams." Yeh Declaration ¶ 12. Does TikTok lack any degree of centralized technical and database management that can do this immediately? Ms. Yeh's declaration does not say.

23. The Yeh declaration is chock-a-block with possibilities. It "is *possible* that Underage User Data is comingled with other data", "sets of Underage User Data are *likely* automatically deleted every day", "it *may be* difficult to disaggregate Underage User Data… and prevent deletion." Yeh Declaration ¶ 13 (emphasis added). Many things could be possible, including that TikTok, which I understand was required to delete Underage User Data for the reasons set out in Plaintiffs' Opposition, knows and has perhaps even documented exactly what steps and processes would be required to effectuate such deletions and therefore has a precise roadmap for the actions required here by the Court's April 28, 2025 directive.

24. The Yeah declaration states she understands "that the Court ordered [sic] could result in accessing and processing of that data" and that "the *only* way to limit the processing of Underage User Data would be to create a new process to extract that data and preserve it in a segregated and forensically sound manner." Yeh Declaration ¶ 25.

---

[2] "Scan" is a database term of art which means going through an entire database table row by row and testing if each row matches identifying conditions. User ID's would be indexed, meaning that one can retrieve the records associated with a User ID directly without having to go row by row through an entire table.

25. This is not evidence that it is infeasible to preserve the data at all. The only processing required by the terms of the Court's April 28 directive (ECF 11) is preserving, i.e., *not* deleting, the data, which could be accomplished simply by not running any Underage User Data specific deletion programs (which may be possible just by commenting out the lines that run those programs in batch schedule configuration files i.e., without having to modify any program code), and, perhaps adding an additional condition to filter out records associated with underage users to the database SQL select statements which would be used to identify records to be deleted under "rolling deletion policies."

26. As to requiring preservation in "a segregated and forensically sound manner", the Yeh Declaration does not say that the user data would be 'modified' after TikTok has banned the user in question. TikTok simply offers no evidence that once preserved, the data would not stay preserved.

27. Data can be preserved before it has been collected for discovery. TikTok could preserve this data long before TikTok has developed what it believes to be a forensically foolproof way to collect the data for review and production.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: May 1, 2025

_____
Douglas Forrest

Senior Vice President, eDiscovery
Analytics & Strategy
International Litigation Services, Inc.
dforrest@ilsteam.com