# EXHIBIT E

Filed
File Date: 12/16/2024 9:54 PM
Merrimack Superior Court
E-Filed Document

# STATE OF NEW HAMPSHIRE

**MERRIMACK, SS.**                                                      **SUPERIOR COURT**

**State of New Hampshire**

Plaintiff,

v.

**TikTok Inc.**

Defendant.

Case No. 217-2024-CV-00399

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TIKTOK INC.'S MOTION TO DISMISS THE STATE'S FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

STANDARD OF REVIEW ................................................................................. 6

ARGUMENT ...................................................................................................... 6

I.    The Court should dismiss all of the State's claims (Counts 1-9) for lack of personal jurisdiction. ............................................................................. 6

    A.    TTI has not purposefully directed activity toward New Hampshire. .......... 7

    B.    The State's claims do not arise out of or relate to TTI's alleged contacts with New Hampshire. ............................................................... 10

II.    The Court should dismiss the State's platform safety and TikTok LIVE "monetization" claims (Counts 1-3 and 7-9) because they impermissibly seek to hold TTI liable for expressive conduct protected by federal and New Hampshire law. ................................................................................................. 11

    A.    Section 230 of the Communications Decency Act bars the State's platform safety and TikTok LIVE "monetization" claims. ...................... 12

        1.    The claims arise from user-generated content on the platform. ...................................................................................... 14

        2.    The claims treat TTI as a publisher of user-generated content. ....................................................................................... 16

    B.    The First Amendment and New Hampshire's Speech Clause bar the State's platform safety and TikTok LIVE "monetization" claims. ......................................................................................................... 21

        1.    The claims impermissibly challenge the platform's exercise of editorial discretion. ............................................................... 21

        2.    The State's platform safety claims also impermissibly seek to compel the platform to warn users about the platform's alleged "risks." ................................................................................ 25

III.    The Court should dismiss the State's CPA claims for additional, claim-specific reasons. ................................................................................................ 27

    A.    The Court should dismiss all of the State's CPA claims (Counts 1-6) because the State does not allege a business or commercial transaction as required under the CPA. ...................................................... 27

    B.    The Court should dismiss the State's unfairness CPA claims concerning platform safety and TikTok LIVE "monetization" (Counts 1 and 2) because the State does not allege an "unfair" act or practice related to those claims. .......................................................... 31

C.    The Court should dismiss the State's deception CPA claims
concerning the platform's safety and "geographic origin" (Counts
3 and 8) because the State does not allege a deceptive act or
practice related to those claims. .............................................................. 36

1.    The State fails to plead alleged misrepresentations and
omissions with particularity. ........................................................ 37

2.    The State fails to challenge actionable misrepresentations. .......... 39

3.    The State's allegations of deception are undercut and
contradicted by its own allegations and materials
incorporated into the FAC. ........................................................... 41

D.    The Court should dismiss the State's child privacy CPA claims
(Counts 4 and 5) because they are preempted by federal law. ................. 44

IV.    The Court should dismiss the State's products liability claims (Counts 7-9) for
additional, claim-specific reasons. ..................................................................... 47

A.    The State lacks standing to bring products liability claims. ..................... 47

B.    The TikTok platform is not a "product." ................................................. 49

CONCLUSION ....................................................................................................................... 52

## TABLE OF AUTHORITIES

**Cases**

*Adv. Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*,
  751 F.3d 796 (7th Cir. 2014) ................................................................................ 8

*Ahern v. Apple Inc.*,
  411 F. Supp. 3d 541 (N.D. Cal. 2019) ................................................................. 39

*AMA Multimedia, LLC v. Wanat*,
  970 F.3d 1201 (9th Cir. 2020) ............................................................................. 10

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ....................................................................... 16, 17

*be2 LLC v. Ivanov*,
  642 F.3d 555 (7th Cir. 2011) ................................................................................. 8

*Beane v. Dana S. Beane & Co., P.C.*,
  160 N.H. 708 (2010) ....................................................................................... 6, 42

*Beckman v. Match.com*,
  668 F. App'x 759 (9th Cir. 2016) ........................................................................ 20

*Bland v. Roberts*,
  730 F.3d 368 (4th Cir. 2013) ......................................................................... 22, 51

*Brikman v. Twitter, Inc.*,
  2020 WL 5594637 (E.D.N.Y. Sept. 17, 2020) ................................................... 42

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ............................................................................................. 25

*Brzica v. Trustees of Dartmouth Coll.*,
  147 N.H. 443 (2002) ............................................................................................ 28

*Buckingham v. R.J. Reynolds Tobacco Co.*,
  142 N.H. 822 (1998) ............................................................................................ 49

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................................... 7

*Calder v. Jones*,
  465 U.S. 783 (1984) ...................................................................................... 7, 8, 9

*California v. Frito-Lay, Inc.*,
  474 F.2d 774 (9th Cir. 1973) ............................................................................... 48

*California v. Infineon Techs. AG*,
  531 F. Supp. 2d 1124 (N.D. Cal. 2007) .............................................................. 48

*Calise v. Meta Platforms, Inc.*,
  103 F.4th 732 (9th Cir. 2024) ............................................................................. 13

*Calise v. Meta Platforms, Inc.*,
  2022 WL 1240860 (N.D. Cal. Apr. 27, 2022) .................................................... 18

*Claridge v. RockYou, Inc.*,
    785 F. Supp. 2d 855 (N.D. Cal. 2011) ................................................................ 28

*Cohen v. Facebook, Inc.*,
    252 F. Supp. 3d 140 (E.D.N.Y. 2017) ............................................................... 17

*Couture v. Noshirvan*,
    2023 WL 8280955 (M.D. Fla. Nov. 30, 2023) ................................................. 14

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ........................................................................................... 6

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ........................................................................ 35

*Dobson v. Milton Hershey Sch.*,
    356 F. Supp. 3d 428 (M.D. Pa. 2018) ............................................................. 28

*Doe v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016) .............................................................................. 17

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) ........................................................................... 18

*Doshier v. Twitter, Inc.*,
    417 F. Supp. 3d 1171 (E.D. Ark. 2019) ........................................................... 8

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ........................................................... 13, 17, 18

*Ellis v. Candia Trailers & Snow Equip., Inc.*,
    164 N.H. 457 (2012) ........................................................................................ 28

*Errato v. Am. Express Co.*,
    2022 WL 17737285 (D. Conn. Dec. 16, 2022) ............................................... 20

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ............................................................. 13, 16, 19

*Fat Bullies Farm, LLC v. Devenport*,
    170 N.H. 17 (2017) .......................................................................................... 33

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) .......................................................... 17

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) ....................................................................... passim

*FTC v. Neovi, Inc.*,
    604 F.3d 1150 (9th Cir. 2010) ........................................................................ 35

*Gonzalez v. Google*,
    2 F.4th 871 (9th Cir. 2021) ............................................................................. 19

*Greater Houston Transp. Co. v. Uber Techs., Inc.*,
    155 F. Supp. 3d 670 (S.D. Tex. 2015) ............................................................ 40

*Greenberg v. Amazon.com, Inc.*,
  553 P.3d 626 (Wash. 2024) ................................................................ 32

*Grossman v. Rockaway Tp.*,
  2019 WL 2649153 (N.J. Super. Ct. June 10, 2019)................................. 51

*Harris Wayside Furniture Co. v. Idearc Media Corp.*,
  2007 WL 1847313 (D.N.H. June 25, 2007)............................................ 33

*Hasson v. FullStory, Inc.*,
  114 F.4th 181 (3d Cir. 2024) .................................................... 8, 10, 30

*Hennessey v. Gap, Inc.*,
  86 F.4th 823 (8th Cir. 2023) ................................................................ 37

*Herrick v. Grindr, LLC*,
  306 F. Supp. 3d 579 (S.D.N.Y. 2018) ............................................ 20, 42

*Hiam v. HomeAway Inc.*,
  267 F. Supp. 3d 338 (D. Mass. 2017), *aff'd*, 887 F.3d 542 (1st Cir. 2018)............ 41

*Home Gas Corp. v. Strafford Fuels, Inc.*,
  130 N.H. 74 (1987) ............................................................................ 30

*In re Facebook*,
  625 S.W.3d 80 (Tex. Sup. Ct. June 25, 2021) .............................. 19, 20, 50

*In re Int'l Harvester Co.*,
  1984 WL 565290 (F.T.C. 1984) .......................................................... 32

*In re Lyft Inc. Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020) .................................................. 40

*In re Social Media Adolescent Addiction/Personal Injury Products Liability Litig.*,
  702 F. Supp. 3d 809 (N.D. Cal. 2023) ............................................ passim

*In re Yahoo! Inc. Consumer Data Sec. Breach Litig.*,
  2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ................................. 28, 40

*Jackson v. Airbnb, Inc.*,
  639 F. Supp. 3d 994 (C.D. Cal. 2022) .................................................. 50

*Jacobs v. Meta Platforms, Inc.*,
  2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023) ............................... 50

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) ........................................................ 24, 50

*Jane Doe No. 1 v. Uber Techs., Inc.*,
  79 Cal. App. 5th 410 (2022) ................................................................ 50

*Johnson v. Arden*,
  614 F.3d 785 (8th Cir. 2010) ............................................................... 13

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ........................................................ 8, 9, 10

*Jones v. Google*,
   73 F.4th 636 (9th Cir. 2023) ........................................................................... 46

*Kelleher v. Marvin Lumber & Cedar Co.*,
   152 N.H. 813 (2005) ...................................................................................... 49

*Kennedy v. Vickrey*,
   2024 WL 232104 (D.N.H. Jan. 22, 2024) ............................................................. 7, 9

*Kibby v. Anthony Indus., Inc.*,
   123 N.H. 272 (1983) ........................................................................................ 6

*Kimball Union Acad. v. Genovesi*,
   165 N.H. 132 (2013) ........................................................................................ 7

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) .................................................................... 14, 19

*Kravitz v. Beech Hill Hosp., L.L.C.*,
   148 N.H. 383 (2002) ...................................................................................... 49

*L.W. through Doe v. Snap Inc.*,
   675 F. Supp. 3d 1087 (S.D. Cal. 2023) .............................................................. 17

*LabMD, Inc. v. FTC*,
   894 F.3d 1221 (11th Cir. 2018) ........................................................................ 33

*LaChance v. U.S. Smokeless Tobacco Co.*,
   156 N.H. 88 (2007) ........................................................................................ 38

*Leonard v. Abbott Lab'ys, Inc.*,
   2012 WL 764199 (E.D.N.Y. Mar. 5, 2012) .......................................................... 40

*M.P. ex rel. Pinckney v. Meta Platforms, Inc.*,
   692 F. Supp. 3d 534 (D.S.C. 2023) ................................................................... 17

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
   925 F.3d 1263 (D.C. Cir. 2019) .................................................................... 12, 13

*Media3 Techs., LLC v. CableSouth Media III, LLC*,
   17 F. Supp. 3d 107 (D. Mass. 2014) ................................................................... 8

*Messer v. Smyth*,
   59 N.H. 41 (1879) ...................................................................................... 39, 40

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974) ...................................................................................... 21

*Missouri ex rel. Koster v. Harris*,
   847 F.3d 646 (9th Cir. 2017) ........................................................................... 48

*Moody v. NetChoice, LLC*,
   144 S. Ct. 2383 (2024) ............................................................................. passim

*Mulder v. Kohl's Dep't Stores, Inc.*,
   865 F.3d 17 (1st Cir. 2017) ............................................................................. 37

*N.Y. ex rel. Abrams v. 11 Cornwell Co.*,
  695 F.2d 34 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d (2d Cir. 1983)......... 47

*Nat'l Ass'n of Manufacturers v. S.E.C.*,
  800 F.3d 518 (D.C. Cir. 2015) ............................................................................................. 26

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ............................................................................................... 13

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) ............................................................................................ 25

*New Hampshire Bank Comm'r for Noble Tr. Co. v. Sweeney*,
  167 N.H. 27 (2014) .................................................................................................................. 7

*New Mexico ex rel. Balderas v. Tiny Lab Prods.*,
  457 F. Supp. 3d 1103 (D.N.M. 2020) ................................................................................... 46

*O'Handley v. Padilla*,
  579 F. Supp. 3d 1163 (N.D. Cal. 2022) *aff'd*, 62 F.4th 1145 (9th Cir. 2023) ......................... 24

*Orkin Exterminating Co., Inc. v. FTC*,
  849 F.2d 1354 (11th Cir. 1988) ........................................................................................... 35

*Phillips v. Double Down Interactive LLC*,
  173 F. Supp. 3d 731 (N.D. Ill. 2016) ................................................................................... 35

*Private Jet Servs. Grp., Inc. v. Sky King, Inc.*,
  2006 WL 2864057 (D.N.H. Oct. 4, 2006) ....................................................................... 39, 40

*Quinteros v. InnoGames*,
  2022 WL 898560 (W.D. Wash. Mar. 28, 2022) ................................................................... 50

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ............................................................................................................. 23

*Renfro v. Champion Petfoods USA, Inc.*,
  25 F.4th 1293 (10th Cir. 2022) ............................................................................................ 41

*Richard v. Speaker of House of Representatives*,
  175 N.H. 262 (2022) ............................................................................................................ 21

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
  487 U.S. 781 (1988) ............................................................................................................. 32

*Ristic v. Mach. Zone, Inc.*,
  2016 WL 4987943 (N.D. Ill. Sept. 19, 2016) ...................................................................... 35

*Rodgers v. Christie*,
  795 F. App'x 878 (3d Cir. 2020) .......................................................................................... 51

*Rosenthal v. Bloomingdales.com, LLC*,
  101 F.4th 90 (1st Cir. 2024) ................................................................................................. 10

*Royer v. Catholic Med. Ctr.*,
  144 N.H. 330 (1999) ............................................................................................................ 49

*Seward v. Richards,*
   174 N.H. 401 (2021) ............................................................................... 7

*Sig Sauer, Inc. v. Jeffrey S. Bagnell, Esq., LLC,*
   615 F. Supp. 3d 39 (D.N.H. 2022) ......................................................... 7

*Skillsoft Corp. v. Harcourt Gen., Inc.,*
   146 N.H. 305 (2001) ....................................................................... 10, 11

*Snierson v. Scruton,*
   145 N.H. 73 (2000) ........................................................................ 38, 39

*Snow v. Am. Morgan Horse Ass'n, Inc.,*
   141 N.H. 467 (1996) ............................................................................. 28

*Snyder v. Phelps,*
   562 U.S. 443 (2011) ............................................................................. 24

*Social Media Cases,*
   2023 WL 6847378 (Cal. Super. Ct. Oct. 13, 2023) ........................ 48, 50

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ............................................................................. 23

*State ex rel. Petro v. Pristine Secure Servs.,*
   2005 WL 3867419 (Ohio Com. Pl. July 5, 2005) ............................... 43

*State of New Hampshire v. Meta Platforms Inc.,*
   Case No. 217-2023-CV-00594 (Merrimack Cnty. Sup. Ct. Dec. 11, 2024) ............................. 9

*State v. City of Dover,*
   153 N.H. 181 (2006) ............................................................................. 47

*State v. Exxon Mobil Corp.,*
   168 N.H. 211 (2015) ............................................................................. 49

*State v. Hess Corp.,*
   161 N.H. 426 (2011) ............................................................................. 49

*State v. Moran,*
   151 N.H. 450 (2004) ..................................................................... passim

*State v. Priceline.com, Inc.,*
   172 N.H. 28 (2019) ............................................................................... 31

*State v. Proctor,*
   171 N.H. 800 (2019) ............................................................................. 30

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.,*
   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ................................ 19

*Tessier v. Rockefeller,*
   162 N.H. 324 (2011) ................................................................... 6, 37, 39

*Trull v. Volkswagen of Am. Inc.,*
   145 N.H. 259 (2000) ............................................................................. 49

*Walden v. Fiore*,
  571 U.S. 277, 290 (2014)...................................................................8, 9

*Watters v. TSR, Inc.*,
  904 F.2d 378 (6th Cir. 1990) ..................................................... 51

*Winter v. Facebook, Inc.*,
  2021 WL 5446733 (E.D. Mo. Nov. 22, 2021)...................... 13, 14

*Winter v. G.P. Putnam's Sons*,
  938 F.2d 1033 (9th Cir. 1991) ............................................ 50, 51

*Working Stiff Partners, LLC v. City of Portsmouth*,
  172 N.H. 611 (2019) .......................................................... 29

*Wozniak v. YouTube, LLC*,
  100 Cal. App. 5th 893 (2024) .................................................. 20

*XMission, L.C. v. Fluent LLC*,
  955 F.3d 833 (10th Cir. 2020) .............................................8, 9

*Zeran v. Am. Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ......................................... 13, 16, 42

*Ziencik v. Snap, Inc.*,
  2024 U.S. Dist. LEXIS 12105 (C.D. Cal. Jan. 19, 2024) ............. 28

**Statutes**

15 U.S.C. § 45(n) ................................................................. 35

15 U.S.C. § 6501 ................................................................... 5

15 U.S.C. § 6502(c) ............................................................... 45

15 U.S.C. § 6502(d) ............................................................... 45

15 U.S.C. § 6504(a) ............................................................... 45

15 U.S.C. § 6504(a)(1) ....................................................... 45, 47

15 U.S.C. § 6504(a)(2) ........................................................... 45

15 U.S.C. § 6504(d) ......................................................... 45, 46

15 U.S.C. § 6504(e) ............................................................... 45

15 U.S.C. § 6505(d) ............................................................... 45

47 U.S.C. § 230(c) ............................................................... 13

47 U.S.C. § 230(e)(3) ........................................................... 13

47 U.S.C. § 230(f)(3) ........................................................... 14

Cal. Civ. Code § 1798.99.28 ...................................................... 26

RSA § 21-M:5 ..................................................................... 49

RSA § 358-A:1 ............................................................... 28, 29

RSA § 358-A:2 ............................................................................................................... 28

**Regulations**

16 C.F.R. § 312.2 ............................................................................................................ 5

**Other Authorities**

*Distribution*, Merriam-Webster Dictionary (last accessed Dec. 16, 2024), https://www.merriam-webster.com/dictionary/distribution ......................................................................... 30

Restatement (Third) of Torts: Prod. Liab. § 19 (1998) ................................................. 50

*Sale*, Merriam-Webster Dictionary (last accessed Dec. 16, 2024), https://www.merriam-webster.com/dictionary/sale ............................................................................... 29, 31

*Selling*, Merriam-Webster Dictionary (last accessed Dec. 16, 2024), https://www.merriam-webster.com/dictionary/selling ............................................................................... 29

TikTok, *Community Guidelines: Enforcement* (last accessed Dec. 16, 2024), https://www.tiktok.com/community-guidelines/en/enforcement ............................................. 42

TikTok, *TikTok introduces Family Pairing*, TikTok (last accessed Dec. 16, 2024), https://newsroom.tiktok.com/en-us/tiktok-introduces-family-pairing ..................................... 43

## INTRODUCTION[1]

The State has sued TikTok Inc. ("TTI"), alleging that various features of the TikTok online entertainment platform are "unfair," "deceptive," and violate New Hampshire's consumer protection and products liability law. The State's central theory is that certain "design features" that TTI uses to select, organize, and present third-party user-generated speech on the platform are harmful to younger users because those features make viewing speech "addictive"—the features entice those users into spending too much time on the platform, viewing too much content. In other words, the State contends that the TikTok platform violates consumer protection and products liability law because the content on the platform is too "engaging" for younger users. Besides this "addiction" theory, the State raises other theories of liability. The State complains that TTI does not do enough to warn users about the platform's alleged risks. The State also objects to an alleged "monetization" feature on TikTok LIVE—a feature that, by the State's account, operates similarly to "like" functions in that it allows users to express themselves about content on the platform. Further, the State claims that the platform collects certain data from users under the age of 13 in violation of federal privacy law. Lastly, the State claims that TTI misrepresents that it is a U.S. company, and it is secretly "controlled by" a China-based parent called "ByteDance."

All of the State's claims fail as a matter of law, and the State's case should be dismissed with prejudice.

As a threshold matter, this Court has no power to adjudicate the State's claims because it lacks personal jurisdiction over TTI. TTI is not at home in New Hampshire, and it has not aimed

---

[1] Unless otherwise stated, all emphasis has been added to, and all citations and internal quotation marks have been omitted from, the quoted material. All citations to exhibits are to the exhibits attached to the accompanying Motion for Judicial Notice.

any suit-related conduct at New Hampshire. The State does not allege that TTI engaged in any of the challenged conduct in or from New Hampshire—e.g., by developing any of the allegedly "addictive" design features in New Hampshire. Nor does the State allege that TTI aimed any of its challenged conduct at New Hampshire—e.g., that TTI used those design features to specifically target residents of New Hampshire. The State's assertion of personal jurisdiction is based entirely on the fact that the platform was available in New Hampshire and that New Hampshire users were allegedly harmed by the platform. But as courts have widely held, personal jurisdiction is not triggered merely because a globally accessible online platform is made available to residents of the forum state.

The State's claims suffer from additional defects. To start, the claims are barred by federal statute, the First Amendment, and New Hampshire's Speech Clause. Section 230 of the federal Communications Decency Act immunizes online platforms from liability for their activities as "publishers" of third-party content. But that is what the State targets: the "features" that form the basis of the State's claims are simply the means by which user-generated content is selected, organized, and presented—in a word, published—on the platform. Not only are those publishing activities immunized by Section 230, but the U.S. Supreme Court recently confirmed in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), that they are also inherently expressive activities, no less entitled to First Amendment protection than are comparable editorial decisions by traditional media entities about how to present third-party speech content to readers and viewers. The State's deception and failure-to-warn claims are further barred by the First Amendment because they effectively seek to make the platform engage in compelled speech by warning users about the alleged risks and harms of user-generated content on the platform.

Apart from these statutory and constitutional barriers, the State's Consumer Protection

Act ("CPA") and products liability claims fail for additional, claim-specific reasons.

Because the TikTok platform is free to download and use, the State cannot satisfy the
CPA's requirement that the alleged "unfair" and "deceptive" acts and practices occur in
connection with a business or commercial transaction. Moreover, the platform and design
features that the State challenges are not "unfair" within the meaning of the CPA because they
are reasonably avoidable by consumers. More fundamentally, the State's attempt to use
consumer protection laws to impose liability against an online entertainment platform for
supposedly being "too engaging" has no support in New Hampshire law. Likewise, the State's
deceptive practices claims do not allege actionable misrepresentations or omissions with the
particularity required by New Hampshire law. Instead, those claims are based on nonactionable
opinion and aspirational statements about the platform's general priorities and goals, none of
which is objectively verifiable as true or false. Even at this preliminary stage, the State's own
allegations and the materials incorporated by reference into the pleadings contradict and undercut
the State's assertions that TTI has misrepresented the platform's safety or the location of its
business operations. Further, the State's attempt to impose state law tort liability against the
platform for allegedly collecting children's data in violation of federal privacy law is preempted
by that very federal law.

The State's attempt to bring its products liability claims *parens patriae* also fails. The
platform is not a "product," and any private individuals allegedly harmed by the platform are free
to pursue whatever claims they may have.

## STATEMENT OF FACTS

The TikTok platform is an online entertainment platform that allows users to create,
share, and comment on videos. First Amend. Compl. ("FAC") ¶¶ 41, 53. Defendant TTI is the
U.S. corporate entity that publishes the TikTok platform in the United States. *Id.* ¶ 4. According

to the State, the platform's "flagship feature" is a recommendation system "powered by TikTok's algorithms" that runs the "'For You' feed." *Id.* ¶ 79. The State also alleges that the platform provides tools, such as "filters," that allow users to edit their videos, and permits users to follow and interact with their favorite creators. *Id.* ¶¶ 99, 193.

TTI has invested significant resources into providing a positive environment for its users. *Id.* ¶¶ 114-15, 120, 123, 128. For example, as of April 17, 2024, the TikTok platform had a webpage devoted to "Youth Safety and Well-Being" that makes clear that the platform is "deeply committed to TikTok being a safe and positive experience for people under the age of 18." *Id.* ¶ 133 & n.78. The platform's "Community Guidelines" prohibit users from posting certain types of content, including sensitive and unlawful content, and the platform moderates and removes user-generated content that violates the Community Guidelines. *Id.* ¶¶ 121-23, 133-36. The platform also offers functions like "Family Pairing," which allow parents to "set controls," "manag[e] screentime," "restrict[] mature content on the App," and "restrict[] who can send messages" to their child's account. *Id.* ¶ 123. And the platform offers screen-time management features that, among other things, prompt users to "Take a Break" and "enjoy offline activities." *Id.* ¶ 115.

In this lawsuit, the State alleges that the platform causes younger users to suffer from psychological and financial harms. *Id.* ¶¶ 78-126, 261, 264. The State asserts two main theories of liability. First, the State asserts an *unfairness* theory: that certain features or aspects of the platform constitute "unfair" business acts or practices. The State challenges three issues in particular:

- **Platform safety.** The State alleges that the platform has "addictive" and "manipulative" "design features" that "maximize engagement," that these features induce younger users into spending too much time engaging with content on the platform, and that their use becomes "compulsive" and "excessive." *Id.* ¶¶ 1, 64, 361-89, 501.

4

- **TikTok LIVE alleged "monetization."** The State alleges that the platform has a livestreaming feature called "TikTok LIVE" that involves an alleged "monetization" and "virtual currency" system. The State alleges that, under TikTok LIVE's "monetization" system, younger users spend money on the platform to buy "Coins," which they then use to activate "Gifts" for other users who are livestreaming on TikTok LIVE as a show of "appreciation and encouragement." *Id.* ¶ 18. The State claims that this alleged "monetization" feature both "coerce[s]" younger users into spending too much money on the platform, and exposes those users to third parties who allegedly use the "monetization" feature to commit financial crimes like fraud and money laundering. *Id.* ¶¶ 390-410.

- **Child privacy.** The State alleges that the platform collects personal information from children under the age of 13 without their parents' consent in violation of the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501, *et seq.*, and implementing federal regulations, 16 C.F.R. § 312.2, *et seq.* ("COPPA Rule"). *Id.* ¶¶ 429-54.

Second, the State asserts a *deception* theory: that TTI engaged in deceptive business acts and practices by inaccurately or inadequately describing to users certain features or aspects of the platform. The State alleges that TTI inaccurately or inadequately described three issues:

- **Platform safety.** The platform's safety features, policies, and the supposed risks involved in using—and engaging with content on—the platform. *Id.* ¶¶ 411-28.

- **Child privacy.** The platform's compliance with COPPA. *Id.* ¶¶ 455-74.

- **Geographic origin.** The platform's "geographic origin." Specifically, the State alleges that TTI misrepresents that it is a U.S. company, when it is actually "controlled by" a "China-based parent" called ByteDance, Ltd. *Id.* ¶¶ 475-91.

On the basis of these allegations, the State asserts nine claims: three claims for unfair acts or practices in violation of the CPA (Counts 1, 2, and 4 at *id.* ¶¶ 361-410, 429-54), three claims for deceptive acts or practices in violation of the CPA (Counts 3, 5, and 6 at *id.* ¶¶ 411-28, 455-91), and three claims for strict and negligent products liability (Counts 7, 8, and 9 at *id.* ¶¶ 492-535). Counts 1, 3, 7, 8, and 9 assert unfairness, deception, and products liability claims based on alleged platform safety issues (*id.* ¶¶ 361-89, 411-28, 492-535); Counts 2 and 3 assert unfairness and deception claims based on alleged TikTok Live "monetization" issues (*id.* ¶¶ 390-428);

Counts 4 and 5 assert unfairness and deception claims based on alleged child privacy issues (*id.* ¶¶ 429-74); and Count 6 asserts a deception claim based on alleged geographic origin issues (*id.* ¶¶ 475-91). The State seeks injunctive relief, restitution, civil penalties of $10,000 per violation of the CPA, compensatory damages, enhanced compensatory damages, and litigation costs and expenses. *Id.* at 146.

## STANDARD OF REVIEW

The Court must dismiss a complaint for lack of personal jurisdiction if the plaintiff fails to allege facts establishing that the Court has jurisdiction over the defendant. *Kibby v. Anthony Indus., Inc.*, 123 N.H. 272, 274 (1983). The Court must dismiss a complaint for failure to state a claim if the plaintiff fails to allege facts that entitle it to relief. *Beane v. Dana S. Beane & Co., P.C.*, 160 N.H. 708, 711 (2010). Moreover, when a plaintiff's claims sound in fraud, the plaintiff must satisfy New Hampshire's heightened pleading requirements for fraud. *See Tessier v. Rockefeller*, 162 N.H. 324, 332 (2011). This requires plaintiffs to "specify the *essential details* of the fraud, and *specifically allege* the facts of the defendant's fraudulent actions." *Id.*

## ARGUMENT

**I.    The Court should dismiss all of the State's claims (Counts 1-9) for lack of personal jurisdiction.**

The State asserts a theory of "specific" personal jurisdiction over TTI. *See* FAC ¶ 33 (asserting that the Court has jurisdiction over TTI because it "transacts business within the State and committed a tortious act within the State").[2] Under New Hampshire's long-arm statute, New Hampshire courts may exercise specific jurisdiction over a nonresident defendant like TTI only to the extent that is allowed by the federal Due Process Clause. *Kimball Union Acad. v.*

---

[2] The State does not allege that TTI is subject to "general" personal jurisdiction in New Hampshire. *See* FAC ¶¶ 34-51. Nor could the State: TTI is incorporated and has its principal place of business in California, *id.* ¶ 24, and is subject to general personal jurisdiction only there, *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

*Genovesi*, 165 N.H. 132, 136, 138 (2013). The federal Due Process Clause permits jurisdiction only when the defendant has "minimum contacts with the forum," such that jurisdiction does not "offend traditional notions of fair play and substantial justice." *Id.* To establish personal jurisdiction, the plaintiff bears the burden to prove that the defendant purposefully directed activity toward New Hampshire, and that the plaintiff's claims arise out of the activity that is purposefully directed to New Hampshire, such that exercising jurisdiction is fair and reasonable. *New Hampshire Bank Comm'r for Noble Tr. Co. v. Sweeney*, 167 N.H. 27, 32 (2014).

The State cannot make that showing here. The State alleges no suit-related conduct that TTI purposefully directed to New Hampshire, and instead relies entirely on the contention that New Hampshire residents were harmed by using a globally accessible online platform. But well-established authority holds that merely providing a generally available online platform that is accessible to a state's residents does not subject a defendant to personal jurisdiction in that state.

### A.    TTI has not purposefully directed activity toward New Hampshire.

A court may exercise specific jurisdiction over a nonresident defendant only if the defendant "purposefully directed" conduct to "forum residents." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, 477 (1985); *see Sweeney*, 167 N.H. at 34-35. To determine whether conduct was "purposefully directed" toward a forum, courts apply the "effects test" adopted in *Calder v. Jones*, 465 U.S. 783 (1984). *See Seward v. Richards*, 174 N.H. 401, 410 (2021); *Sig Sauer, Inc. v. Jeffrey S. Bagnell, Esq., LLC*, 615 F. Supp. 3d 39, 44 (D.N.H. 2022). Under the effects test, jurisdiction in New Hampshire is appropriate only where the defendant "intentionally directed" tortious conduct at New Hampshire, knew that the conduct "was likely to have a significant impact," and "understood the brunt of that impact would be felt in New Hampshire." *Kennedy v. Vickrey*, 2024 WL 232104, at *4 (D.N.H. Jan. 22, 2024), *appeal docketed*, 24-1187, Feb. 27, 2024. "[M]ere injury to a forum resident is not a sufficient

connection to the forum." *Walden v. Fiore*, 571 U.S. 277, 290 (2014). Rather, the forum state

must have been the "focal point" of the defendant's alleged conduct. *Calder*, 465 U.S. at 788-89.

Applying these principles, numerous courts have held that making an interactive website

generally accessible to users worldwide—including to users in the forum state—does not amount

to the kind of "conduct targeted at the state" that is necessary to establish the "purposeful

direction" element. *See be2 LLC v. Ivanov*, 642 F.3d 555, 556, 558-59 (7th Cir. 2011) (no

targeting of forum state when defendant merely operated "interactive" website); *Johnson v.*

*TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021) (forum residents "clicking ads

and buying things" on website insufficient to establish jurisdiction); *Hasson v. FullStory, Inc.*,

114 F.4th 181, 188-92 (3d Cir. 2024) (filtering restaurants using website's search filter and

operating restaurants in forum state insufficient to establish jurisdiction); *XMission, L.C. v.*

*Fluent LLC*, 955 F.3d 833, 844-45 (10th Cir. 2020) (ability to post on a website insufficient to

establish jurisdiction); *Adv. Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*, 751

F.3d 796, 803 (7th Cir. 2014) (receipt of company emails and access to website insufficient to

establish jurisdiction); *Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1178 (E.D. Ark. 2019)

(engagement with online advertisements insufficient to establish jurisdiction); *Media3 Techs.,*

*LLC v. CableSouth Media III, LLC*, 17 F. Supp. 3d 107, 112 (D. Mass. 2014) (generic

advertising and website interactivity insufficient to establish jurisdiction).

The rationale for these decisions is straightforward. As a practical matter, a website

operator cannot be said to have "purposefully directed" conduct toward a forum state if it

"simply wants as many responses as possible *but* is indifferent to the physical location of the

responder." *XMission*, 955 F.3d at 847; *see Doshier*, 417 F. Supp. 3d at 1178 (no jurisdiction

over Twitter because online platform "is accessible nationwide" and does not "specific[ally]

target[]" forum state). And, as a policy matter, if "accessibility" to a website "alone" established jurisdiction, then "jurisdiction would have no limit." *Johnson*, 21 F.4th at 320. Every state where an online platform "is accessed" could assert jurisdiction over the platform, and "the defense of personal jurisdiction . . . would no longer exist." *XMission*, 955 F.3d at 844-45.

These principles bar jurisdiction over TTI here, as New Hampshire is not the "brunt" or "focal point" of any of the alleged conduct at issue. *Kennedy*, 2024 WL 232104, at *4; *Calder*, 465 U.S. at 788-89. Indeed, *none* of the alleged conduct that the State challenges even occurred in New Hampshire. The State's theories are that the platform is "unfair" because it contains features that promote harmful engagement with the platform, and TTI deceived users by inaccurately and inadequately disclosing those risks. FAC ¶¶ 8, 10-11, 39, 45, 56, 366, 369-70, 373, 374-75, 377-79, 381-82, 401-02, 530, 532. But the State does not allege that TTI developed any of the purported features in New Hampshire or uses them to specifically target New Hampshire residents. The State also does not allege that TTI made any of the challenged representations or omissions from New Hampshire. Nor does the State allege that any of the challenged representations or omissions were aimed at New Hampshire residents specifically. The only connection that TTI's alleged conduct has to New Hampshire is that it allegedly "harm[s] . . . New Hampshire's children and their parents." FAC ¶ 22. But mere harm to a state's residents does not establish that TTI "purposefully directed" conduct toward that state. *Walden*, 571 U.S. at 290.

In this Court's recent decision in the State's case against Meta involving the Instagram and Facebook platforms,[3] the Court concluded that the State satisfied the "purposeful direction"

---

[3] *State of New Hampshire v. Meta Platforms Inc.*, Case No. 217-2023-CV-00594 (Merrimack Cnty. Sup. Ct. Dec. 11, 2024) ("*Meta* Order").

element as to Meta. *Meta* Order 19. The Court relied on the State's allegations that Instagram and Facebook collect data from New Hampshire users and then profit from that data by selling ads to third parties. *Id.* TTI respectfully disagrees with that ruling. Courts consistently hold that, in the online context, an alleged practice of collecting user data in a state and then selling ads to third parties does not show purposeful direction toward a forum. *See Hasson*, 114 F.4th at 190-91; *TheHuffingtonPost.com*, 21 F.4th at 320-21; *see also Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 97-98 & n.1 (1st Cir. 2024); *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1211 (9th Cir. 2020). TTI submits that the Court should follow this authority and conclude that the State has failed to establish personal jurisdiction against TTI.

**B.    The State's claims do not arise out of or relate to TTI's alleged contacts with New Hampshire.**

The State's attempt to establish jurisdiction over TTI also fails the second element required for specific jurisdiction: the State's claims do not arise out of or relate to TTI's alleged forum-specific contacts with New Hampshire.

This element requires courts to engage in a close scrutiny of the connection between the defendant's alleged conduct and the forum state. Claims do not "arise out of" or "relate to" forum-specific contacts "merely because a plaintiff's cause of action arose out of the general relationship between the parties." *Skillsoft Corp. v. Harcourt Gen., Inc.*, 146 N.H. 305, 308 (2001). Rather, "the action must *directly* arise out of the *specific* contacts between the defendant and the forum state." *Id.*

Here, the State's claims arise out of alleged *national* contacts, not New Hampshire-specific contacts. This is true for *all* of the State's claims. For example, the State's challenge to the "fairness" and defective "design" of platform features—such as the platform's allegedly "addictive" design elements and TikTok LIVE's alleged "monetization"—arises out of

nationally available features. FAC ¶¶ 8, 10-11, 39, 45, 56, 241-42, 366, 369-70, 373, 374-75, 377-79, 381-82, 530, 532. The State's deception and failure-to-warn claims arise out of statements on a globally accessible website, to the U.S. Congress, and to participants in a conference in Canada—not to New Hampshire residents. *Id.* ¶¶ 133-38. The same is true with TTI's child privacy claims, which arise out of the platform's alleged nationwide data-collection practices—not New Hampshire-specific conduct. *Id.* ¶¶ 325, 341, 344, 346, 436.

As with the "purposeful direction" element, the Court in the *Meta* decision concluded that the State satisfied the "relatedness" element as to Meta. *Meta* Order 15-16. The Court again relied on the State's allegations about Meta's national advertising practices, concluding that those practices were sufficiently connected to the State's claims because Meta used the allegedly "addictive" design features to increase ad revenue. *Id.* at 16. TTI respectfully disagrees with that ruling as well. As just discussed, well-established caselaw recognizes that merely having a nationally accessible online platform does not establish the kind of connection to the forum state that is necessary to establish personal jurisdiction. *See Skillsoft*, 146 N.H. at 308 (the plaintiff's claims "must *directly* arise out of the *specific* contacts between the defendant and the forum state"). Moreover, TTI's alleged nationwide advertising practices have no connection to the State's claims here. *See, e.g.*, *TheHuffingtonPost.com*, 21 F.4th at 321 (online platform's "ads" and ad revenue were "beside the point" for jurisdictional purposes when plaintiff's claim was "unrelated" to ads). The State's claims concern nationally available design features, nationally directed statements, and nationwide data-collection practices—not ads that users encounter when using the platform.

## II.   The Court should dismiss the State's platform safety and TikTok LIVE "monetization" claims (Counts 1-3 and 7-9) because they impermissibly seek to hold TTI liable for expressive conduct protected by federal and New Hampshire law.

The State's CPA and products liability claims in Counts 1-3 and 7-9 assert that the

platform's "design" and TikTok LIVE alleged "monetization" features are "unfair" and
defective, that the platform misrepresented and failed to warn users of the risks of those features,
and that younger users suffer mental and financial harms as a result. FAC ¶¶ 361-428, 492-535.

These claims are barred by Section 230 of the Communications Decency Act and the
Speech Clauses of the United States and New Hampshire Constitutions because they seek to
impose liability on TTI based on publishing conduct protected by federal and New Hampshire
law. Under Section 230, TTI cannot be held liable for any harms that users supposedly suffer by
engaging with third-party user-generated content on the platform based on TTI's conduct as the
alleged "publisher" of that content. Likewise, the U.S. and New Hampshire Constitutions bar the
State's attempt to hold TTI liable for the exercise of editorial discretion when selecting,
organizing, and displaying—i.e., publishing—user-generated content. The U.S. and New
Hampshire Constitutions further bar the State's deception and failure-to-warn claims because
those claims effectively seek to make TTI engage in compelled speech by warning users about
the alleged risks and harms of engaging with user-generated content on the platform.

### A. Section 230 of the Communications Decency Act bars the State's platform safety and TikTok LIVE "monetization" claims.

Congress enacted Section 230 to ensure that online platforms could publish third-party
content without the fear of facing tort liability for actions taken in the exercise of their editorial
discretion. To that end, Section 230 provides that "[n]o provider or user of an interactive
computer service shall be treated as the publisher or speaker of any information provided by
another information content provider." 47 U.S.C. § 230(c); *see id.* § 230(e)(3) (preempting
inconsistent state and local laws). The effect of this provision is to confer onto online platforms
immunity for "third-party content that they publish" on those platforms. *Marshall's Locksmith
Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019); *see Johnson v. Arden*, 614 F.3d

785, 791 (8th Cir. 2010) ("these provisions bar plaintiffs from holding ISPs legally responsible for information that third parties created and developed"); *Winter v. Facebook, Inc.*, 2021 WL 5446733, at *3 (E.D. Mo. Nov. 22, 2021) (collecting cases from the First, Third, Fourth, Eighth, Ninth, Tenth, and Eleventh Circuits). That immunity is broad and extends "against causes of action of all kinds," *Marshall's*, 925 F.3d at 1267, ranging from claims arising from a provider's "exercise of its editorial and self-regulatory functions," *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997), to claims arising from providing users with "a forum with[in] which to communicate" and "failure to delete content," *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019).

To avoid chilling the expressive activity that online platforms facilitate, courts "agree" that Section 230 "should be construed broadly in favor of immunity," *Force*, 934 F.3d at 64, and that "close cases . . . must be resolved in favor of immunity," *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc). Moreover, enforcing that immunity at the earliest juncture is essential to achieving that goal— because Section 230 not only protects websites "from ultimate liability," but also "from having to fight costly and protracted legal battles," *id.* at 1174-75, Section 230 immunity is "effectively lost if a case is erroneously permitted to go to trial," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009). Courts thus frequently apply Section 230 immunity at the pleading stage. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024) (affirming dismissal because Section 230 immunity is a "threshold issue"); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1101 (9th Cir. 2019) (similar).

For purposes of Section 230 immunity, TTI indisputably qualifies as a "provider" of "an interactive computer service": namely, the TikTok platform. *See Dyroff*, 934 F.3d at 1097;

*Couture v. Noshirvan*, 2023 WL 8280955, at *2 (M.D. Fla. Nov. 30, 2023); *Winter v. Facebook, Inc.*, 2021 WL 5446733, at *4 (E.D. Mo. Nov. 22, 2021). Section 230 therefore "mandates dismissal" of the State's claims so long as two other elements are met: (1) the claims seek to hold TTI liable for "information provided by another information content provider," and (2) TTI allegedly acted "as the publisher or speaker of that information." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *see Force*, 934 F.3d at 65. Counts 1-3 and 7-9 satisfy both elements.

### 1.    The claims arise from user-generated content on the platform.

Counts 1-3 and 7-9 satisfy the first element for Section 230 immunity because all of those claims—i.e., unfair and deceptive acts and practices, design defect, and failure-to-warn—are based on allegedly harmful content provided by third-party "information content providers": namely, the third-party users who "create" and "develop" the content that they post on the platform. 47 U.S.C. § 230(f)(3). This is true for both categories of harm underlying those claims—i.e., the psychological harms that users allegedly suffer because of their sustained engagement with the platform's user-generated content, *e.g.*, FAC ¶¶ 107-09, 144, 202, and the financial harms that users supposedly suffer from TikTok LIVE's alleged "monetization" feature, *id.* ¶ 264.

Take, for example, the alleged psychological harms suffered by younger users because of their engagement with "addictive" content. The State admits that the alleged content at issue is generated by other users—not TTI. *Id.* ¶ 36. The State also admits that it is the engagement with *that* user-generated content that allegedly causes the harms at issue here—not content created by TTI. For example, the FAC alleges that engagement with this content causes "emotional and psychological harm to its users" by "increasing their risk for eating disorders, depression, anxiety, low self-esteem, and negative body image," *id.* ¶¶ 107-09, and because it depicts

"graphic, violent, and distressing content" like "disordered eating, self-harm, and videos celebrating or encouraging suicide," *id.* ¶ 202.

The same is true for alleged financial harms. The State claims that TikTok LIVE's alleged "monetization" feature "coerc[es]" younger users into spending money on the platform to buy "Coins," and also exposes those users to financial crimes like fraud and money laundering that are supposedly committed by others on the platform. *Id.* ¶¶ 261, 264. But as the State admits, those alleged financial harms are attributable to the *content* on TikTok LIVE. This includes the user-generated content on TikTok LIVE that allegedly motivates users to activate "Gifts"—which, as the State admits, are simply ways that users communicate about other users' content. *See id.* ¶¶ 18 ("During a livestream, followers can show their appreciation and encouragement . . . by sending virtual 'Gifts'"), 241-42 (describing "Gifts" as "social recognition reward signals").

In the *Meta* decision, the Court agreed with the legal principle that Section 230 protects against "any claims where the alleged harm arises from the substance of third-party content posted" on an online platform. *Meta* Order 25-26. Even so, the Court concluded that Section 230 did not apply to Meta because the State's allegations in that particular case did not turn on the content on the Instagram and Facebook platforms, but instead turned on those particular platforms' design features. As the Court put it, "Meta's product design features, *in and of themselves*, are harmful . . . *regardless of the substance of the third-party content displayed*." *Meta* Order 25-26.

The Court's ruling as to Meta, Facebook, and Instagram does not apply to the State's particular allegations about the TikTok platform here. Unlike in *Meta*, the State does not allege that the design features on the TikTok platform are "in and of themselves" harmful "regardless

of the substance of the third-party content displayed." *Meta* Order 25-26. Rather, the State expressly alleges harm based on the substance of the *content* on the TikTok platform, not the platform features in the abstract. Indeed, paragraph after paragraph of the FAC alleges that users are harmed by allegedly objectionable content on the platform. *See, e.g.*, FAC ¶¶ 18, 107-09, 202, 261, 264.[4]

### 2. The claims treat TTI as a publisher of user-generated content.

Section 230's second element is also satisfied, as Counts 1-3 and 7-9 seek to hold TTI liable for how it selects, organizes, and displays—in a word, publishes—user-generated content.

Analyzing this element, courts explain that Section 230 bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions." *Zeran*, 129 F.3d at 330. These "protected" editorial functions are broad and encompass *any* "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates.Com, LLC*, 521 F.3d at 1170-71. This includes "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content," *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), as well as "editorial decisions and functions ancillary to the decision to make content available." *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litig.*, 702 F. Supp. 3d 809, 827 (N.D. Cal. 2023).

To determine whether a claim targets publishing activity, what matters is not "the name of the" claim, but whether the claim *in substance* "requires the court to treat the defendant as the

---

[4] In the *Meta* decision, when the Court analyzed the CPA's exemption for publishing activity (RSA 358-A:3, IV), the Court reasserted its conclusion that the State's claims against Meta "do not arise out of Meta's publishing of deceptive material," but the "addictive features it implements" on Facebook and Instagram. *Meta* Order 32. That ruling would not apply here. First, the State's allegations relating to the TikTok platform rest entirely on the platform's "reproduction of printed or pictorial matter" as a publisher. RSA 358-A:3, IV. Second, the State alleges no facts establishing that the TikTok platform published any user-generated content with "knowledge of its deceptive character." *Id.* Indeed, there is no allegation that the platform published any "deceptive" user-generated content at all.

'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1102. Thus, Section

230 covers "claims which, though artfully pleaded to avoid direct reference, implicitly require

recourse to [third-party user-generated] content." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140,

156 (E.D.N.Y. 2017).

Of particular relevance here, courts hold that the "ordinary meaning" of "publisher"

includes an online platform's use of "tools such as algorithms that are designed to match [third-

party] information with a consumer's interests." *Force*, 934 F.3d at 66. After all, the entire

function of an online platform is to decide what content to select, how to organize it, and how to

present it to users. Decisions that are "part and parcel of [a website's] overall design and

operation"—and that "reflect choices about what content can appear on the website and in what

form"—inherently "fall within the purview of traditional publisher functions." *Fields v. Twitter,

Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (quoting *Doe v. Backpage.com, LLC*, 817

F.3d 12, 20-21 (1st Cir. 2016)).

Counts 1-3 and 7-9 challenge traditional publisher functions. This is true for each of the

State's unfairness, defective design, deception, and failure-to-warn theories that underlie Counts

1-3 and 7-9.

Take, for example, the platform features that the State challenges as "unfair" or

"defective" in Counts 1, 2, 7, and 9. All of them are core publishing activities:

- **Recommendation engine.** The State challenges the use of an algorithmic
  "recommendation engine," which allegedly curates and provides users with content that
  the platform predicts the user will want to see. FAC ¶¶ 79-89. Such "algorithms"
  organize, present, and recommend content, and thus are publishing operations protected
  under Section 230. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 480 (2023); *In re Social
  Media*, 702 F. Supp. 3d at 833; *see also Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393
  (2024); *Dyroff*, 934 F.3d at 1098; *Force*, 934 F.3d at 65-66, 70; *M.P. ex rel. Pinckney v.
  Meta Platforms, Inc.*, 692 F. Supp. 3d 534, 538-59 (D.S.C. 2023); *L.W. through Doe v.
  Snap Inc.*, 675 F. Supp. 3d 1087, 1097-98 (S.D. Cal. 2023).

- **Push notifications.** The State challenges the use of "push notifications" to "alert users of new messages" or "suggest new videos to entice users to re-open the App." FAC ¶¶ 94-98. Such "notifications" are "tools meant to facilitate the communication and content of others," and a platform "act[s] as a publisher of others' content" when using them. *Dyroff*, 934 F.3d at 1098. The fact that a platform allegedly "encourages" users "to post on [the] platform does not" deprive it of Section 230 immunity. *Calise v. Meta Platforms, Inc.*, 2022 WL 1240860, at *3 (N.D. Cal. Apr. 27, 2022); *see In re Social Media*, 702 F. Supp. 3d at 833 (applying Section 230 to reject claims challenging "notifications . . . made to alert users to third-party content" and "that someone has commented on or liked a user's post").

- **Infinite scroll.** The State challenges the platform's "infinite scroll" feature—that is, there is no limit on how many videos users may view on the platform. FAC ¶¶ 90-93. This too is an editorial tool used to organize, present, and recommend content. *See In re Social Media*, 702 F. Supp. 3d at 831 & n.16 (dismissing challenges to "endless scroll" features because it would "require defendants to publish less third-party content"); *Force*, 934 F.3d at 65-66, 70.

- **Filters and effects.** The State challenges the platform's provision of "filters" and "effects" that users employ to "alter [their] appearance." FAC ¶¶ 99-112. These are neutral, interactive tools that *third parties* employ to create *their* speech, and facilitating third-party speech is a quintessential publishing function. TTI could regulate users' choices about how to use these tools only by making "changes to the content posted" on the platform—a core publishing function. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016).

- **Safety and screen-time management features.** The State alleges that the platform employs "defective user controls to curb unhealthy App usage, including ineffective time management features and parental controls"—which the State claims are necessary to encourage users to take breaks and consume less content. FAC ¶¶ 113-26. In other words, the State contends that the platform has a duty to implement tools that would result in publishing less content to certain users. Section 230 bars claims that would "require defendants to publish less third-party content." *In re Social Media*, 702 F. Supp. 3d at 831; *see also Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016) (Section 230 barred claim alleging an interactive computer service "fail[ed] to adequately regulate access to user content").

- **TikTok LIVE's alleged "monetization."** Finally, the State targets TikTok LIVE's alleged "monetization" feature. FAC ¶ 241. But the State admits that "Gifts" allegedly "function like social recognition reward signals, similar to 'Likes' on other apps." *Id.* ¶ 242. In other words, even on the State's allegations, "Gifts"—just like "likes" or "comments"—are simply a way for platform users to communicate about another user's content. *See Dyroff*, 934 F.3d at 1097 (enabling users to "post comments and respond to comments posted by others" is "[t]he prototypical service qualifying for immunity").

The State's deception and failure-to-warn claims in Counts 3, 8, and 9 also impermissibly

challenge protected publishing activities. The gravamen of these claims is that, for the platform's statements about its features to have been accurate and complete, the platform was required to "do more to protect [its] users" from "malicious or objectionable" content. *In re Facebook*, 625 S.W.3d 80, 83 (Tex. Sup. Ct. June 25, 2021). This theory turns on the State's contention that the platform "did not do enough to block or remove content." *Gonzalez v. Google*, 2 F.4th 871, 891 (9th Cir. 2021), *rev'd on other grounds*, *Twitter v. Taamneh*, 598 U.S. 471 (2023). Section 230 squarely bars claims challenging the alleged failure to remove allegedly harmful content from a platform. *See Force*, 934 F.3d at 65 ("failure to delete content from . . . Facebook pages" "falls within the heartland" of Section 230); *Klayman*, 753 F.3d at 1359 ("the very essence of publishing is making the decision whether to print or retract a given piece of content"). Indeed, Congress enacted Section 230 to bar this exact kind of second-guessing, and for good reason: a contrary rule would disincentivize platforms from developing content-moderation standards and developing tools to empower users to self-control what they see on a platform.

The State's deception and failure-to-warn claims are nearly identical to the theory asserted in *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), where a platform "was held liable . . . because it attempted to *remove* some problematic content from its website, but didn't remove enough," *Roommates.Com*, 521 F.3d at 1170. Congress enacted Section 230 to overrule *Stratton*, *id.* at 1163, and to immunize interactive computer services like the TikTok platform from claims that seek to hold them liable for "failing to detect and remove" third-party content on their platforms, *id.* at 1172. Applying that rule, numerous courts have held that Section 230 bars claims seeking to hold platforms liable for not removing third-party content as aggressively as their own policies allegedly require. This is true no matter how the claim is styled—including, as here, when the plaintiff styles the claim

19

as one challenging "deceptive" acts or practices or the "failure to warn." *See Wozniak v. YouTube, LLC*, 100 Cal. App. 5th 893, 918, 920 (2024) (barring liability premised on "public and widely publicized promises" about user safety and data security because the promises were made in the platform's "capacity as publisher"); *Beckman v. Match.com*, 668 F. App'x 759, 759 (9th Cir. 2016) (barring misrepresentation claim based on platform's alleged non-compliance with its own safety policies because the "basis for each of those claims is [the service's] role as a publisher of third-party information"); *Errato v. Am. Express Co.*, 2022 WL 17737285, at *6-7 (D. Conn. Dec. 16, 2022) (similar).

The same analysis applies here. The State's deception and failure-to-warn claims target TTI's conduct as a publisher because they seek to punish TTI for allegedly not adhering closely enough to its own stated publishing policies, and for allegedly failing to warn about the supposed risks related to TikTok LIVE's alleged "monetization" feature. FAC ¶¶ 396-97. These claims "implicitly require[] recourse to [third-party] profiles themselves and the traditional function of a publisher," and are therefore barred. *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 591 (S.D.N.Y. 2018); *see also Facebook*, 625 S.W.3d at 94 ("unanimous view of other courts" that failure-to-warn theories arise from alleged "transmission of harmful third-party communications" and thus barred by Section 230).

In the *Meta* decision, the Court concluded that this element of Section 230 was not met because the State's claims against Meta were not based on its role as a "publisher," but on Meta's separate alleged duty as a manufacturer to "design reasonably safe products." *Meta* Order 25-26. This aspect of the Court's *Meta* ruling does not apply to the State's allegations about the TikTok platform. As just explained, each theory underlying Counts 1-3 and 7-9—i.e., unfairness, defective design, deception, and failure-to-warn—directly targets the platform's exercise of

traditional *publisher* functions such as how it selects, organizes, and displays user-generated content. This is true regardless how the State's claims are styled.

**B.** **The First Amendment and New Hampshire's Speech Clause bar the State's platform safety and TikTok LIVE "monetization" claims.**

In addition to Section 230, the First Amendment and New Hampshire's Speech Clause also bar Counts 1-3 and 7-9. *First*, and as the U.S. Supreme Court recently confirmed in *Moody v. NetChoice, LLC*, the longstanding First Amendment protections that apply to traditional publishers of third-party content apply equally to the features that online platforms use to select, organize, and display third-party user-generated content as part of that platform's expressive choices.[5] *Second*, the State's claims for alleged deception and failure-to-warn in Counts 3, 8, and 9 are barred for the additional reason that the State's enforcement action effectively seeks to make TTI engage in compelled speech by warning users about the alleged risks and harms of engaging with user-generated content on the platform. The First Amendment bars such compelled speech.

**1.** **The claims impermissibly challenge the platform's exercise of editorial discretion.**

The First Amendment and New Hampshire's Speech Clause bar Counts 1-3 and 7-9 because those claims impermissibly attack the platform's "exercise of editorial control and judgment" in selecting content for publication. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

As the Supreme Court held earlier this year in *Moody*, the First Amendment's longstanding protections for expressive editorial judgments apply equally to online platforms—like the TikTok platform—that disseminate third-party user-generated content. As *Moody*

---

[5] New Hampshire's Speech Clause is the "equivalent of" the U.S. Constitution's Speech Clause, and courts analyze them together. *Richard v. Speaker of House of Representatives*, 175 N.H. 262, 275 (2022).

explains, a platform's expressive choices about "which third-party content" an online platform's viewer feed "will display"—"or how the display will be ordered and organized"—are what "give the feed a particular expressive quality." 144 S. Ct. at 2405-06. The First Amendment prohibits a state's attempt to regulate or "alter[]" how an online platform chooses "the views [it] will, and will not, convey." *Id.* at 2405.

Counts 1-3 and 7-9 violate these First Amendment protections, because they seek to "regulate" and "alter[]" the "editorial choices" that the platform makes in selecting which posts will appear in a given user's feed. *Id.* at 2399, 2402, 2404-06, 2409. For one, the State's "unfairness" and defective design claims in Counts 1, 2, 7, and 9 expressly seek to impose liability for editorial choices about curating and disseminating speech on the platform. The challenged design features each involve a method of displaying content, such as "algorithms," "personalization and automation features," "recommendation engine," "infinite scroll," "push notifications," and "filters." These features are how TTI exercises its expressive choices and its "[t]raditional publish[ing] and edit[ing]" discretion to "select and shape other parties' expression into [its] own curated speech products." *Id.* at 2393. The same is true of alleged "monetization" features on TikTok LIVE. The State admits that "Gifts" "function like social recognition reward signals, similar to 'Likes' on other apps," FAC ¶ 242, showing one user's "appreciation and encouragement" for another user's content, *id.* ¶ 18. Indeed, that expressive aspect is exactly *why* such features are protected. *See Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013) (Facebook "Like" function is protected because it conveys a "substantive statement").

Counts 1-3 and 7-9 are barred by the First Amendment for the additional reason that they seek to hold TTI liable on the ground that the platform's design elements supposedly make the user-generated third-party speech that is published on the platform "too engaging" and

"addictive" for younger users. In other words, the State's theory is that certain "disfavored speech has adverse effects" because it is too "catchy." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577-78 (2011). That is a content-based speech challenge that has long been deemed "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And, of course, the State largely dismisses the fact that the TikTok platform offers parents ways to control younger users' access to content on the platform that is allegedly too "engaging" and "catchy"—including to monitor those users' activities and to filter out harmful content. This includes functions like "Family Pairing," which allow parents to "set controls," "manag[e] screentime," "restrict[] mature content on the App," and "restrict[] who can send messages" to their child's account. FAC ¶ 123.

The State's deception and failure-to-warn claims in Counts 3, 8, and 9 are likewise barred. Again, the gravamen of these claims is that the platform inaccurately and inadequately described its risks, safety features, and the application of content moderation policies and other safety-related public assurances. *See id.* ¶¶ 26, 127-32, 151, 153, 155, 158, 161, 162, 265. According to the State, the platform's safety-related representations—such as that the platform is "deeply committed to TikTok being a safe and positive experience for people under the age of 18," and that "TikTok LIVE . . . [is] safe," *id.* ¶¶ 182, 416(a), (j)—are false because the platform "produc[es] ineffective moderation of content," *id.* ¶ 143.

Those claims directly attack the TikTok platform's editorial choices about what user-generated content its content-moderation standards will "include and exclude" on users' feeds, and how it applies those "content-moderation standards to remove, alter, organize, [and] prioritize" content. *Moody*, 144 S. Ct. at 2393-94. Although the State styles its claims as challenging "deceptive" acts and practices and a "failure to warn," FAC ¶¶ 425, 471, 488, 524,

530, the State effectively seeks an "order telling [the platform] what content-moderation policies to adopt and how to enforce those policies," *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186-88 (N.D. Cal. 2022) (holding that First Amendment barred a plaintiff's challenge to Twitter's removal of a user from the platform; "Twitter has important First Amendment rights that would be jeopardized by a Court order telling Twitter what content-moderation policies to adopt and how to enforce those policies."), *aff'd*, 62 F.4th 1145 (9th Cir. 2023). Indeed, the State expressly seeks an injunction to that effect, requesting that the Court "enjoin TikTok from engaging in" the "deceptive" "acts and practices" "alleged in the Complaint." FAC at 146; *see also id.* ¶ 425 (seeking "order permanently enjoining [TTI] from engaging in [] deceptive acts and practices").

Even worse, the State is doing so in service of its attempt to remove content from the platform that the State has deemed "too engaging," or otherwise harmful, inappropriate, and objectionable to younger users. The First Amendment does not allow this. By its terms, the State's theory is that the platform allegedly misrepresents, omits, and fails to warn users about the alleged risks and harms associated with certain *content* on the platform. No matter how artfully the State may plead its claims, that theory targets both the allegedly harmful third-party content on the platform and the platform's curation, publication, and moderation of that content. The government cannot "regulat[e] the content-moderation policies" and other expressive choices that an online platform "use[s] for [its] feed[]" in an attempt to "change the speech that will be displayed there." *Moody*, 144 S. Ct. at 2408. To the contrary, the First Amendment bars the State from "interfer[ing] with [the platform's] editorial choices" as to what content-moderation policies to adopt, and from attempting to "alter[] the content of [its] compilation" by insisting "excluded [content] be included" and included content be excluded. *Id.* at 2402.[6]

---

[6] Courts often do not even apply the tiers of constitutional scrutiny when evaluating an attempt, like the State's, to impose tort-like liability for First Amendment-protected conduct. *See Snyder v. Phelps*, 562 U.S. 443, 451-52

In the *Meta* decision, the Court concluded that the First Amendment did not bar the State's claims against Meta. *Meta* Order 27-28. The Court reasserted its ruling that the State's claims against Meta were not based on harms arising from the content that is published on the Facebook and Instagram platforms, but from the "addictive design features themselves." *Id.* at 27. The Court's ruling does not apply here for the same reasons stated above: the State's case against TTI is based on the substance of the content on the TikTok platform, not design features in the abstract.

## 2. The State's platform safety claims also impermissibly seek to compel the platform to warn users about the platform's alleged "risks."

The First Amendment and New Hampshire's Speech Clause bar the State's deception and failure-to-warn claims in Counts 3, 8, and 9 for another reason: those claims improperly seek to force the platform to engage in compelled speech by warning users about the alleged "risks" of the platform, its features, and user-generated content on the platform. Indeed, as just explained, the State expressly seeks an injunction to that effect. That is not permitted under the U.S. and New Hampshire Constitutions.

In *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024), the Ninth Circuit confirmed that states cannot require providers of third-party speech on online platforms to warn users about the alleged risks that those platforms might pose to younger users. *Bonta* involved a challenge to California's Age-Appropriate Design Code Act ("CAADCA"), Cal. Civ. Code § 1798.99.28, *et seq*. Similar to the State's claims here, the CAADCA required online platforms to make certain

---

(2011); *James v. Meow Media, Inc.*, 300 F.3d 683, 696-97 (6th Cir. 2002). In the event that the Court applies a level of scrutiny here, the State's content- and viewpoint-based attack on the platform's user-generated content and the exercise of its editorial discretion as to that content requires strict scrutiny—which the State cannot meet. Although the State cites a general interest in protecting minors from content that the State deems "too engaging" or otherwise harmful, objectionable, or inappropriate, *see* FAC ¶¶ 181, 182, 183, 184, 187, 253, 269, 271, 273, 274, that "free-floating" interest in "restrict[ing] the ideas to which [minors] may be exposed" cannot satisfy strict (or even intermediate) scrutiny, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011).

disclosures and warnings about the alleged "risk of material detriment" to younger users from "each offered online service, product, or feature likely to be accessed by children." *Bonta*, 113 F.4th at 1116. Specifically, the CAADCA required that platforms make periodic reports to the California Attorney General disclosing whether the platform's "design" could:

- "harm children, including by exposing children to harmful, or potentially harmful, content";
- "lead to children experiencing or being targeted by harmful or potentially harmful, contact";
- "allow children to be party to or exploited by a harmful, or potentially harmful, contacts"; and
- "permit children to witness, participate in, or be subject to harmful, or potentially harmful, conduct."

*Id.* at 1109-110.

The Ninth Circuit concluded that the CAADCA's warning and disclosure requirements violated the First Amendment. *Id.* at 1117. The court made two key rulings. *First*, the court concluded that CAADCA's disclosure requirements were not "commercial speech," and thus triggered heightened scrutiny. As the court explained, those disclosure requirements compelled businesses that are covered by the CAADCA to "opine on and mitigate the risk that children are exposed to harmful content online"—disclosures that "require businesses to go beyond opining about their products or services to opine on highly controversial issues of public concern." *Id.* at 1119-20. *Second*, the court concluded that these disclosure requirements are "clearly" compelled speech in violation of a covered business's First Amendment rights—including "the right to refrain from speaking at all." *Id.* at 1117. As the D.C. Circuit put it when rejecting a similar attempt by the federal government to impose certain disclosure requirements on businesses: "[r]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Nat'l*

26

*Ass'n of Manufacturers v. S.E.C.*, 800 F.3d 518, 530 (D.C. Cir. 2015) (quoting approvingly from appellant's brief).

The same result should apply here. The State's deception and failure-to-warn claims in Counts 3, 8, and 9 seek to impose liability and to obtain an injunction against the platform based on its alleged failure to disclose or warn that the platform and its features—including the platform's "design elements" and TikTok LIVE's alleged "monetization" feature—may cause psychological or financial harms. That is an improper attempt to compel speech barred by the First Amendment and New Hampshire's Speech Clause.

## III.    The Court should dismiss the State's CPA claims for additional, claim-specific reasons.

In addition to Section 230's statutory barriers and the First Amendment and New Hampshire Speech Clause's constitutional barriers, the State's CPA claims (Counts 1-6) fail for additional reasons. *First*, all of the State's CPA claims fail because the CPA applies only to business or commercial transactions, and the State does not allege any such "transaction." *Second*, the State's unfair practices claims (Counts 1 and 2) fail because the platform (and the features that the State challenges) can be reasonably avoided by users, and thus are not "unfair" for purposes of the CPA. *Third*, the State's deceptive practices claims relating to the platform's safety and "geographic origin" (Counts 3 and 6) fail because the State alleges no actionable deception with the particularity required under the heightened pleading standard for claims sounding in fraud. *Finally*, the State's child privacy claims (Counts 4 and 5) fail because they are preempted by federal law.

### A.    The Court should dismiss all of the State's CPA claims (Counts 1-6) because the State does not allege a business or commercial transaction as required under the CPA.

The CPA applies only to acts or practices "in the conduct of any trade or commerce."

RSA § 358-A:2. As relevant here, the CPA defines "trade" and "commerce" as the "advertising,
offering for sale, sale, or distribution of" goods and services. RSA § 358-A:1. But as the New
Hampshire Supreme Court has explained, the "scope of the CPA" is "narrower" than this
seemingly "broad" definition of "trade" and "commerce" may suggest. *Ellis v. Candia Trailers
& Snow Equip., Inc.*, 164 N.H. 457, 465 (2012). The Court has held that the CPA applies only to
business or commercial transactions. *Id.* Thus, the Court has rejected CPA claims where the
plaintiff failed to show that the defendant "sold or offered to sell" goods or services, *Snow v. Am.
Morgan Horse Ass'n, Inc.*, 141 N.H. 467, 471 (1996), or where the plaintiff's claims did not
involve "consumers seeking to purchase goods or services," *Brzica v. Trustees of Dartmouth
Coll.*, 147 N.H. 443, 452 (2002).

None of the State's CPA claims satisfies this "commercial or business transaction"
requirement. The State's CPA claims—rooted in user-generated content and the features of the
platform's design that select, organize, and display that content—are based entirely on use of the
TikTok platform. *See, e.g.*, FAC ¶¶ 366-67. But the platform is *free* for consumers to download
and use. Making an online platform available for free is not "advertising, offering for sale, sale,
or distribution of" any goods and services—it is merely allowing access and use. RSA § 358-
A:1. As other courts have recognized, allowing free access and use of a platform does not
constitute the kind of "commercial or business transaction" required under state consumer
protection statutes like the CPA. *See Ziencik v. Snap, Inc.*, 2024 U.S. Dist. LEXIS 12105, at *16
(C.D. Cal. Jan. 19, 2024) ("exchanging personally identifiable information for use of a free
social networking application" is not a "purchase" or "lease"); *Dobson v. Milton Hershey Sch.*,
356 F. Supp. 3d 428, 435 (M.D. Pa. 2018) (no purchase or lease if item is free of charge); *In re
Yahoo! Inc. Consumer Data Sec. Breach Litig.*, 2017 WL 3727318, at *32 (N.D. Cal. Aug. 30,

2017) (no purchase or lease for use of free e-mail service); *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 864 (N.D. Cal. 2011) (the exchange of personally identifiable information does not qualify as a purchase or lease).

The State's failure to satisfy the CPA's business or commercial transaction requirement is confirmed by the CPA's statutory text. In determining the meaning of a statute's terms, courts look to the term's "common usage, using the dictionary for guidance." *Working Stiff Partners, LLC v. City of Portsmouth*, 172 N.H. 611, 617 (2019). Here, the dictionary definitions of the relevant terms in the CPA—"offering for sale," "sale," and "distribution"—each contemplate *payment* in exchange for goods and services. "[O]ffering for sale" and "sale" are clear: to sell something just is to "give up (property) . . . for something of value (such as money)."[7] The terms and phrases that are immediately adjacent to "distribution" in the CPA confirm that distribution refers to exchanges of *money or its equivalent*. The CPA itself refers to the "distribution of *any services and any property*" or "any other article, commodity, or thing of value." RSA § 358-A:1. In the business and commercial contexts that the CPA is designed to regulate, "services," "property," and other "article[s], commodit[ies], or thing[s] of value" are not conveyed for free. Indeed, leading dictionaries define "distribution" as "the marketing or merchandising of commodities"[8]—i.e., conveyances of *money or its equivalent*. So while users have the right to access and use the platform, access and use is simply that—access and use, not a "distribution" for value.

Other canons of statutory construction underscore this conclusion. In interpreting statutes,

---

[7] *See Selling*, Merriam-Webster Dictionary (last accessed Dec. 16, 2024), https://www.merriam-webster.com/dictionary/selling ("to give up (property) to another for something of value (such as money)"); *Sale*, Merriam-Webster Dictionary (last accessed Dec. 16, 2024) ("the act of selling"), https://www.merriam-webster.com/dictionary/sale.

[8] *Distribution*, Merriam-Webster Dictionary (last accessed Dec. 16, 2024), https://www.merriam-webster.com/dictionary/distribution.

New Hampshire courts often apply the *noscitur a sociis* canon, where "the broader term itself takes on the more specialized character of its neighbors." *Home Gas Corp. v. Strafford Fuels, Inc.*, 130 N.H. 74, 82 (1987). Here, the placement of the terms "offering for sale" and "sale" next to "distribution" confirms that the CPA requires an exchange of goods or services for money. The canon of *ejusdem generis*—where "general words," like distribution, "are construed to apply only to persons or things that are similar to the specific words"—compels the same conclusion. *State v. Proctor*, 171 N.H. 800, 806 (2019). The specific terms "offering for sale" and "sale" inform the meaning of the more general term "distribution," which likewise should be read to involve an exchange for money or its equivalent.

In the *Meta* decision, the Court ruled that the State satisfied the CPA's business or commercial transaction requirement because Meta collects users' data when they use the platform. *Meta* Order 33-34. The Court's ruling was based on its determination that a "sale" encompasses "*any*" exchange of consideration. *Id.* at 34.

TTI respectfully disagrees with the Court's ruling. A "sale" is the "transfer of ownership of and title to property from one person to another for a *price*."[9] But users who download and use the TikTok platform do so for *free*—they do not pay a price to do so. Indeed, a contrary reading of "sale" or "price" would broaden the scope of the CPA to cover virtually every single interaction that occurs on the internet. Virtually all websites collect user data, and that data can itself include "virtually every user action"—"including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website." *Hasson*, 114 F.4th at 185. If collecting data alone is enough

---

[9] *Sale*, Merriam-Webster Dictionary (last accessed Dec. 16, 2024), https://www.merriam-webster.com/dictionary/sale.

to qualify as a "sale," then checking football scores on ESPN.com or getting directions from Google Maps would all involve a "sale"—even though these actions are entirely free to users. There is nothing indicating that the CPA reaches such a broad swath of conduct.

**B.    The Court should dismiss the State's unfairness CPA claims concerning platform safety and TikTok LIVE "monetization" (Counts 1 and 2) because the State does not allege an "unfair" act or practice related to those claims.**

On top of the State's threshold failure to satisfy the CPA's "business or commercial transaction" requirement, the State's unfair practices claims in Counts 1 and 2 fail for additional reasons. Although these claims challenge features on the platform such as the platform's alleged "design features" and TikTok LIVE's alleged "monetization," FAC ¶¶ 366, 392, the State fails to allege that these features are "unfair" within the meaning of the CPA. At base, New Hampshire law simply does not support the State's attempt to use consumer protection laws to target an online entertainment platform because it is supposedly "too engaging" for younger users.

New Hampshire imposes a high bar for establishing that a business practice is "unfair" for purposes of the CPA. New Hampshire applies the "rascality test," under which the "objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *State v. Moran*, 151 N.H. 450, 452 (2004). New Hampshire courts also look to the Federal Trade Commission Act, or FTCA, "for guidance." *State v. Priceline.com, Inc.*, 172 N.H. 28, 39 (2019). The FTCA considers an act "unfair" if it "is within at least the penumbra of some . . . established concept of unfairness[,]" is "immoral, unethical, oppressive, or unscrupulous[,]" or causes "substantial injury to consumers." *Moran*, 151 N.H. at 453. The State's claims fail to satisfy both tests.

To start, the State cannot show that the challenged features fail New Hampshire's "rascality test." At base, the State's theory of unfairness appears to boil down to the fact that it does not like the platform and would prefer that younger users spend less time on it. In the

31

State's view, younger users in New Hampshire should not "spend their free time on social media swiping through an app." FAC ¶ 61.

But the State's views about an online platform do not make the platform "unfair," or mean that the platform "raise[s] an eyebrow of someone inured to the rough and tumble of the world of commerce." *Moran*, 151 N.H. at 452. To the contrary, our laws presume that people, including minors, are able to choose for themselves whether, when, and how to engage with third-party speech—even speech that the State may find "too engaging" or otherwise objectionable and inappropriate for younger users. As the U.S. Supreme Court has consistently held, the government has no legitimate interest in "improving" the "marketplace of ideas," *Moody*, 144 S. Ct. at 2402, and has no "free-floating power" to quash speech that it believes is "unsuitable" for younger users, *Brown*, 564 U.S. at 794; *see also Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 791 (1988) ("the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners"). Likewise, the Federal Trade Commission—the entity vested with the authority to enforce the FTCA, on which New Hampshire's CPA is based—has itself stated that it will not use the consumer protection laws to quash commercial conduct "merely because it offends the tastes or social beliefs of some viewers." *Greenberg v. Amazon.com, Inc.*, 553 P.3d 626, 641 (Wash. 2024) (en banc) (quoting *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1073, 1984 WL 565290, at *97 (F.T.C. 1984)).

Indeed, if the State's theory were correct—that a platform is "unfair" because it is "too engaging" and because it is allegedly designed to encourage users to use it—then there would be no limit to the range of everyday goods and services that could be deemed "unfair." On the State's theory, virtually every company doing business in New Hampshire—including

32

businesses as benign as coffee shops to gyms—could be held liable under state consumer protection statutes. That is not New Hampshire law. To the contrary, New Hampshire requires that the challenged practices go beyond simply "encourag[ing]" the use of a service. *See Fat Bullies Farm, LLC v. Devenport*, 170 N.H. 17, 27 (2017) (conduct "does not rise to the level of rascality necessary to establish a consumer protection violation merely because it encourages a sale"). Indeed, the challenged practices must go beyond even the "rough and tumble of the world of commerce." *Moran*, 151 N.H. at 452.

The State also fails the FTCA's three-factor test. As to the first, "public policy" factor, the public policy that is allegedly violated must be "clear and well-established—that is, declared or embodied in formal sources such as statutes, judicial decisions, or the Constitution as interpreted by the courts, rather than being ascertained from the general sense of the national values." *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 (11th Cir. 2018). "Put another way, an act or practice's 'unfairness' must be grounded in statute, judicial decisions—i.e., the common law—or the Constitution." *Id.* A "general sense" of New Hampshire "values" will not suffice." *Id.* But the State does not identify any New Hampshire statute, judicial decision, or constitutional provision that clearly establishes a state policy prohibiting the publishing practices challenged in the FAC.

The State also does not allege facts establishing the second FTCA factor—that the platform's publishing practices are "immoral, unethical, oppressive, or unscrupulous." *Moran*, 151 N.H. at 453. To give some meaning to this otherwise decidedly vague factor, courts have focused on whether the defendant's conduct was "coerc[ive]," or imposed a lack of meaningful choice or consent. *Harris Wayside Furniture Co. v. Idearc Media Corp.*, 2007 WL 1847313, at *7 (D.N.H. June 25, 2007).

No such "coercive" conduct is alleged here. Critically, the State alleges no facts to suggest that TTI forces anyone to download and use the TikTok platform. Nor could the State. The download and use of the platform is free. Users do not lose any money when they start—or stop—engaging with the platform. And users can stop using the platform whenever they want. Indeed, the implausibility of the State's "unfairness" theory is underscored by the fact that the features that the State challenges have been widely available for years across numerous other online platforms. *See In re Social Media*, 702 F. Supp. 3d at 819-21. The State itself acknowledges the many publicly available sources that describe the platform features that it now claims are "unfair"—sources ranging from federal and state government reports, to academic research and studies, to articles from widely circulated news and media publications. *See* FAC ¶¶ 79 n.55, 87 n.56, 89 n.57, 92 n.58, 107 n.61, 110 nn.62-64, 114 n.66, 126 n.71, 131 nn.73-77, 164 n.112, 188 n.116, 197 nn.121-22, 198 nn.123-24, 202 nn.126-27, 207 n.128, 221 n.137, 226 nn.141-44, 227 n.145, 261 n.159, 262 n.161, 267 n.163, 272 n.164.

The third FTCA factor—substantial injury to consumers—logically cannot stand alone, independent of the other two factors. For an alleged harm to be legally cognizable, it must result from some wrongful act. And the other two factors are what define the relevant wrongful acts under the CPA. Put differently, if a consumer experiences a psychological or financial injury in the buying and selling of goods or services—but there is nothing wrongful about the buying or selling itself—the asserted injury *itself* cannot make the buying or selling unlawful. Otherwise, unhappy buyers would always have a CPA claim, and successful New Hampshire businesses would be subject to CPA claims every day. Again, that is not New Hampshire law. *See Moran*, 151 N.H. at 452 (challenged practices must go beyond the "rough and tumble of the world of commerce").

Even setting that point aside, this factor requires a "substantial injury to consumers which *is not reasonably avoidable by consumers themselves*." 15 U.S.C. § 45(n). To determine whether consumer injuries are reasonably avoidable, courts consider "whether the consumers had a free and informed choice" about whether to use the product and at what potential risk. *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010). A consumer who "could have picked other forms of entertainment" has made a free choice, and any injuries arising from that choice are deemed reasonably avoidable. *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016).

This is true even when the platform is supposedly "too engaging," as the State alleges here. For example, two federal courts have rejected claims that allegedly "addictive" online games were "unfair" because—notwithstanding allegations that the games "exploit[ed] . . . psychological triggers"—there was nothing to prevent the users from "opt[ing] for alternative entertainment." *Id.*; *see Ristic v. Mach. Zone, Inc.*, 2016 WL 4987943, at *4 (N.D. Ill. Sept. 19, 2016) ("while any type of addiction is unfortunate, this Court . . . does not read [Illinois's consumer protection statute] to protect [plaintiff] from his own decision to play the [game]").

That principle bars satisfaction of the third factor here. TikTok platform users could have picked other forms of entertainment. And as just discussed, the State itself makes clear that public information about the challenged features of the platform has been available for years. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (injury is "reasonably avoidable" under FTCA if consumers "have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of"); *see also Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365-66 (11th Cir. 1988) (same).

35

The State's attempt to use the consumer protection laws to target an entertainment platform for being "too engaging" has no support in New Hampshire law. And the State's theory of unfairness—essentially, that a business act or practice is "unfair" if it encourages people to patronize that business—threatens massive liability for virtually every company doing business in New Hampshire. That result is the *opposite* of what New Hampshire law contemplates. *See Moran*, 151 N.H. at 452 (challenged practices must go beyond the "rough and tumble of the world of commerce"). The Court should reject it.

In the *Meta* decision, the Court concluded that the particular Facebook and Instagram design features at issue in that case gave rise to a CPA unfairness claim. *Meta* Order 36-37. The Court's ruling was based on two key allegations by the State: (1) the risks of the design features on Facebook and Instagram are not "known and understood by the public," and (2) Meta "exploited children[]" for financial gain. *Id.* Neither factor applies here. As just explained, the State's FAC itself cites the many public sources that describe the TikTok platform features that the State now characterizes as "unfair." And the State's particular theory of "exploitation" that it asserts in this case against the TikTok platform—i.e., that the platform had features "designed to maximize engagement" with *content* on the platform, FAC ¶ 1—is not cognizable as a matter of law.

### C. The Court should dismiss the State's deception CPA claims concerning the platform's safety and "geographic origin" (Counts 3 and 8) because the State does not allege a deceptive act or practice related to those claims.

The State's deceptive practices claims relating to the platform's safety and "geographic origin" (Counts 3 and 8) also fail as a matter of law. *First*, for virtually all of the State's deception allegations, these allegations fail to satisfy New Hampshire's heightened pleading requirements for fraud because they do not identify alleged misrepresentations or omissions with the requisite particularity. *Second*, to the extent that the State does specifically identify any

alleged deceptive representations, such representations are not actionable because they are either too vague and general, aspirational statements, corporate puffery, or non-verifiable statements of opinion. *Third*, the State's own allegations and materials that are incorporated by reference into the FAC undercut or contradict the suggestion that TTI acted deceptively.

### 1.    The State fails to plead alleged misrepresentations and omissions with particularity.

Because the State's deceptive practices claims sound in fraud, the State must satisfy New Hampshire's heightened pleading requirements for fraud. *See Tessier*, 162 N.H. at 332; *see also Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21-22 (1st Cir. 2017) ("Rule 9(b)'s requirements apply to both general claims of fraud and also to associated claims . . . where the core allegations effectively charge fraud."); *Hennessey v. Gap, Inc.*, 86 F.4th 823, 827 (8th Cir. 2023) (claim alleging deceptive practices under state law consumer protection statute subject to Federal Rule of Civil Procedure 9(b)'s analogous heightened pleading requirements). This requires the State to plead facts establishing "the *essential details* of the fraud," and to "*specifically allege* the facts of the defendant's fraudulent actions." *Tessier*, 162 N.H. at 332. The State fails this requirement as to virtually all of TTI's alleged misrepresentations and omissions.

**Platform safety.** The State repeatedly fails to allege specific facts establishing exactly who misrepresented or failed to disclose the particular risks and features that the State complains about, or when and where those persons supposedly engaged in such misrepresentations or omissions. *See* FAC ¶¶ 26, 127-32, 151, 153, 155, 158, 161, 162, 265, 367. Instead, the State largely relies on listing out general categories of alleged misrepresentations or omissions without connecting those categories to specific statements, or to specific allegations of fact establishing who made those statements, when they made those statements, and where. *See id.* ¶ 416. Indeed,

the State's list itself purports to be non-exhaustive, with the State vaguely alleging that the challenged statements are "not limited to" the listed categories. *Id.*

**Geographic origin.** The State also fails to identify virtually any specific representation or omission about TTI's "geographic origin" that it says was false or deceptive. *See id.* ¶¶ 475-91. Instead, the State largely asserts, in conclusory fashion, that TTI inaccurately "portrays itself as a U.S.-based company independent of ByteDance, its Chinese parent company," and then vaguely gestures toward statements made by TTI in its Terms of Service and website and in congressional testimony from TTI's CEO that the State says "create[d] the appearance" that the platform is "independent from" "ByteDance." *See id.* ¶¶ 348-49, 358. These vague and general allegations about how TTI supposedly misrepresented and concealed its "geographic origin"—which varyingly fail to identify specific misrepresentations or omissions; specific material facts that were misrepresented or omitted; when those specific misrepresentations were allegedly made or when those specific facts should have been disclosed; and by whom specifically—are not enough to satisfy New Hampshire's heightened pleading requirements for claims sounding in fraud.

In the *Meta* decision, the Court ruled that the heightened pleading requirements for claims sounding in fraud do not apply to CPA deceptive practices claims. *Meta* Order 40-41. The Court relied on two New Hampshire Supreme Court cases where the court appeared to apply ordinary pleading standards to CPA claims, *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 93-100 (2007), and *Snierson v. Scruton*, 145 N.H. 73, 80-81 (2000). *Meta* Order 40.

TTI respectfully disagrees with that ruling. Neither *LaChance* nor *Snierson* ruled on or addressed the pleading standards for CPA deceptive practices claims. Indeed, *Snierson* analyzed the parties' CPA deceptive practices claims only *after* concluding that the plaintiff alleged fraud

with the requisite specificity. 145 N.H. at 77, 80-81. More recent precedent from the New

Hampshire Supreme Court provides that claims sounding in fraud are subject to heightened

pleading requirements. *See Tessier*, 162 N.H. at 332. By their terms, the State's deceptive

practices claims sound in fraud. Indeed, the language of the State's deceptive practices claims is

almost verbatim to that of common law fraud. *Compare, e.g.*, FAC ¶¶ 415-16 (alleging

"misrepresentations as to material facts" and "omitting material facts" "with the intent that

consumers rely on [TTI's] deceptive practices") *with Snierson*, 145 N.H. at 77 ("To establish

fraud, a plaintiff must prove that the defendant made a representation with knowledge of its

falsity or with conscious indifference to its truth with the intention to cause another to rely upon

it.").

## 2.    The State fails to challenge actionable misrepresentations.

Even when the State does specifically identify alleged misrepresentations, they are non-

actionable statements that no reasonable consumer could rely on. *See Ahern v. Apple Inc.*, 411 F.

Supp. 3d 541, 555-56 (N.D. Cal. 2019) (analyzing New Hampshire CPA).

**Platform safety.** Under the CPA, "only factual misstatements, not statements of opinion,

constitute actionable misrepresentations." *Private Jet Servs. Grp., Inc. v. Sky King, Inc.*, 2006

WL 2864057, at *5 (D.N.H. Oct. 4, 2006). A "representation which merely amounts to a

statement of opinion, judgment, probability, or expectation, or is vague and indefinite in its

terms, or is merely a loose, conjectural, or exaggerated statement, goes for nothing." *Id.* (quoting

*Messer v. Smyth*, 59 N.H. 41, 43 (1879)). The State's deceptive practices claims fail this test.

Take, for example, the State's theory that TTI failed to adequately warn users that the

platform was "addictive," and thus posed mental health risks to younger users. This theory

challenges statements such as that the platform "is a safe environment for users of all ages and

children." FAC ¶ 416(a). But terms like "addictive" and "safe" are hardly self-defining terms

when used to describe speech—they are quintessentially "vague and indefinite" terms in this context. *Messer*, 59 N.H. at 43. They are also subjective "opinion[s]" or "judgment[s]" about the platform and its safety—whether a platform is so engaging as to be "addictive" and not "safe" is not a fact that can be proven true or false. *Id.* It is well-established that such "[g]eneral statements about compliance with safety and quality standards are non-actionable puffery." *Leonard v. Abbott Lab'ys, Inc.*, 2012 WL 764199, at *22 (E.D.N.Y. Mar. 5, 2012) (applying New Hampshire CPA); *see also In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 770-71 (N.D. Cal. 2020) (general statements about company's "commitment to safety" and "safety measures" were non-actionable); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *26 (N.D. Cal. Aug. 30, 2017) (general statement by company that "protecting our systems and our users' information is paramount" was "non-actionable"); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015) (general statement that company's car service was "safest ride on the road" was "non-actionable").

The same is true for statements like "TikTok works to support teen users and parents by building effective controls." FAC ¶ 416(b). These statements—e.g., that a feature is "effective"—do not "suggest a particular standard or quality," but are statements of aspiration and "self-laudatory opinions" that are not actionable under the CPA. *Private Jet Servs. Grp.*, 2006 WL 2864057, at *5. This is likewise the case for statements like the platform "works to support the well-being of everyone on the App," FAC ¶ 416(c), which are merely "aspirational statements" that are "too vague for a reasonable consumer to rely on," *Leonard*, 2012 WL 764199, at *22.

**Geographic origin.** The State's theory of deception on its "geographic origin" claim is that TTI has misrepresented that it is "located, controlled, and/or headquartered in the United

40

States," and that it is in fact "influence[d]" and "controlled" by a "China-based parent company, ByteDance." *Id.* ¶¶ 349, 360, 480. But whether and to what extent a domestic company is "influenced" or "controlled by" a foreign entity is a vague, general, and "inherently subjective" statement that is not capable of being proven true or false. *See Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1304 (10th Cir. 2022) (dismissing claims under Colorado consumer protection act because challenged statements about product's "Fresh and Regional" character were "inherently subjective").

### 3.    The State's allegations of deception are undercut and contradicted by its own allegations and materials incorporated into the FAC.

To the extent that the State identifies any representation of fact, the State's own allegations and the materials incorporated by reference into the FAC undercut and contradict the State's theory that TTI acted deceptively as to those representations. *See Hiam v. HomeAway Inc.*, 267 F. Supp. 3d 338, 353 (D. Mass. 2017), *aff'd*, 887 F.3d 542 (1st Cir. 2018) (analyzing deceptive practices claim under Massachusetts consumer protection law; holding that representation is not deceptive if substantially true).

**Platform safety.** To start, the FAC and the materials referenced in it are inconsistent with the State's theory that TTI has misrepresented or omitted key facts about platform safety.

For example, the State alleges that TTI misrepresented that the platform "identif[ies]" and "removes" content that violates policies such as the platform's Community Guidelines. FAC ¶ 416(g). But the State admits that the platform makes ongoing efforts to enforce its Community Guidelines and identify content that violates those policies. *Id.* ¶¶ 138, 142, 154, 162, 169-71, 179, 180, 204.

Likewise, the State alleges that TTI has misrepresented that the platform "prohibits content about dangerous challenges, bullying, drugs, mature themes, disordered eating and

weight loss, suicide and self-harm, and content that exploits children." *Id.* ¶ 416(f). But a review of the Community Guidelines confirms that the platform does in fact prohibit this content.[10] Those same guidelines also expressly disclose that the platform "*cannot guarantee* that all content shared on TikTok complies with our Terms of Service or Community Guidelines."[11]

For good reason: the suggestion that an online platform can guarantee that it can remove each and every instance of violative content is implausible, and no reasonable user would believe it. As one court acknowledged, "[i]t would be impossible . . . to screen each of [the] millions of postings for possible problems." *Zeran*, 129 F.3d at 331. For that reason, courts have consistently held that a platform cannot be held liable for alleged deception about its content moderation policies where, as here, the platform expressly warns that it cannot ensure all violative content is removed. *See Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003); *Herrick*, 306 F. Supp. 3d at 596; *Brikman v. Twitter, Inc.*, 2020 WL 5594637, at *4 (E.D.N.Y. Sept. 17, 2020).

The State also alleges that, although the platform markets tools like "Family Pairing" and "Restricted Mode" to help parents limit their children's content access and "customize their safety settings based on individual needs" on the platform, FAC ¶¶ 120, 123, those controls "do[] not work as advertised," *id.* ¶ 124. But the State does not (and could not) allege that TTI ever represented that such tools would prevent minors from ever seeing mature or inappropriate content. Indeed, on the same Newsroom post that the State cites for these allegations, TTI clarifies that Family Pairing "allows parents and teens to customize their safety settings based on

---

[10] TikTok, *Community Guidelines: Enforcement* (last accessed Dec. 16, 2024), https://www.tiktok.com/community-guidelines/en/enforcement. The Court may consider the Community Guidelines and other platform-related documents because they are incorporated by reference into the FAC. *See* FAC ¶¶ 128 (Community Guidelines), 123 (Newsroom); *see also Beane*, 160 N.H. at 711 (court may consider "documents sufficiently referred to in the complaint" when deciding motion to dismiss).

[11] TikTok, *Community Guidelines: Enforcement* (last accessed Dec. 16, 2024), https://www.tiktok.com/community-guidelines/en/enforcement.

individual needs," and that Restricted Mode "[l]imit[s] the appearance of content that may not be appropriate for all audiences."[12] The Newsroom post even states that these safety features are a part of the platform's "continued work toward providing parents better ability to guide their teen's online experience."[13] This language on its face simply states that Family Pairing and Restricted Mode are part of an ongoing commitment to improving the safety of the TikTok platform. It does not represent that the platform has implemented a definitive, perfect solution.

In the *Meta* decision, the Court ruled that, at least for purposes of the pleading stage, the State sufficiently alleged that Meta deceived users about the supposed risks and harms of using Facebook and Instagram. *Meta* Order 41-43. The Court's ruling was based on an alleged information asymmetry between Meta and its users—i.e., Meta knew about the risks and harms of using Facebook and Instagram, those risks and harms are less "visible or obvious" to a "reasonable consumer," and Meta "omitted" and "aimed to conceal" those risks and harms from the public. *Id.*

The State's "information asymmetry" theory does not apply here. Unlike in *Meta*, the State's theory of harm in this case is based entirely on the substance of the alleged *content* on the TikTok platform. But as just explained, the State's own admissions and materials incorporated by reference into the FAC establish that the platform discloses that it cannot guarantee that all violative content is removed or that younger users will never see mature or inappropriate content on the platform. And the State itself cites numerous sources widely publicizing the alleged risks and harms of using online platforms.

**Geographic origin.** The FAC also undercuts the suggestion that TTI has somehow

---

[12] TikTok, *TikTok introduces Family Pairing* (last accessed Dec. 16, 2024), https://newsroom.tiktok.com/en-us/tiktok-introduces-family-pairing.

[13] *Id.*

misrepresented or concealed its "geographic origin." As a matter of law, a company's

"geographic origin" means its actual "business location"—not whether it is "influenced" or

"controlled" by a foreign entity, as the State alleges (and which TTI denies). *State ex rel. Petro v.*

*Pristine Secure Servs.*, 2005 WL 3867419, at *2 (Ohio Com. Pl. July 5, 2005). The State alleges

no facts suggesting that TTI has ever misrepresented or failed to disclose that its business

location is in the United States, not China. The FAC itself admits that "TikTok Inc. is

incorporated in California," "headquartered" in Los Angeles, and has its "principal place of

business" in California. FAC ¶¶ 31, 351.

> **D.    The Court should dismiss the State's child privacy CPA claims (Counts 4 and 5) because they are preempted by federal law.**

The State's final set of CPA claims (Counts 4 and 5) allege that the platform improperly

collected data from users under 13 in violation of COPPA and also inaccurately and inadequately

described its data collection efforts. *See* FAC ¶¶ 429-74. Both claims are preempted by COPPA.

Congress enacted COPPA in 1998 to create a uniform, nationwide standard governing the

online collection of data from users under 13. *See* Children's Online Privacy Protection Act of

1998, Pub. L. No. 105-277, tit. XIII, 112 Stat. 2681-728 (codified at 15 U.S.C. §§ 6501-6506).

As part of those efforts, Congress created a comprehensive remedial scheme for enforcing

alleged violations of COPPA. Under that scheme, COPPA vests the federal government—

through the Federal Trade Commission—with the primary authority for enforcing COPPA. *Id.*

§§ 6502(c), 6505(d). COPPA supplements that authority by allowing state attorneys general to

bring their own civil enforcement actions *parens patriae*. *Id.* § 6504(a)(1). But in exchange for

this grant of enforcement authority, COPPA imposes certain limitations on state enforcement

actions. The limitations are both procedural and substantive. States must bring their actions in a

federal district court of proper venue, not state court. *Id.* § 6504(a)(1), (e). To ensure that the

federal government retains its lead role in enforcing COPPA, states must either give the FTC notice before bringing their action or establish that they are entitled to an "[e]xemption" from these notice requirements. *Id.* § 6504(a)(2). Similarly, COPPA bars states from "institut[ing]" enforcement actions "during the pendency of" a parallel FTC proceeding that has been brought against the same defendant. *Id.* § 6504(d). And COPPA restricts states to three specifically enumerated categories of relief—injunctive relief, "damage, restitution, or other compensation on behalf of residents of the State," and "such other relief as the court may consider to be appropriate." *Id.* § 6504(a).

To enforce this comprehensive remedial scheme, COPPA also contains an express preemption clause. That clause bars any attempt by states to impose liability in a way that is "inconsistent with" COPPA. *Id.* § 6502(d). Specifically, the preemption clause provides: "No State or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this chapter that is inconsistent with the treatment of those activities or actions under this section." *Id.*

Counts 4 and 5 are "inconsistent with" COPPA's remedial scheme and thus preempted. For one, the State brought this case in state court, not a federal district court of proper venue. Second, the State alleges no facts suggesting that it gave the federal government the required notice or that it is exempt from the notice requirements. *See* FAC ¶¶ 287-346, 429-74. Third, there is a pending FTC proceeding against this same defendant. The State filed its operative complaint against TTI in October 2024. *Id.* at 146. But two months before, in August, the United States—through the Department of Justice and FTC—brought an action against TTI in California

federal court for the same alleged COPPA violations.[14] The United States alleges the same

claims at issue here—that TTI violated COPPA because it "collect[s] personal information from

children through the TikTok app and website"; has "actual knowledge that [it is] collecting

personal information from children; and "collected, used, and disclosed personal information

from children in violation of COPPA and the COPPA Rule." *Id.* ¶¶ 117-18. The federal

government's case remains pending.[15] Lastly, Counts 4 and 5 seek relief beyond that permitted

by COPPA, including civil penalties of $10,000 per CPA violation and litigation costs and

expenses. FAC ¶¶ 453-54, 473-74.

The State cannot end-run COPPA's remedial scheme by pleading its claims *indirectly* as

state law consumer protection claims rather than directly under COPPA's express provisions for

state civil enforcement actions. Last year, the Ninth Circuit considered whether and in what

circumstances state law consumer protection claims are "inconsistent with"—and thus preempted

by—COPPA. *See Jones v. Google*, 73 F.4th 636, 639 (9th Cir. 2023). The Ninth Circuit held that

a state law is consistent with COPPA so long as it merely "supplement[s]" or "require[s] the

same thing" as COPPA. *Id.* at 643.

Here, the State's claims do not merely "supplement" or "require the same thing" as

COPPA—they directly violate COPPA and its remedial scheme. No matter how the State may

style Counts 4 and 5, those claims just *are* COPPA claims. The claims are expressly predicated

on alleged violations of COPPA. In the State's words: "By the actions it has taken in violation of

the COPPA, TikTok has committed unfair acts in violation of the CPA." FAC ¶ 433. And

because of COPPA's preemption clause, the State must make the same liability showing under

---

[14] Ex. 1, Compl., *United States v. ByteDance Ltd.*, No. 2:24-cv-06535 (C.D. Cal. Aug. 2, 2024) ¶¶ 115-23.

[15] Ex. 2, Docket Sheet, *United States v. ByteDance Ltd.*, No. 2:24-cv-06535 (C.D. Cal.) (last accessed Dec. 16, 2024).

Counts 4 and 5 as it would have been required to make had it brought its claims directly under COPPA. Otherwise, Counts 4 and 5 would be preempted by COPPA. *See New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1220-21 (D.N.M. 2020) (state law consumer protection claims preempted by COPPA when they would impose liability without meeting COPPA's "actual knowledge" requirement).

Finally, the State expressly states that it brings Counts 4 and 5 *parens patriae*. FAC ¶ 30. COPPA is clear: when, as here, a state brings a *parens patriae* civil enforcement action for COPPA violations, it must do so in compliance with COPPA's remedial scheme and the procedural and substantive requirements for such enforcement actions. *See* 15 U.S.C. § 6504(a)(1) ("the State, as parens patriae, may bring a civil action on behalf of the residents of the State"). Counts 4 and 5 do not comply with those requirements and are preempted.

**IV. The Court should dismiss the State's products liability claims (Counts 7-9) for additional, claim-specific reasons.**

Finally, the Court should dismiss Counts 7-9 for strict and negligent products liability. These claims assert that the platform and its features are "products," FAC ¶¶ 493, 512, 529; that the platform was defectively designed because it poses "risks" to younger users, *id.* ¶¶ 492-510, 529-530; that TTI failed to adequately warn users of those risks, *id.* ¶¶ 511-27, 529-30; and that New Hampshire users suffered "substantial injury" and "damages" as a result, *id.* ¶¶ 508-09, 525-26, 533-34. These claims fail for two reasons: (1) the State lacks standing to bring products liability claims *parens patriae*, and (2) the platform is not a "product."

**A. The State lacks standing to bring products liability claims.**

"*Parens patriae* standing . . . requires a finding that individuals could not obtain complete relief through a private suit." *N.Y. ex rel. Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 40 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d (2d Cir. 1983) (en banc); *cf. State v. City of*

*Dover*, 153 N.H. 181, 186 (2006) (New Hampshire follows federal precedent on scope of *parens patriae* standing). A State may not assert *parens patriae* standing when the individuals who are allegedly "directly affected" by the alleged wrongdoing can "pursu[e] their own interests" and "obtain complete relief through . . . private suit." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652-53 (9th Cir. 2017). A corollary of this rule is that, absent a specific grant of legislative authorization, states may not bring *parens patriae* actions to recover money damages based on alleged personal injuries to private, third-party individuals. *See California v. Frito-Lay, Inc.*, 474 F.2d 774, 775 (9th Cir. 1973); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1164 (N.D. Cal. 2007). The State's attempt to bring its products liability claims *parens patriae* violates both rules.

*First*, the State alleges no facts suggesting that any private individuals who believe they were harmed by the conduct that the State alleges here are unable to try to seek relief through private suits. In fact, many users already have. There is a federal MDL that includes hundreds of cases brought by individuals raising the same claims, challenging the same features, and seeking the same relief. *See In re Social Media*, 702 F. Supp. 3d at 818. Many other users have filed claims in coordinated proceedings in California state court. *See Social Media Cases*, 2023 WL 6847378, at *1-8 (Cal. Super. Ct. Oct. 13, 2023).

*Second*, the State cites no authority allowing it to seek money damages for a products liability claim based on personal injuries allegedly suffered by private third parties, much less a specific grant of legislative authorization. *See* FAC ¶¶ 30, 509, 526, 534. The State cites only RSA §§ 21-M:5, 21-M:9, and 358-A:4 for the general propositions that the "Attorney General is responsible for representing the public interest," and is "authorized to enforce the State's consumer protection laws" and to seek "injunctive relief, restitution, and civil penalties." *Id.*

¶ 30. None of those statutes authorizes the State to bring products liability claims for money damages based on personal injuries to private third parties. *See, e.g.*, RSA § 21-M:5 (discussing Attorney General's power to "[r]epresent the public interest in the administration of the department of justice").

In the *Meta* decision, the Court ruled that the State had standing to pursue its products liability claims *parens patriae*. *Meta* Order 50. The Court concluded that the New Hampshire Supreme Court has not applied these requirements as part of the threshold standing analysis, and instead applied them when determining the scope of recoverable damages in a *parens patriae* action. *Id.* TTI respectfully disagrees with that ruling, as the difference between standing and damages is immaterial here. Like all torts, an essential element of a products liability claim is the damages element—i.e., the plaintiff suffered legally cognizable damages. *See Buckingham v. R.J. Reynolds Tobacco Co.*, 142 N.H. 822, 829 (1998); *Kravitz v. Beech Hill Hosp., L.L.C.*, 148 N.H. 383, 391 (2002). Here, the only damages that the State asserts on its products liability claims are money damages based on alleged personal injuries to private third parties. FAC ¶¶ 507-09, 524-26, 532-34. And the New Hampshire Supreme Court has held that the State has no cognizable damages when, as here, its damages are based entirely on "losses" that "properly belong" to private individuals. *State v. Hess Corp.*, 161 N.H. 426, 437 (2011). Regardless of whether this defect is framed as a standing or damages issue, the end result is the same: the State cannot pursue its products liability claims.

**B.     The TikTok platform is not a "product."**

To state a products liability claim, the State must allege that a *product* caused the alleged injuries. *Trull v. Volkswagen of Am. Inc.*, 145 N.H. 259, 264 (2000); *Royer v. Catholic Med. Ctr.*, 144 N.H. 330, 332 (1999). The State's standing issues aside, the TikTok platform is not a "product."

New Hampshire looks to the Second and Third Restatements when analyzing products liability claims. *See State v. Exxon Mobil Corp.*, 168 N.H. 211, 242 (2015); *Kelleher v. Marvin Lumber & Cedar Co.*, 152 N.H. 813, 831 (2005). In defining what counts as a "product," the Second and Third Restatements "focus on tangible" and "physical items." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991). The Second Restatement provides that products are "tangible items, such as tires, automobiles, and insecticides." *Id.* (citing Restatement (Second) of Torts § 402A comment d). The Third Restatement provides that a product is "tangible personal property distributed commercially for use or consumption." Restatement (Third) of Torts: Prod. Liab. § 19 (1998). Intangible "ideas and expression" are not products— even if such ideas and expression may injure those who engage with them. *See Winter*, 938 F.2d at 1034-35; *see also James*, 300 F.3d at 701; *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022).

Applying these rules, courts regularly conclude that online platforms that facilitate the sharing of intangible information and ideas—like the TikTok platform—are not a "product" for purposes of products liability law. *See Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994, 1011 (C.D. Cal. 2022) (Airbnb); *Quinteros v. InnoGames*, 2022 WL 898560, at *1, *7 (W.D. Wash. Mar. 28, 2022) (online videogame); *Facebook*, 625 S.W.3d at 85 n.1 (Facebook); *Jane Doe No. 1 v. Uber Techs., Inc.*, 79 Cal. App. 5th 410, 419 (2022) (Uber); *Social Media Cases*, 2023 WL 6847378, at *15 (social media platforms are not products because they "are not tangible" or "analogous to tangible personal property"); *Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586, at *4 (Cal. Super. Ct. Mar. 10, 2023) (Facebook).

The same result should apply here. The TikTok platform is not a tangible or physical item of personal property. It is an intangible online platform that allows users to create, share, and

50

view similarly intangible content. *See* FAC ¶¶ 41, 53, 81, 190, 206. Moreover, all of the alleged harms at issue in the State's products liability claims arise out of users' engagement with that intangible content. *See, e.g., id.* ¶ 507 (defective design claim; "The Addictive Features of [the platform] negatively impact children's brain development, sleep, and overall mental health and well-being").

In an apparent attempt to sidestep this authority, the State frames its products liability claims as also attacking the platform's individual "design features," which it says are products. *Id.* ¶¶ 493, 497. That analysis is incorrect. No New Hampshire court has applied products liability law in this manner. In any event, the argument is unavailing. Like the platform itself, the platform's features are not tangible property. Instead, the features relate to how the platform "bring[s] [intangible] ideas and information to the public." *Winter*, 938 F.2d at 1037 n.8.

For example, the platform's algorithm-based recommendation system, "infinite scroll" feature, and push notifications deliver content to users. The presentation of "information," including by "algorithm" or "formula," is not a product. *Rodgers v. Christie*, 795 F. App'x 878, 880 (3d Cir. 2020); *see also Estate of B.H.*, 2022 WL 551701, at *3 (rejecting products liability claim "premised on the content and dissemination of [a television] show"). Other features that the State challenges—such as filters and effects—are tools that the platform provides to allow users to express themselves. Products liability "has never been extended to words or pictures." *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990); *see Grossman v. Rockaway Tp.*, 2019 WL 2649153, at *3, *15 (N.J. Super. Ct. June 10, 2019) (an online platform allowing users to "develop messages or graphic overlays that accompany photographs" did not "support the theory that [the platform's] actions qualify or constitute a product"). The same is true for TikTok LIVE's alleged "monetization" feature. FAC ¶ 241. Allowing users to express "appreciation and

encouragement" for user content by activating "Gifts" is an intangible feature related to third-party expression, not a product. *See Bland*, 730 F.3d at 386 (user "likes" are "speech" and "symbolic expression").

In the *Meta* decision, the Court ruled that the Facebook and Instagram platforms are "products." *Meta* Order 51-53. The Court reasoned that those platforms were "akin to the distribution and use of tangible property" because they are the "vehicle" through which Meta "effectuates" its business. *Id.* at 51. The Court also reasserted its ruling that the State's particular allegations of harm against Meta in that case were based on design features of the Facebook and Instagram platforms, not the content on those platforms. *Id.* at 53.

TTI respectfully disagrees with that conclusion and its application to this case. In defining what count as a "product," the Second and Third Restatements (and the courts that apply them) do not look to whether the item is an alleged component or instrumentality of the defendant's business. This makes sense: if something counts as a "product" simply because it is used in the defendant's business, products liability law would have no limits. As the authorities discussed above show, the question is whether the item is a tangible or physical piece of property. The TikTok platform—and the content on the platform that allegedly gives rise to the harms at issue here—are not tangible, physical items.

## <u>CONCLUSION</u>

The Court should dismiss the FAC with prejudice.


Dated: December 16, 2024                    Respectfully submitted,

                                            TIKTOK INC.
                                            By its counsel,
                                            SHAHEEN & GORDON, PA

                                            By: */s/ Brian M. Quirk*

Brian M. Quirk, Esq., NH Bar #12526
Olivia Bensinger, NH Bar #274145
P.O. Box. 2703
107 Storrs Street
Concord, NH 03302-2703
(603) 225-7262
bquirk@shaheengordon.com
obensinger@shaheengordon.com

O'MELVENY & MYERS LLP

Daniel M. Petrocelli (*pro hac vice* pending)
Lauren F. Kaplan (*pro hac vice* forthcoming)
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
lkaplan@omm.com

Stephen D. Brody (*pro hac vice* forthcoming)
Jonathan D. Hacker (*pro hac vice* forthcoming)
Martha F. Hutton (*pro hac vice* pending)
1625 Eye Street N.W.
Washington DC, 20006
Telephone: (202) 383-5167
sbrody@omm.com
jhacker@omm.com
mhutton@omm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has this day been filed with the Court using the Court's filing system and served on all counsel of record.

/s/ *Brian M. Quirk*
Brian M. Quirk
NH Bar #12526