# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | MDL 3144-GW-RAOx | Date | November 5, 2025 |
|---|---|---|---|
| Title | *In Re: Tiktok, Inc., Minor Privacy Litigation* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**    **IN CHAMBERS - TENTATIVE RULING ON DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL
PROCEDURE 12(b)(1) AND 12(b)(6) [104]; and DEFENDANTS'
MOTION TO STAY [105]**

Attached hereto is the Court's Tentative Ruling on Defendants' Motions [104, 105], set for hearing on November 6, 2025 at 8:30 a.m.

Initials of Preparer    JG

*In Re: Tiktok, Inc., Minor Privacy Litigation*; 2:25-ml-03144-GW-(RAOx)
Tentative Rulings on (1) Defendants' Motion to Stay, and (2) Defendants' Motion to Dismiss

      Defendants ByteDance Inc., ByteDance Ltd., TikTok Inc., TikTok Ltd., TikTok LLC, TikTok Pte. Ltd., and TikTok U.S. Data Security Inc. (collectively, "Defendants") move to stay this multi-district litigation pending resolution of the earlier-filed government action against it which is also before this Court. *See* Motion to Stay ("Stay Motion"), Docket No. 105-1; *United States v. ByteDance Ltd*., No. 2:24-cv-06535-GW-RAO (C.D. Cal. Aug. 2, 2024) ("DOJ Action" or "*ByteDance*"). Additionally, Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Motion to Dismiss ("MTD"), Docket No. 104-1. Plaintiffs J.C., A.J., B.M., L.F., D.M., D.G., A.B., A.L., M.G., V.M., Z.B., I.B., K.F., J.W., S.T., I.T., and E.B. (collectively, "Plaintiffs") oppose both motions. *See* Opposition to Motion to Stay Case ("Stay Opp."), Docket No. 109; Opposition to Motion to Dismiss ("MTD Opp."), Docket No. 110. Defendants also submit respective reply briefs. *See* Stay Reply, Docket No. 119; MTD Reply, Docket No. 118. For the reasons stated herein, the Court would (1) **DENY** the Stay Motion and (2) **DENY** the MTD in large part, but **GRANT** it with leave to amend with respect to claims brought under the laws of various states in which no Plaintiff is domiciled or was injured.

## I.    <u>Background</u>

      This case concerns minors under the age of 13 who used the social media platform TikTok and the Plaintiffs' contention that the minors' personal information was collected, shared, and exploited without parental notice and consent and in violation of their privacy rights.

### A.  **TikTok Platform**

      TikTok is a social media platform that "allows users to create, upload, and share shortform videos." *See* Consolidated Class Action Complaint ("Compl."), Docket No. 94, ¶ 82. TikTok is a successor to Musical.ly, which launched in 2014 as a platform to "create and share short lip-sync videos." *Id*. ¶ 76. Musical.ly was incredibly popular among children under the age of 13, who made up a "significant portion" of its users. *Id*. ¶¶ 77-79. In 2017, ByteDance Ltd. created TikTok and purchased Musical.ly, merging the two applications and consolidating their data. *Id*. ¶¶ 80-81. The popularity of TikTok has grown exponentially, with 170 million users in the United States as of 2024. *Id*. ¶ 9. Many TikTok users are children; a July 2020 estimate had "more than one-third" of its daily users as 14 or younger. *Id*. ¶ 10. According to Plaintiffs, TikTok intentionally

attracts children to its platform by featuring and serving content from well-known children's brands and promoting child models, celebrities, and influencers. *Id.* ¶¶ 92-95.

TikTok is free to download and generates revenue primarily through "showing third-party advertisements to users on its platform." *Id.* ¶¶ 82-83. These advertisements are targeted specifically to users based upon a substantial amount of information TikTok collects, "including account and profile information, user-generated content, such as videos viewed, videos 'liked,' accounts followed, content viewed, content created, messages, purchase information, usage information, as well as location data, device information, metadata, and data from cookies and similar technologies that track users across different websites and platforms." *Id.* ¶ 84. Age is a component of this profiling, and factors into the algorithmically personalized content provided to users as well as the products and services they are shown. *Id.* ¶¶ 99-102.

In addition to its primary platform, which provides users with full access to its features and potential library of content, TikTok operates a "modified platform" called "Kids Mode." *Id.* ¶ 3. Kids Mode "restricts user activity and prevents users from posting, messaging, or using features like commenting or sharing." *Id.* TikTok also collects personal information, albeit less, from users in Kids Mode. *Id.* ¶¶ 124-125, 128-129. When creating a TikTok account, users must enter their birthdate, which functions as an "age gate," diverting users who self-identify as under the age of 13 to the Kids Mode version of the TikTok platform. *Id.* ¶¶ 103-105. However, Plaintiffs allege that in recent years, the age gate could be easily bypassed, such as by restarting the account creation process to simply assert a different birthdate or avoiding the age gate entirely by creating an account using the login credentials from other online accounts such as Instagram and Google that did not themselves require birthdates. *Id.* ¶¶ 109-117.

## B. *Musical.ly* Injunction

On February 27, 2019, the United States filed a complaint alleging that TikTok (then still called Musical.ly) unlawfully collected and used the personal information of children under the age of 13 in violation of the Children's Online Privacy Protection Act ("COPPA").[1] *Id.* ¶ 7; *see*

---

[1] "COPPA aims to 'safeguard the confidentiality, security, and integrity of . . . children's personal online information' by requiring 'companies that operate websites and online services marketed toward children . . . [to] provide certain disclosures about their data collection activities.' Under COPPA it is unlawful for a website or online service that is 'directed to children' or has 'actual knowledge' of child users to collect personal information from those children unless the platform collects information in a manner permitted by FTC regulations. COPPA further defines a 'website or online service directed to children' as '(i) a commercial website or online service that is targeted to

Complaint, *United States v. Musical.ly*, No. 2:19-cv-1439 (C.D. Cal. Feb. 27, 2019), Docket No. 1. Just one month later, the parties stipulated to a permanent injunction (the "2019 Injunction" or "*Musical.ly* Injunction") and a $5.7 million civil penalty to resolve the case. Compl. ¶ 8; *United States v. Musical.ly*, No. 2:19-cv-1439 (C.D. Cal. Feb. 27, 2019), Docket No. 10. The *Musical.ly* Injunction enjoined TikTok from violating the "COPPA Rule" (16 C.F.R. Part 312) and the "continued collection and use of the Private Information of children under the age of 13 without notice and verifiable parental consent." Compl. ¶ 2.

### C. *ByteDance*

On August 2, 2024, the United States filed a complaint against Bytedance Inc. and other entities associated with the TikTok platform, alleging that TikTok violates the COPPA Rule and the terms of the 2019 Injunction by knowingly allowing children to bypass the age gate and collecting personal information from them both on the full access and Kids Mode platforms, failing to obtain parental consent, failing to honor parents' requests to delete their children's accounts and personal information, and failing to delete accounts and information identified as belonging to children. *See ByteDance*, Docket No. 1. The *ByteDance* action is ongoing before this Court.

### D. Plaintiffs' Claims

Shortly after the *ByteDance* complaint was filed, minors filed private actions in courts across the country predicated on similar factual allegations underlying the *ByteDance* COPPA action, which were consolidated by the Judicial Panel on Multidistrict Litigation and subsequently transferred to this Court. *See* Docket No. 1. Based on those factual allegations, Plaintiffs now assert the following causes of action in their consolidated Complaint on behalf of themselves and proposed multistate classes or state-specific classes: (1) intrusion upon seclusion under the laws of 38 states; (2) unjust enrichment under the laws of 44 states; (3) California Constitution invasion of privacy; (4) negligence under California law; (5) California Unfair Competition Law ("UCL"); (6) negligence under Connecticut law; (7) Connecticut Unfair Trade Practices Act ("CUTPA"); (8) Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"); (9) negligence under Florida law; (10) negligence under Georgia law; (11) Georgia Fair Business Practices Act ("GFBPA");

---

children; or (ii) that portion of a commercial website or online service that is targeted to children.' Thus, a company can become subject to COPPA's requirements in two ways: if its platform is 'directed to children' or it has 'actual knowledge' of child users." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 875 (N.D. Cal. 2024) (citations omitted) (first quoting *Jones v. Google LLC*, 73 F.4th 636, 641 (9th Cir. 2023); then quoting 15 U.S.C. § 6502(a)(1); and then quoting 15 U.S.C. § 6501(10)(A)).

(12) negligence under Missouri law; (13) Missouri Merchandising Practices Act ("MMPA"); (14) New York Civil Rights Law ("NYCRL"); (15) negligence under New York law; (16) negligence under Pennsylvania law; (17) Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); (18) negligence under Washington law; and (19) Washington Consumer Protection Act ("WCPA"). *See generally* Compl.

## II.    <u>Legal Standards</u>

### A. *Landis* Stay

"A district court has inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)). "A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979). "This rule . . . does not require that the issues in such proceedings are necessarily controlling of the action before the court." *Id*. at 863-64.

"Where it is proposed that a pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among these competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX*, 300 F.2d at 268.

"The proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997). "'[I]f there is even a fair possibility that the stay . . . will work damage to some one else,' the party seeking the stay 'must make out a clear case of hardship or inequity.'" *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) (quoting *Landis*, 299 U.S. at 255). Moreover, a "'stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time.'" *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (quoting *Leyva*, 593 F.2d at 864). "Generally, stays should not be indefinite in nature." *Id*.

### B. Rule 12(b)(1)

Under Rule 12(b)(1), a defendant may move to dismiss for a lack of subject-matter

jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Article III of the Constitution limits the jurisdiction of
federal courts to 'Cases' and 'Controversies.'"  *Murthy v. Missouri*, 603 U.S. 43, 56 (2024).  "To
satisfy Article III's case or controversy requirement, a plaintiff must establish that she has standing
to invoke the jurisdiction of the federal courts."  *Bowen v. Energizer Holdings, Inc.*, 118 F.4th
1134, 1142 (9th Cir. 2024).  "[T]he irreducible constitutional minimum of standing contains three
elements."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "The plaintiff must have
(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,
and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578
U.S. 330, 338 (2016).

### C.  Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon
which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed under Rule
12(b)(6) for one of two reasons: (1) it lacks a cognizable legal theory; or (2) it alleges insufficient
facts to support a cognizable legal theory.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007);
*see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal
under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or
sufficient facts to support a cognizable legal theory.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  The court must construe the complaint
in the light most favorable to the plaintiff, accept all allegations of material facts as true, and draw
all reasonable inferences from well-pled factual allegations.  *Gompper v. VISX, Inc.*, 298 F.3d 893,
896 (9th Cir. 2002).  The court is not required, however, to accept as true legal conclusions couched
as factual allegations.  *See Iqbal*, 556 U.S. at 678.  "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged."  *Id.*

### III.  <u>Discussion</u>

### A.  Motion to Stay

Defendants have requested a stay in the alternative to their motion to dismiss.  *See* Stay
Motion at 1 ("In the event the Court declines to grant [the motion to dismiss], Defendants hereby
request in the alternative that the Court stay Plaintiffs' case pending resolution of the related and

parallel civil action brought by the U.S. Department of Justice.").  However, because it would be inefficient to address the merits of the parties' other motions should the Court be inclined to grant the stay of proceedings, the Court addresses the Stay Motion first.

As a threshold observation, the bulk of Defendants' arguments in support of a stay are directed toward the course of justice prong: simplifying of issues, avoidance of potentially inconsistent results, and judicial efficiency.  *See* Stay Motion at 6-15.  However, the Court notes that "case management standing alone is not necessarily a sufficient ground to stay proceedings." *Dependable Highway*, 498 F.3d at 1066.  Therefore, the Court begins its analysis by considering the parties' potential hardships.

### 1. Possible Harm to Plaintiffs

Defendants argue that Plaintiffs will not "suffer any material harm in the event of a stay," asserting that a delay "even of over a year" is not "a sufficient basis to justify a denial of a stay." *See* Stay Motion at 16.  Plaintiffs counter that "a stay will prevent Plaintiffs from obtaining evidence central to their case and will palpably risk the total loss of that evidence." *See* Stay Opp. at 4.  Specifically, Plaintiffs point to Defendants' arguments that they "should not be forced" to preserve user data "for Plaintiffs' case" as it "conflicts with COPPA and DOJ's approach," *see* Stay Motion at 12-13, arguing that they suggest Defendants will "delete swaths of evidence that are central to Plaintiffs' case" if a stay is granted.  *See* Stay Opp. at 3.  Additionally, Plaintiffs assert that their ability to obtain evidence from class members will be hindered, risking "important deposition evidence due to witnesses forgetting important facts."  *Id*. at 4.  Finally, Plaintiffs contend that the stay may last indefinitely, particularly given external developments regarding the ownership of the TikTok platform in the United States, therefore requiring "a greater showing" from Defendants to justify a stay.  *Id*. at 4-5.

Given the parties' protracted dispute over user data preservation, which itself is the subject of two further motions presently before this Court, as well as the purportedly "dramatically different approach to preservation" taken by the DOJ (*see* Stay Motion at 12), the Court agrees with Plaintiffs that there is at least a fair possibility that Plaintiffs will permanently lose evidence within Defendants' possession if their case is deferred until the resolution of the DOJ Action.  *See Fed. Trade Comm'n v. Noland*, No. 20-cv-00047-PHX-DWL, 2020 WL 7075241, at *5 (D. Ariz. Dec. 3, 2020) (finding possible damage to plaintiff counseled against stay where "concern of loss of evidence" was not "hypothetical or conclusory").  Defendants make a distinction between

preservation and spoliation of user data, *see* Stay Reply at 13-14, but if data sought by Plaintiffs is subject to Defendants' rolling deletion policies[2] and permanently lost to Plaintiffs, that seems to this Court a distinction without a difference. Defendants further argue that Plaintiffs' assertion that they will be harmed by a loss of evidence "is speculative," but rest this argument on speculation about this Court's resolution of the parties' ongoing preservation dispute.[3] *Id*. at 15.

Moreover, the Court agrees with Plaintiffs that the length of Defendants' proposed stay raises further evidentiary concerns. Presently, the DOJ Action is set to go to trial on May 11, 2027. *See ByteDance*, Docket No. 63. "A delay of this length certainly risks the loss of evidence and the degradation of witnesses' memories," particularly where a complaint was filed "over one year ago" and discovery has not yet commenced. *See Carrillo v. Lowe's Home Centers, LLC*, No. 2:24-cv-01215-DAD-(SCRx), 2025 WL 950324, at *4 (E.D. Cal. Mar. 28, 2025) (referring to 17-month delay); *United States v. Vandewater Int'l Inc.*, No. 2:17-cv-04393-RGK-(KSx), 2019 WL 6954316, at *2 (C.D. Cal. Aug. 20, 2019) ("[T]he prejudice to [plaintiff] resulting from an 18-month stay is high . . . The risk of spoliation of evidence is not insignificant."); *Blue Cross & Blue Shield of Alabama v. Unity Outpatient Surgery Ctr., Inc.*, 490 F.3d 718, 724 (9th Cir. 2007) ("Delay inherently increases the risk that witnesses' memories will fade and evidence will become stale." (internal quotation marks omitted)). Moreover, trial in the DOJ Action has already been pushed back once and may be further impacted by various external factors such as the present government shutdown or changes to the ownership of the TikTok platform, potentially further prolonging Plaintiffs' ability to proceed with their case.

Defendants argue that "[m]ere delay is not a sufficient basis to justify denial of a stay," citing to two cases outside of this circuit. *See Stay Motion at 16; Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd*., No. 20-cv-4660-KSM, 2022 WL 3042768, at *4

---

[2] Defendants have explained that they have "'rolling deletion' policies that automatically delete data in a table after a certain time period" and data sought by Plaintiffs is subject to "different deletion policies" such that data may be deleted under any one of them. *See* Docket No. 41 at 5.

[3] Defendants claim that they have "no intention of destroying relevant evidence, and will continue to preserve relevant categories of user data" in this case "pending full and complete resolution of their protective order motion." Stay Reply at 14. If the Court granted a stay of proceedings and thereby did not resolve the parties' preservation dispute, this would be cold comfort to Plaintiffs and their preservation concerns; if the Court does grant a stay and resolves the preservation dispute, then it seems that Defendants may potentially be subject to the dueling preservation obligations that they hope to avoid unless they are entirely successful on their motion for a protective order, and potentially for longer than they would be absent a stay, thereby negating this supposed benefit of a stay to Defendants.

(E.D. Pa. Aug. 2, 2022); *UnitedHealthcare Ins. Co. v. Regeneron Pharms., Inc.*, No. 20-cv-10664
(VB), 2021 WL 6137097, at *3 (S.D.N.Y. Dec. 29, 2021).  While perhaps in the Third Circuit a
"court may insist" that a plaintiff "demonstrate a unique injury," *Halman*, 2022 WL 3042768, at
*4 (internal quotation marks omitted), courts in the Ninth Circuit "often conclude that a stay poses
a fair possibility of damage to a litigant where there is a risk that relevant evidence could be lost
or that witnesses' memories could fade."  *Espire Ads LLC v. TAPP Influencers Corp.*, No. 23-cv-
1347-MWF-(MAAx), 2023 WL 4247193, at *3 (C.D. Cal. May 10, 2023) (collecting cases).
Moreover, Defendants "overstate the non-movant's burden in opposing a *Landis* stay" by arguing
that they must show prejudice; Plaintiffs "need only establish 'a fair possibility that the stay . . .
will work damage to someone else.'"  *Id*. (quoting *Landis*, 299 U.S. at 255).[4]

Defendants argue that "materials relevant to this action will be preserved in the DOJ's
case," and the DOJ will sufficiently protect Plaintiffs' interests.  *See* Stay Reply at 15-16.
However, to suggest Plaintiffs must prove otherwise inverts Defendants' burden.  Assuming that
"there is significant, if not identical, factual overlap between the two matters" as Defendants
contend, *see id.* at 14, Defendants are reminded that "[o]nly in rare circumstances will a litigant in
one cause be compelled to stand aside while a litigant in another settles the rule of law that will
define the rights of both."  *Landis*, 299 U.S. at 255.  Defendants have not established any such rare
circumstances here, and merely opined that "federal agencies like the DOJ have primary
responsibility to enforce COPPA[] and to protect children" from online exploitation of their
personal information.  Stay Reply at 15.  Moreover, Plaintiffs assert that they "bring a variety of
state-law claims that will require overlapping, but not identical, discovery to that in the DOJ
Action," such that there is "discovery being preserved that would not be in the absence of
Plaintiffs' case."  Stay Opp. at 7.  Regardless of the extent to which the DOJ's interests are aligned
with Plaintiffs, the Court finds no basis to insist that Plaintiffs must be satisfied by the approach
to discovery taken by the DOJ.[5]

---

[4] Additionally, the Court finds *Regeneron* inapposite on its facts, because in that case the plaintiffs' claims were
dependent "on an adjudication that Regeneron engaged in an illegal kickback scheme," which was to be "determined
in the DOJ Action," such that all "relevant evidence" was "already being preserved in the DOJ Action."  *Regeneron*,
2021 WL 6137097, at *3-5.  Conversely, here, there is evidently disparity between the evidence that the DOJ and
Plaintiffs consider relevant and the precise relationship between the respective cases is a matter of dispute between
the parties.

[5] Defendants cite two out-of-circuit district cases that held otherwise.  *See Regeneron*, 2021 WL 6137097, at *5;

Because there is at least a fair possibility of harm to Plaintiffs, the Court proceeds to consider whether Defendants have sufficiently demonstrated clear hardship or inequity.

### 2. Hardship to Defendants

Defendants asserts that they will be "significantly prejudiced" if this case proceeds in parallel with the DOJ Action because (1) "litigating the DOJ Action at the same time as this matter could lead to inconsistent rulings" and (2) Defendants would have "to contend with dueling discovery processes." *See* Stay Motion at 15. Plaintiff contends that the fact that "Defendants would have to face both DOJ and Plaintiffs in the absence of a stay is not sufficient to meet Defendants' burden to justify a stay." *See* Stay Opp. at 8. Plaintiffs also argue that Defendants have previously "supported coordination between the private cases and the DOJ Action," and assert that its inaction in moving to stay in "more than a year since the first private case was filed" constitutes "objective evidence that Defendants have not experienced a 'clear case' of hardship." *Id*. at 8-9. Plaintiffs further argue that coordinating this case with the DOJ Action would prevent dueling discovery, while a stay would create those inefficiencies. *Id*. at 10. Defendants' reply addresses their previous statements and inaction, asserting that "circumstances have materially changed" and, moreover, delay is not a legal basis to deny a stay now. *See* Stay Reply at 11-12.

Acknowledging that the Court is coordinating the DOJ Action along with this proceeding, Defendants within their discussion of the third *Landis* prong contend that it is the fact that "Plaintiffs' claims will be adjudicated by different factfinders compared to the DOJ Action" that "opens the door for completely different outcomes in each case." *See* Stay Motion at 11. Defendants envision a parade of horribles in which "one jury could deem the TikTok age gate sufficient in the DOJ Action, while another could deem it insufficient in Plaintiffs' case," which "could lead to . . . more onerous injunctive relief in Plaintiffs' case compared to the DOJ Action," which, if inconsistent with the relief sought by the DOJ, "could run afoul of COPPA's express

---

*Simms v. Philip Morris, Inc.*, No. 01-cv-1107 (GK), 2003 WL 27394525, at *2 (D.D.C. July 7, 2003). For reasons already explained at note 4, *supra*, the Court finds *Regeneron* distinguishable. In *Simms*, the court's brief analysis seemed largely to turn on the concern that a stay was "necessary to avoid diversion of the Court's and Defendants' resources from the DOJ case, where massive efforts ha[d] already been expended." *Simms*, 2003 WL 27394525, at *2. While discovery has commenced in the DOJ Action, *see* Stay Reply at 8, the Court has no basis to find either its own or Defendants' resources inordinately strained by the procession of both cases simultaneously such that a stay is necessary to prevent an impediment on the DOJ Action.

Moreover, while Defendants suggests that plaintiffs are unharmed when a stay is granted at an early stage of litigation prior to the investment of substantial resources, *see* Stay Motion at 16, and the parties dispute the extent of time and resources invested thus far into this case, *see id.* & Stay Opp. at 5-6, the Court does not find time and expense spent litigating a case thus far to be a particularly probative of the potential damage to Plaintiffs of a stay.

preemption provision." *Id*. at 11-12.  First, the risk of inconsistent results "goes to the third *Landis* factor[,] . . . not to whether [TikTok] will suffer a 'clear case of hardship or inequity' in going forward with this case." *Mieco, Inc. v. Triple Point Tech., Inc.*, No. 17-cv-6564 PSG-(JCx), 2018 WL 6258894, at *4 (C.D. Cal. Aug. 16, 2018); *Klein v. Cook*, No. 5:14-cv-03634-EJD, 2015 WL 2454056, at *4 (N.D. Cal. May 22, 2015) ("Defendants' burden of simultaneous litigation is not a significant consideration in [the hardship] analysis.").

Moreover, the Court is unconvinced that this speculative chain of events represents a "clear case" of hardship to Defendants,[6] or that a stay would necessarily prevent the possibility of factfinders reaching different outcomes.  The fact that Defendants may face two separate factfinders is a facet of "being required to defend a suit, [which] without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*." *Lockyer*, 398 F.3d at 1112. Furthermore, the Court agrees with Plaintiffs that the "risk of inconsistent judgments typically carries weight when the cases are in separate courts or other fora." *See* Stay Opp. at 14.  Here, the risk of inconsistent outcomes in the form of conflicting rulings is attenuated given that both cases are before this Court.  *Cf. Klein*, 2015 WL 2454056, at *4 (acknowledging possibility of "conflicting rulings" due to "overlapping issue" in both state and federal action); *Ball ex rel. Regeneron Pharms., Inc. v. Baker*, No. 21 CIV.6418 (NSR), 2022 WL 17808785, at *6 (S.D.N.Y. Dec. 18, 2022) (observing risk of "inconsistent rulings" if New York court adjudicated same issues as Massachusetts court).

Likewise, parallel discovery and inconsistent approaches taken by Plaintiffs and the DOJ toward it falls within the category of "being required to defend a suit" and "does not constitute a clear case of hardship or inequity." *Lockyer*, 398 F.3d at 1112 (internal quotation marks omitted). Moreover, if the DOJ Action is as similar to this case as Defendants assert, *see* Stay Motion at 8-9, then the discovery processes in both cases will ultimately "likely be relatively similar, suggesting that it would not pose an additional burden." *Walter v. Leprino Foods Co.*, No. 20-cv-00700-JLT-BAM, 2023 WL 4600685, at *5 (E.D. Cal. July 18, 2023).  Indeed, Defendants elsewhere anticipate that the resolution of the parties' dueling preservation motions will affirm

---

[6] The outcome of any jury verdict in either case is inherently speculative.  *See, e.g.*, *Stryker Sales Corp. v. Zimmer Biomet, Inc.*, 231 F. Supp. 3d 606, 623 (E.D. Cal. 2017) (finding "risk for inconsistent rulings" did not support stay because "any potential effect of [another] court's future findings is speculative").  Moreover, as Plaintiffs note, "there is no guarantee that either matter will go to trial," and "every other stage of litigation" can "be coordinated and addressed consistently by this Court."  *See* Stay Opp. at 15.

preservation obligations consistent with the DOJ approach.  *See* Stay Reply at 13-14 & n.9.

Therefore, the Court finds that Defendants have not met their burden to demonstrate a clear case of hardship or inequity.

### 3.  Orderly Course of Justice

Defendants assert several reasons why the orderly course of a justice supports a stay.  First, they contend that a stay is warranted because the federal government is "the primary enforcer of alleged COPPA violations" and that allowing Plaintiffs' case to proceed would allow Plaintiffs to "evade Congress's intent that the federal government have priority over COPPA enforcement efforts by filing COPPA-based claims masquerading as privacy, unfair competition, and other state law claims."  Stay Motion at 6-8 & n.11.  Relatedly, Defendants point to the similarity between the conduct alleged in the DOJ complaint and in Plaintiffs' complaint to assert that the circumstances are "analogous to how courts address stay requests invoking the doctrine of primary jurisdiction."  *Id*. at 8-10.  Next, Defendants assert that a stay will avoid the possibility of inconsistent judgments, *id.* at 10-13, and contend that judicial efficiency interests support granting a stay because the resolution of "core issues in the DOJ Action" will "simplify and streamline" this case.  *Id*. at 14.

Relying on recent Ninth Circuit precedent and their own statutory interpretation, Plaintiffs argue that COPPA "says nothing about private actions," which are "therefore excluded from the statute's ambit," and moreover "there is nothing in COPPA's text or structure that defers private actions until after a government enforcement action has concluded."  Stay Opp. at 13.  Plaintiffs further argue that similarity in allegations weighs against a stay, primary jurisdiction doctrine lacks relevance here, the risk of inconsistent judgments is insignificant because this Court presides over both pending actions, and judicial efficiency will not be served by a stay because the Court can "most efficiently address common issues together" and remaining complexities must be resolved regardless.  *Id*. at 14-18.

Defendants' first two arguments largely rest on "COPPA's statutory framework" and the purported congressional "intent for the federal government take the lead with respect to these enforcement issues."  Stay Motion at 10.  However, the Court finds it notable that the DOJ has not requested that Plaintiffs' case be stayed pending the resolution of its enforcement efforts or given any indication that it views Plaintiffs' private action to impinge upon COPPA, its framework, or intent.  Accordingly, the Court has no reason to find that permitting Plaintiffs to proceed with this

action in any way deprives DOJ of its status as COPPA's "primary enforcer." *Id*. at 6. The Court further declines Defendants' invitation to probe COPPA's "text and structure" or opine upon the alleged "inconsistency" created by allowing Plaintiffs to proceed in this case despite limitations imposed on state attorneys general.[7] *Id*. at 8. Suffice to say, COPPA does not "create an *exclusive* remedial scheme for enforcement of COPPA requirements," and "does not bar state-law causes of action that are parallel to, or proscribe the same conduct forbidden by, [it]." *Jones*, 73 F.4th at 643-44 (emphasis in original). The Court would find it both unnecessary and inappropriate on a motion to stay to attempt to further untangle the relationship between COPPA enforcement actions and private rights of action under state laws predicated upon similar underlying conduct.

The Court further finds Defendants' analogy to primary jurisdiction doctrine unavailing. "Primary jurisdiction applies in a limited set of circumstances," and "is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008) (citations and internal quotation marks omitted). Specifically, the Ninth Circuit has "held that the doctrine applies in cases where there is: "(1) a need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Id*. at 1115 (brackets and internal quotation marks omitted). Defendants equivocate "primary enforcement authority" (Stay Motion at 10) with "exclusive authority," *Tortilla Factory, LLC v. Rowdy Mermaid Kombucha LLC*, No. CV 18-2984-R, 2018 WL 9802099, at *2 (C.D. Cal. Sept. 11, 2018), but the Court is unconvinced that these are sufficiently similar such that primary jurisdiction principles should apply.[8] Moreover, Defendants

---

[7] The Court does, however, further address identical preemption arguments Defendants raised in support of their MTD in Section II.B.2.

[8] "[P]rimary jurisdiction doctrine is designed to protect agencies possessing quasi-legislative powers and that are actively involved in the administration of regulatory statutes." *Clark*, 523 F.3d at 1115 (internal quotation marks omitted). Since COPPA is a nonexclusive regime that does not preclude parallel state law causes of action, *Jones*, 73 F.4th at 643-44, the Court finds it difficult to see why the DOJ would require such protection.

have identified no "issue of first impression" or "particularly complicated" issue requiring resolution by the federal government.[9]  *Clark*, 523 F.3d at 1114 (internal quotation marks omitted).

The possibility of inconsistent judgments was addressed in the previous subsection and the Court reincorporates that analysis as it applies to the orderly course of justice prong, with the additional note that the Court will continue to coordinate both actions and address potential conflicts between them, including the present preservation dispute and, if such a scenario should arise, the effect of a jury verdict in one action on any subsequent trial of the other.

Finally, while it is true that the resolution of certain common factual and legal issues in the DOJ Action would bear on this action, the Court is not persuaded that staying this action until the conclusion of the DOJ Action is more efficient than coordinating and addressing them together. The Court is particularly wary of staying this case given the "complex" nature of the litigation and the fact that it "involves several related cases."  *See In re Pandora Media, LLC Copyright Litig.*, No. 22-cv-00809-MCS-(MARx), 2023 WL 2661192, at *2 (C.D. Cal. Jan. 31, 2023) ("Given the multidimensional nature of the suit, the Court is not willing to inject yet another confounding variable that risks complicating the case management process for all parties.").  Moreover, case management considerations would not be sufficient to grant a stay given the Court's other findings on the balance of hardships.  *See Dependable Highway*, 498 F.3d at 1066.

For the foregoing reasons, the Court would **DENY** the Stay Motion.

**B.  Motion to Dismiss**

1.  <u>Article III Standing</u>

Article III "[s]tanding is a threshold matter of jurisdiction," and the Court finds it therefore proper to address it prior to considering the myriad merits issues.  *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021).

*a.  Other States' Laws*

Plaintiffs are citizens of California, Connecticut, Florida, Georgia, Missouri, New York, Pennsylvania, and Washington.  Compl. ¶¶ 22-37.  However, they assert "multistate" intrusion upon seclusion and unjust enrichment claims under the laws of other states on behalf of citizens

---

[9] Indeed, the facts alleged in and issues raised by this case bear a marked similarity to those in previous litigation over the YouTube platform.  *See Jones*, 73 F.4th at 639-40.  In that case, the Federal Trade Commission ("FTC"), the federal agency charged with regulatory authority over COPPA (*see* 15 U.S.C. § 6505(a)), filed an amicus brief expressing a view consistent with the conclusion drawn by the Ninth Circuit.  *Jones*, 73 F.4th at 643.

of those states.[10]  *Id*. ¶¶ 407, 409, 430, 442.  Defendants argue that Plaintiffs lack standing to assert
claims in states where none of them are domiciled or are alleged to have been injured.  *See* MTD
at 8.  Plaintiffs argue that they have demonstrated individual standing and whether they can
represent multistate classes should be resolved at class certification under Federal Rule of Civil
Procedure 23.  *See* MTD Opp. at 5-6.  Plaintiffs further assert that the state laws are sufficiently
similar such that multistate classes are appropriate and Defendants have not demonstrated
otherwise.  *Id*. at 6-7.

      "Courts in the Ninth Circuit have consistently held that a plaintiff in a putative class action
lacks standing to assert claims under the laws of states other than those where the plaintiff resides
or was injured."  *Jones v. Micron Tech. Inc*., 400 F. Supp. 3d 897, 908 (N.D. Cal. 2019) (collecting
cases).  However, it is also true that the Ninth Circuit follows the "class certification approach,"
such that "once the named plaintiff demonstrates her individual standing to bring a claim, the
standing inquiry is concluded, and the court proceeds to consider whether the Rule
23(a) prerequisites for class certification have been met."  *Melendres v. Arpaio*, 784 F.3d 1254,
1262 (9th Cir. 2015) (internal quotation marks omitted).  "Unfortunately, courts in this circuit have
not agreed on how *Melendres* alters the [out-of-state claim] analysis, if at all."  *Hamilton v. NuWest
Grp. Holdings LLC*, No. C22-1117-JCC, 2023 WL 130485, at *2 (W.D. Wash. Jan. 9, 2023).

      "Some courts . . . interpret *Melendres* to [] mean that any disjuncture between the claims
of named and unnamed plaintiffs, including the presence of out-of-state claims, should be resolved
at the class certification stage, not as a threshold standing issue."  *Id*. (internal quotation marks
omitted) (collecting cases); *see, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., &
Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 955-56 (N.D. Cal. 2018) (finding distinction between
disjuncture in "'sister state' law scenario" and at issue in *Melendres* "immaterial" and that "district
courts retain discretion to address standing before or after class certification" in either).  Other
courts have distinguished the question of whether a plaintiff has "standing 'to obtain relief for
unnamed class members' for the same injury," which *Melendres* instructs should be resolved at

---

[10] One or both of these claims implicate the following additional states in which no Plaintiff is domiciled or is
alleged to have been injured: Alabama, Alaska, Arizona, Arkansas, Colorado, Delaware, Hawaii, Idaho, Illinois,
Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,
Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon,
Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin,
and Wyoming.  *See* Compl. ¶¶ 430, 442.

class certification, from the question of whether named plaintiffs "have standing to bring certain *claims*." *Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1020 (S.D. Cal. 2020) (emphasis added) ("*Melendres* does not . . . stand for the proposition that this Court must delay its consideration of . . . whether the California Plaintiffs have standing to assert unjust enrichment claims on behalf of unnamed class members under other states' laws."); *Kim v. Walmart, Inc.*, No. 2:22-cv-08380-SB-(PVCx), 2023 WL 4316786, at *4 (C.D. Cal. Mar. 14, 2023) ("*Melendres* did not involve the application of multiple states' laws and thus is not controlling in th[at] context.").

Even if the Court were to agree with Plaintiffs that it has discretion to defer resolving whether they may bring multistate claims in states they are not domiciled or injured until class certification, the standing issues presented by this case are most efficiently resolved at this stage. *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) (requiring "Plaintiffs to present a named class member who possesses individual standing to assert each state law's claims against Defendants" where named plaintiffs from "13 different states" brought claims under "35 other states" so as to avoid "subjecting [defendants] to the expense and burden of nationwide discovery without . . . plaintiffs who clearly have standing and are willing and able to assert claims under these state laws."); *McKinney v. Corsair Gaming, Inc.*, No. 22-cv-00312-CRB, 2022 WL 2820097, at *12 (N.D. Cal. July 19, 2022) ("Given that Plaintiffs here seek to represent class members with claims under the state laws of 43 other states, while none of the named Plaintiffs have contacts with any of those states, the Court will consider standing arguments at this stage.").

Plaintiffs argue that the proposed "multi-state classes comprise state laws that are not materially different from the states where Plaintiffs reside." *See* MTD Opp. at 6. Whether or not this assessment is correct, Plaintiffs "'must demonstrate standing for each claim [they] seek[] to press,' and a plaintiff who lacks any connection to another state cannot be said to have suffered an 'injury in fact' under the laws of that state." *Krantz v. Old Copper Co., Inc.*, No. 2:24-cv-10031-SPG-(BFMx), 2025 WL 2326840, at *11 (C.D. Cal. Aug. 11, 2025) (citations omitted) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).[11]   Accordingly, Plaintiffs lack standing to assert claims under any state laws other than California, Connecticut, Florida, Georgia, Missouri, New York, Pennsylvania, and Washington, and the Court would **GRANT** the MTD insofar as it seeks dismissal of Plaintiffs' claims under the laws of the remaining states named in

---

[11] Notably, the only case Plaintiffs cite in support of their argument that standing is met is a case that rejected an argument predicated on an alleged conflict of laws, not Article III. *See McKinney*, 2022 WL 2820097, at *12.

the Complaint with leave to amend.  Plaintiffs shall have thirty days from the issuance of a final

ruling to add named class representatives who have standing to assert claims from the other states.

> ### b.  Unfair Competition Injury

Next, Defendants contend that Plaintiffs have failed to plausibly allege a concrete or

ascertainable injury and therefore lack Article III or statutory standing sufficient to support their

unfair competition claims.[12]  *See* MTD at 16-23.  Statutory "standing, unlike constitutional

standing, is not jurisdictional."  *Noel v. Hall*, 568 F.3d 743, 748 (9th Cir. 2009).  "The question

whether a plaintiff states a claim for relief typically relates to the merits of a case, not to the

dispute's justiciability, and conflation of the two concepts often causes confusion."  *Jewel v. Nat'l

Sec. Agency*, 673 F.3d 902, 907 n.4 (9th Cir. 2011).  While the parties have largely collapsed their

discussion of Article III and statutory standing of unfair competition claims together, the Court

addresses them separately in the interest of avoiding that confusion.

"Injury in fact is the threshold requirement for standing and can be difficult to satisfy."

*Kumar v. Koester*, 131 F.4th 746, 751 (9th Cir. 2025).  "To establish injury in fact, a plaintiff must

show that he or she suffered an invasion of a legally protected interest that is concrete and

particularized and actual or imminent, not conjectural or hypothetical."  *Spokeo*, 578 U.S. at 339

(internal quotation marks omitted).  To be concrete, an injury "must actually exist" and cannot be

abstract or a "bare procedural violation."  *Id*. at 340-41.  To be particularized, "the injury must

affect the plaintiff in a personal and individual way and not be a generalized grievance."  *Food &

Drug Admin. v. All. for Hippocratic Med*., 602 U.S. 367, 381 (2024) (internal quotation marks

omitted).  Finally, to be actual or imminent as opposed to speculative, "the injury must have

already occurred or be likely to occur soon."  *Id*.

While Defendants argue that Plaintiffs have failed to demonstrate Article III and statutory

standing for their unfair competition claims, their arguments are primarily directed at whether

Plaintiffs have plausibly alleged an "*economic* injury."  *See* MTD at 18 (emphasis in original).

However, Defendants admit that Article III only requires a concrete injury, and to the extent that

unfair competition statutes impose an ascertainable injury requirement, this is a "'substantially

---

[12] Defendants also make references to Article III in their challenge to Plaintiffs' unjust enrichment claims.  *See*
MTD at 24 n.23 & MTD Reply at 19.  Beyond asserting that Plaintiffs "must establish Article III standing to bring
any claim in federal court" and that "Plaintiffs cannot demonstrate any actionable injury," however, Defendants have
not articulated any specific Article III objections to Plaintiffs' unjust enrichment claims.  *See* MTD at 24 n.23.  The
Court presumes that its analysis in this subsection also applies to these generalized and inchoate Article III arguments.

narrower' standing requirement" than what is mandated by Article III. *Id*. at 17 (quoting *Griffith v. TikTok, Inc*., 697 F. Supp. 3d 963, 976 (C.D. Cal. 2023)). Defendants cite only two cases in support of their contention that Plaintiffs' allegations are insufficient to support Article III standing, both arising out of the data breach context. *See* MTD at 18 n.21; *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1231 (N.D. Cal. 2022) (finding no injury in fact because "it would be difficult to trace any future identity theft or fraud to [defendant's] specific" data breach); *Burns v. Mammoth Media, Inc.*, No. 20-cv-04855-DDP-(SKx), 2023 WL 5608389, at *4 (C.D. Cal. Aug. 29, 2023) (finding data implicated in "breach was not sensitive enough to create a sufficient risk of identity theft to constitute an actual injury for purposes of standing"). Plaintiffs' claims are not predicated on a data breach, however, and the Court finds these cases inapposite.

While the parties' arguments focus on economic injury, "intangible privacy injuries," such as "disclosure of sensitive private information, even without further consequence[, ] give[] rise to Article III standing." *In re Facebook, Inc., Consumer Priv. User Profile Litig.* ("*Facebook Profile*"), 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019); *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1050 (N.D. Cal. 2018) (A "complaint need not include economic injury to establish standing for [] intrusion upon seclusion, invasion of privacy, or unjust enrichment claims."). Indeed, the Ninth Circuit has "repeatedly explained that intangible privacy injuries can be redressed in the federal courts," including "where a plaintiff alleges standing based on the violation of a statute whose purpose is to protect privacy." *Facebook Profile*, 402 F. Supp. 3d at 784-85; *see In re Facebook, Inc. Internet Tracking Litig.* ("*Facebook Tracking*"), 956 F.3d 589, 598 (9th Cir. 2020) (plaintiffs "established standing to bring claims for invasion of privacy, intrusion upon seclusion . . . [and] claims under the Wiretap Act and [California Invasion of Privacy Act], because they adequately alleged privacy harms"); *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273 (9th Cir. 2019) (finding plaintiffs' allegation of violation of Illinois Biometric Privacy Act constituted a concrete injury of "invasion of an individual's biometric privacy rights"); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (finding Video Privacy Protection Act protected substantive right to privacy and thus allegation of violation conferred Article III standing).

Given the Ninth Circuit's holdings in *Facebook Tracking*, *Patel*, and *Eichenberger*, and its characterization of COPPA in *Jones*,[13] the Court would find that COPPA likely falls within a

---

[13] *See* 73 F.4th at 641-42 (explaining that COPPA requires "companies that operate websites and online services

category of statutes protective of substantive privacy rights, and closely aligned with common-law privacy causes of action, such that adequately pleading an underlying COPPA violation suffices to establish an Article III injury for state claims predicated on such a violation.  *See Patel*, 932 F.3d at 1273 (where "statutory provisions codify a substantive right to privacy, [its] violation . . . gives rise to a concrete injury sufficient to confer standing"); *see also D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1192 (S.D. Cal. 2024) (applying *Patel* and *Facebook Tracking* to conclude that allegation of California Invasion of Privacy Act violation was sufficient for Article III standing).  The parties have not briefed this issue, as they largely dispute whether Plaintiffs have adequately alleged an economic injury.  Suffice to say, however, the pleading requirements for Article III standing in this context are more nuanced than Defendants' brief overtures to it would suggest, and the Court is unpersuaded that two factually distinct district court cases demonstrate Plaintiffs' unfair competition claims are deficient in this respect.

Accordingly, the Court would **DENY** the MTD insofar as it seeks dismissal of Plaintiffs' unfair competition claims predicated on a lack of Article III standing.

    2.  <u>Preemption</u>

Defendants raise the same preemption argument in support of their MTD as they do in their Stay Motion.  *See* MTD at 5-8.  To reiterate, Defendants contend that Plaintiffs' state claims are preempted by COPPA because they "create tension with COPPA's statutory scheme," MTD at 5, predicated on a COPPA provision that proscribes any "State or local government" from imposing "liability . . . that is inconsistent with" COPPA.  15 U.S.C. § 6502(d).  Defendants assert that Plaintiffs' private action is untenable because it creates a "scenario where states acting in their *parens patriae* capacity are barred from initiating their own COPPA enforcement action, but private plaintiffs are not."  MTD at 6.  Therefore, Defendants assert, "COPPA and common sense dictate that Plaintiffs' state claims should only continue (if it all) after the DOJ action is resolved." *Id*. at 7.  Plaintiffs assert that *Jones* forecloses Defendants' preemption arguments and that Defendants' interpretation of COPPA is unsupported by its text.  *See* MTD Opp. at 3-5.

As indicated with respect to the Stay Motion, the Ninth Circuit has held unequivocally that "COPPA's preemption clause does not bar state-law causes of action that are parallel to, or proscribe the same conduct forbidden by, COPPA."  *Jones*, 73 F.4th at 644.  More specifically,

---

marketed toward children" to "safeguard the confidentiality, security, and integrity of the children's personal online information" and referring to COPPA's "substantive federal requirements").

COPPA's "bar on 'inconsistent' state laws implicitly preserves 'consistent' state substantive laws." *Id*. at 643.  Notably, the state causes of action *Jones* found consistent with COPPA were state causes of action for "invasion of privacy, unjust enrichment, consumer protection violations, and unfair business practices" predicated on alleged COPPA violations.  *Id*. at 640.  The Ninth Circuit also foreclosed implied preemption for the same reasons it rejected express preemption. *Id*. at 644.

Defendants seek to elude *Jones* by asserting that "the federal enforcement action against Google [in *Jones*] settled before the private plaintiffs ever filed their state-law claims," whereas here Plaintiffs seek to litigate their claims alongside the DOJ.  *See* MTD at 7.  *Jones* did not discuss the status of the federal enforcement action, and the Court is unconvinced that it matters.  If parallel state causes of action predicated on the same conduct are consistent with COPPA, as *Jones* declares that they are, then it makes no difference when Plaintiffs litigate them, because they will not "stand as an obstacle to COPPA in purpose or effect."  *Jones*, 73 F.4th at 643.

Defendants' circuitous argument otherwise rests on a provision in COPPA that limits "Actions by *States*."  *See* 15 U.S.C. § 6504(d) (emphasis added) ("[N]o State may, during the pendency of [a federal enforcement] action, institute an action under subsection (a) against any defendant named in the complaint in that action for violation of that regulation.").  Defendants argue that Congress did not intend to suspend states' rights but not private plaintiffs, and therefore all litigation over "COPPA-related matters" must yield to the federal government.  *See* MTD at 6. This argument is unavailing for several reasons.  First, the Court rejects Defendants' proposed category of "COPPA-related matters."  *Id*.  As Defendants admit, COPPA treats states and private citizens differently: COPPA creates "no private right of action," but grants states some "authority to bring their own enforcement actions" under COPPA directly.  *Id*.  The fact that COPPA delineates the terms under which states may bring COPPA enforcement actions in relation to federal enforcement authorities therefore does not necessarily bear upon private state law actions predicated on the same conduct.

Moreover, in Defendants' appeals to COPPA's "statutory scheme," MTD at 5, they elide the foremost consideration: the statute's text. *See King v. Navy Fed. Credit Union*, 148 F.4th 628, 632 (9th Cir. 2025) ("When interpreting an express preemption clause, courts must in the first instance focus on the plain wording of the clause, and then the surrounding regulatory framework and stated purposes of the regulation." (brackets and internal quotation marks omitted)); *Am.*

*Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024) ("[T]he plain wording of the express preemption clause necessarily contains the best evidence of Congress's preemptive intent." (brackets and internal quotation marks omitted)).[14]  If it was Congress's intent to prevent private citizens from simultaneously litigating state claims predicated on COPPA-related conduct until the resolution of a federal COPPA action, it could have said/done so.  Instead, 15 U.S.C. § 6504(d), which imposes such a limitation on state-brought COPPA actions, evinces that Congress chose not to similarly limit private causes of action arising out of state law in this way.  *See, e.g.*, *Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994) ("Congressional narrowness and precision in preempting some state laws cuts against an inference of a Congressional intention to preempt laws with a broad brush, and without express reference.").[15]

The implications of Defendants' interpretation of COPPA further highlight its untenability. If Defendants are correct that *Jones* is inapposite because the federal enforcement action in *Jones* had settled prior to Plaintiffs' private suit, then Plaintiffs are either subject to only a temporary form of preemption that concludes if a preceding federal action is resolved,[16] which is fundamentally at odds with how preemption works;[17] or Plaintiffs' right to bring their state law claims at all turns on the status of a federal action, which is inconsistent with *Jones* and nowhere to be found in COPPA's text.  Under this view, even a private plaintiff who filed a state law claim first might see her case dissolve if the federal government later initiated a COPPA action.  Since COPPA was not meant to immunize defendants from private citizens seeking relief under state laws from conduct that falls under COPPA, *see Jones*, 73 F.4th at 643, it seems implausible that the rights of private citizens to do so would be so mercurial as to turn on the resolution of litigation

---

[14] While Defendants focus their argument on express preemption, they also assert Plaintiffs' claims are impliedly preempted "[f]or the same reasons."  MTD at 7 n.8.  Defendants do not make a specific argument under field or conflict preemption, and the Court is therefore unpersuaded that there is sufficient evidence of either to find implied preemption, much less in a way that would not conflict with *Jones*.

[15] While Defendants protest that the simultaneous litigation of a COPPA action and private action predicated on alleged COPPA violations defies "common sense," *see* MTD at 7, it would seem far more nonsensical to this Court to adopt a novel theory of preemption asserted not by the federal government, who can assuredly defend its own rights and interests, but by Defendants, so as to protect the federal government's rights.

[16] This is suggested by Defendants' use of the same arguments to alternatively request a stay.

[17] "Preemption . . . '*invalidates* state laws,'" *Baden*, 107 F.4th at 938 (emphasis added) (quoting *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712-13 (1985)), it does not temporarily suspend them.

beyond their control.

The Court would therefore **DENY** the MTD insofar as it seeks dismissal based upon COPPA preemption.

       3.  <u>Statement of Privacy Claims</u>

          *a.  Intrusion upon Seclusion and Violation of Right to Privacy*

The parties agree that Plaintiffs' intrusion upon seclusion claims require Plaintiffs to show (1) that Defendants "intentionally intrude[d] into a place, conversation, or matter" for which Plaintiffs have "a reasonable expectation of privacy," and (2) the intrusion was "in a manner highly offensive to a reasonable person." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009).[18]  A California constitutional cause of action for invasion of privacy requires a "legally protected privacy interest," "a reasonable expectation of privacy," and a "sufficiently serious" invasion. *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35-37 (1994).  When a constitutional privacy claim and common law intrusion upon seclusion claim "are brought on the same factual basis, it is appropriate to assess the two claims together and examine the largely parallel elements of these two claims which call on the Court to consider (1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification and other relevant interests." *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 580-81 (N.D. Cal. 2025) (internal quotation marks omitted).

          i.  Reasonable Expectation of Privacy

Plaintiffs assert that Defendants collect a vast amount of data from underage users of both the full access and Kids Mode TikTok platforms in order to target them with advertisements and to personalize the content algorithmically served to them so they keep using the platform.  *See* Compl. ¶¶ 74-75, 96-101 (full access), 124-31 (Kids Mode).  Plaintiffs base their allegations on the categories of data collected and ways in which they are used in part on Defendants' own privacy policies. *Id*. ¶¶ 97, 99 (full access), 124-25 (Kids Mode).  Defendants assert that Plaintiffs have failed to establish a reasonable expectation of privacy (1) because Defendants' "privacy

---

[18] Neither of the parties distinguish the intrusion upon seclusion laws of the other 37 states under which Plaintiffs have brought such claims, other than to suggest that they are sufficiently similar such that California law may be representative, *see* MTD at 9 n.11.  Although there are differences in the wording of the respective states' laws, *see id.*, Index A, the Court presumes for the purpose of this motion that the other 37 states (or at least the five besides California for which Plaintiffs have demonstrated Article III standing) require a reasonable expectation of privacy and high degree of offensiveness or something like it, and that these states interpret those elements sufficiently consistent with California law such that the intrusion upon seclusion claims may be analyzed together.

policies expressly disclose that they collect all the information Plaintiffs now claim was private, for the precise uses Plaintiffs challenge," and (2) "much of the information at issue does not implicate a state-law privacy interest at all."  *See* MTD at 10.  Plaintiffs counter that (1) COPPA, and not Defendants' privacy policies, set what a reasonable expectation of privacy is in the context of children's data; (2) the privacy policy governing the full access platform does not disclose the collection of data of children under 13; and (3) neither the Complaint nor Defendants establish that Plaintiffs or their parents saw or consented to the privacy policies at issue.  *See* Opp. at 7-9. Plaintiffs also dispute the privacy of the nature of the information at issue.  *Id*. at 9-10.

"A reasonable expectation of privacy can exist where a defendant gains 'unwanted access to data by electronic or other covert means, in violation of the law or social norms.'"  *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022) (quoting *Facebook Tracking*, 956 F.3d at 601-02).  "Courts consider the customs, practices, and circumstances surrounding the data collection, including the amount of data collected, the sensitivity of data collected, the manner of data collection, and the defendant's representations to its customers."  *Id*.  Importantly, "the mere existence of a privacy policy is not dispositive because users might lack actual or constructive notice of the policy."  *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 601 (N.D. Cal. 2021).

The Court first addresses the extent to which COPPA and, relatedly, Plaintiffs' minor status bears on the reasonable expectation of privacy.  While many cases have addressed what constitutes a reasonable expectation of privacy in the context of online activity and digital data collection, few have considered the specific context of minor data collection that falls within the ambit of COPPA. Some courts have indicated that "the status of [plaintiffs] as minors is not a main driver of the privacy analysis."  *McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022, 1036 (N.D. Cal. 2019).[19] However, another has held that "[g]iven the legal bar on interest-based advertising for . . . children's apps," minor plaintiffs "adequately pleaded that they had a reasonable expectation of privacy in *their* personal information notwithstanding any *general* disclosure by [defendant] about potential interest-based advertising and data collection."  *A.B. by & through Turner v. Google LLC*,

---

[19] *McDonald* did not consider whether the minor plaintiffs had demonstrated a reasonable expectation of privacy, but only the "offensiveness element in particular, which [was] the only element of the intrusion claim that defendants [had] squarely challenge[d]."  385 F. Supp. 3d at 1034.  The *McDonald* court found allegations that defendants "surreptitiously gathered user-specific information," tracked users, then shared, bought, and sold information with third parties, resulting in "minor users being shown targeted advertisements," met the standard for offensiveness.  *Id*. at 1035.

737 F. Supp. 3d 869, 884 (N.D. Cal. 2024) (emphasis in original).  A third court distinguishes between "routine" data collection "that merely 'happens' to impact children in some instances," from affirmatively "targeting children with a website that will collect their data." *Hubbard v. Google LLC*, No. 19-cv-07016-SVK, 2025 WL 82211, at *4 (N.D. Cal. Jan. 13, 2025).[20]  The Court finds COPPA relevant to the "customs, practices, and circumstances surrounding the data collection" at issue and therefore in setting Plaintiffs' reasonable expectations of privacy as to how their data would be collected and used. *Hammerling*, 615 F. Supp. 3d at 1088.

Defendants argue that COPPA is irrelevant to this analysis because Plaintiffs must allege "more than a bare statutory violation" of COPPA and "must adequately allege the elements underlying their privacy claims." *See* MTD Reply at 7-8.  Plaintiffs may, however, use COPPA as relevant context in establishing the elements of their privacy claims, particularly given the highly "context-specific nature of the [reasonable expectation of] privacy inquiry." *McDonald*, 385 F. Supp. 3d at 1035.  COPPA signifies a legal determination about the particular sensitivity of digital information concerning minors and the significance of parental control over the extent of collection and nature of such data. *See* 15 U.S.C. § 6502(a).[21]  Online platforms directed at children, and the data they collect, are distinguishable from the general principle that "the internet is not a place where users have a reasonable expectation of privacy." *Thomas v. Papa Johns Int'l, Inc.*, No. 22-CV-2012-DMS-(MSBx), 2024 WL 2060140, at *1 (S.D. Cal. May 8, 2024).

Defendants argue that their data collection and use, at least as to the full platform, is not meant for children under the age of 13[22] and they were entitled to rely upon representations made by most Plaintiffs that they were over the age of 13. *See* MTD Reply at 7.  Plaintiffs' Complaint,

---

[20] *Hubbard* also considered the relevance of minor status with respect to the offensiveness analysis. *Hubbard*, 2025 WL 82211, at *4.

[21] The FTC found that the online collection of personal information from children "present[s] unique privacy and safety concerns because of the particular vulnerability of children, the immediacy and ease with which information can be collected from them, and the ability of the online medium to circumvent the traditional gatekeeping role of the parent . . . Children generally lack the developmental capacity and judgment to give meaningful consent to the release of personal information to a third party." FED. TRADE COMM'N, PRIVACY ONLINE: A REPORT TO CONGRESS 5 (1998).

[22] Defendants specifically seek to distinguish *Turner* on the basis, noting that the app in *Turner* "affirmatively represented" that it was "meant for children under 13," as opposed to the full access version of TikTok, which makes no such representations and has an age gate. *See* MTD at 14-15.  The Court finds this distinction uncompelling. First, Plaintiffs have raised allegations regarding Kids Mode, which is affirmatively represented as for children under 13. Compl. ¶¶ 123-131.  Regardless, the applicability of COPPA (and the reasonable expectation of privacy it may confer) encompasses platforms that are "directed to" children, a more nuanced and fact-specific inquiry that does not necessarily require an affirmative representation that children are its intended audience. *See* 16 C.F.R. § 312.2.

however, alleges that Defendants purposefully induced children under the age of 13 to use the full access platform and collected and used their data despite knowing they were under 13. *See* Compl. ¶¶ 89-95. Defendants' alleged inducement and knowledge of children under 13 to use the full access platform, the sufficiency of the age gate, and the relevance of Plaintiffs' misrepresentations of their age involve factual questions at the heart of this case and are not properly resolved on this motion. Under the light most favorable to Plaintiffs, Plaintiffs had a reasonable expectation that their data protected under COPPA would not be collected, used, or shared without the requisite notice and consent.

With respect to Defendants' privacy policies, the Court is unconvinced that they preclude Plaintiffs' reasonable expectation of privacy, particularly given the absence of any allegations, much less any factual record, as to the circumstances under which Plaintiffs were presented the privacy policies (if at all) and whether they amounted to "actual or constructive notice." *Hart*, 526 F. Supp. 3d at 601. "[T]he Court will not presume awareness or notice (concerning minor children under the age of 13, no less) merely because these terms existed." *Hubbard*, 2025 WL 82211, at *5 (refusing to dismiss based on alleged disclosure of data collection practices within privacy policies where defendants did "not . . . explain whether these terms would have been conspicuously presented to Plaintiffs or provide any reason for the Court to accept at the pleading stage that Plaintiffs were on notice of these terms"); *see also Turner*, 737 F. Supp. 3d at 884 (rejecting argument that privacy policies dispelled reasonable expectation of privacy in part because defendants could not "establish, for purposes of this motion, that plaintiffs actually saw or agreed to [the] general terms and policies").[23] Even if Plaintiffs were exposed to the privacy policies in some fashion, it is unlikely that such privacy policies would be dispositive at this stage given the complications posed by COPPA's role and the capacity of minors to assent to such

---

[23] Defendants argue that Plaintiffs "rely on and cite" Defendants' policies in the Complaint and cannot deny that they had notice of them because this would omit facts "essential" to their causes of action. *See* MTD Reply at 9. Plaintiffs' Complaint uses Defendants' privacy policies as evidence of their allegations of the type of data Defendants collect and how it is used, but reliance upon them does not appear to be essential to their causes of action; on the contrary, Plaintiffs expressly deny they (through their guardians) were conferred appropriate notice and consent. Compl. ¶¶ 103-122. Moreover, Plaintiffs' citations to the privacy policies in their Complaint says nothing about Plaintiffs' actual or constructive notice of them during the relevant time period when they began using TikTok.

It is true that "allegations that a plaintiff did not consent to data collection practices, without more, does not support a reasonable expectation of privacy." *D'Angelo*, 726 F. Supp. 3d at 1206. But here there is something "more" than in *D'Angelo*: an affirmative parental notice and consent obligation under COPPA.

policies.[24]  Moreover, Defendants' "privacy policies" and "issues of notice and consent . . . are not appropriate for resolution as a part of [the Rule] 12(b)(6) analysis of whether or not plaintiffs have sufficiently stated an intrusion claim to go forward."  *McDonald*, 385 F. Supp. 3d at 1037. Accordingly, the Court need not address at this juncture the parties' further arguments on the scope of the policies' disclosure or its applicability to Plaintiffs.  *See* MTD Opp. at 8; MTD Reply at 9.

Finally, the Court finds Defendants' argument that "many kinds of personal information identified in the Complaint" simply "do not implicate privacy interests" unavailing.  The general principle that information like "names, birthdays, social security numbers, occupations, addresses, [and] social media profiles" may not be considered sufficiently "sensitive" to implicate "privacy interests," *Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 996 (9th Cir. 2023), is inapposite with respect to minors in the context of platforms directed to children as alleged here.  *See Turner*, 737 F. Supp. 3d at 884.  Moreover, even assuming any particular category of data would in it itself be insufficient to implicate a reasonable expectation of privacy, "with the ever-rapid progression of technology and data processing, courts in various contexts have acknowledged the heightened privacy interests implicated by the aggregation of data over time to create detailed profiles about individuals."  *Cherkin v. PowerSchool Holdings, Inc.*, No. 24-cv-02706-JD, 2025 WL 844378, at *4 (N.D. Cal. Mar. 17, 2025) (brackets and internal quotation marks omitted).

### ii.  Highly Offensive

Defendants next argue that the manner in which they "allegedly collected Plaintiffs' information is not 'highly offensive,'" characterizing their conduct as "routine commercial behavior."  *See* MTD at 13-14.  According to Defendants, certain "plus factors" are required to meet the requisite offensiveness, such as surreptitious collection from apps that were affirmatively represented as for children.  *Id*. at 14.  Defendants assert such a "plus factor" is absent here because "Defendants never claimed that the 13+ Experience was appropriate for under-13 users."  *Id*. at 15.  Plaintiffs reply that they have alleged a violation of federal law, which is generally considered highly offensive, and moreover have alleged that Defendants targeted children and knowingly violated COPPA, two "plus factors" accepted by other courts.  *See* MTD Opp. at 10-11.

---

[24] As Plaintiffs point out, COPPA requires *parental* notice and consent.  *See* MTD Opp. at 8.  The Court also notes that "California law permits a minor to disaffirm a contract . . . to protect a minor against himself and his indiscretions and immaturity as well as against the machinations of other people and to discourage adults from contracting with an infant."  *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1000 (N.D. Cal. 2012) (internal quotation marks omitted); *see* Cal. Fam. Code § 6710.

"[T]he highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *Facebook Tracking*, 956 F.3d at 606. This requires "a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Id.* "A violation of federal law is generally considered egregious, and because COPPA prohibits [] data collection from minors to protect their privacy," courts have found "an egregious intrusion into the minors' expectation of privacy" adequately alleged where "defendants allegedly engaged in the specific conduct proscribed by COPPA." *Turner*, 737 F. Supp. 3d at 884; *see also McDonald*, 385 F. Supp. 3d at 1036 (acknowledging that "courts have found [some] kind of 'plus' factor [like an affirmative misrepresentation] to be significant in establishing an expectation of privacy or making a privacy intrusion especially offensive," but nevertheless finding privacy claim predicated on collection and use of minor data for targeted advertising was sufficiently stated "even without that factor"); *Hubbard*, 2025 WL 82211, at *4 ("The Court cannot conclude as a matter of law that targeting children with a website that will collect their data does not constitute highly offensive behavior.").

Consistent with *Turner*, *McDonald*, and *Hubbard*, the Court finds that Plaintiffs' allegations that Defendants targeted children and knowingly violated COPPA sufficient to plead the requisite offensiveness at this stage. Defendants' effort to distinguish these cases based on its argument that the full access platform was not marketed towards children raises a factual dispute not appropriate for resolution at this juncture.[25] Plaintiffs have sufficiently alleged that Defendants entice children with brands, influencers, and content targeted for them despite representing that the full access platform was for users 13 and older; Defendants knew TikTok was violating COPPA; and Defendants failed to delete underage accounts and ignored parental deletion requests. *See* MTD Opp. at 11; Compl. ¶¶ 89-95, 99-122, 132-163.[26]

---

[25] *See supra* note 22.

[26] The Court finds Defendants' further efforts to distinguish *Turner* and *Hubbard* on factual grounds in their reply brief unavailing. Defendants argue that the "internal narrative" YouTube circulated evincing the targeting of children under the age of 13 was decisive in *Hubbard*, whereas Defendants are only alleged to be "allowing users to post content that might appeal to children on the platform." MTD Reply at 12. Plaintiffs need not present "smoking gun" evidence like an internal memorandum at the pleading stage, merely "allegations [that] allow the Court to reasonably infer that [Defendants] affirmatively targeted children." *Hubbard*, 2025 WL 82211, at *4. Contrary to Defendants' characterization of Plaintiffs' allegations, Plaintiffs have alleged facts from which the Court can reasonably infer that Defendants "actively sought to increase viewing and engagement by children under 13 through content directed at

Defendants' reliance on *Hammerling* is misplaced. *Hammerling* held that "data collection of routine commercial behavior" was "not considered a highly offensive intrusion of privacy." *Hammerling v. Google LLC*, No. 21-cv-09004-CRB, 2022 WL 17365255, at *9 (N.D. Cal. Dec. 1, 2022) (internal quotation marks omitted). However, *Hammerling* expressly distinguished its facts, involving allegations that Google collected browsing history from third-party apps on adult plaintiffs' Android smartphones, from *McDonald*, noting "[t]his case concerns neither alleged data collection from and targeting of minor children, nor dissemination to third parties." *Id*. at *9 n.12. Therefore, the Court finds *Hammerling* inapt here as to the offensiveness inquiry.

The Court would therefore **DENY** the Motion insofar as it seeks dismissal of the intrusion upon seclusion and California constitutional invasion of privacy claims.

> *b. New York Civil Rights Law*

Plaintiffs' New York privacy claim is "governed exclusively by sections 50 and 51 of the [New York] Civil Rights Law." *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 123 (1993). "To prevail on a statutory right to privacy claim pursuant to the New York Civil Rights Law, a plaintiff must prove: (1) use of plaintiff's name, portrait, picture or voice (2) for advertising purposes or for the purposes of trade (3) without consent and (4) within the state of New York." *Lohan v. Perez*, 924 F. Supp. 2d 447, 454 (E.D.N.Y. 2013) (internal quotation marks omitted). Defendants argue that the second element has not been met. Specifically, Defendants contend that Plaintiffs' allegation that "TikTok used the identities, photographs, likenesses, and personal information of the New York Plaintiffs or members of the New York Class . . . to build profiles and target advertisements to those children," Compl. ¶ 782, is not for advertising or trade purposes as those terms are defined under New York law. *See* MTD at 15-16. Defendants assert that the advertising or trade purpose

---

those children, while publicly representing that such children were not permitted to access TikTok's Full Access Platform," Compl. ¶ 90, including Defendants' own estimates that over a third of its daily users were under 14 and 95% of smartphone users under 17 use their app, coupled with "promoting" child influencer and branded content on the full access platform. *Id*. ¶¶ 91-95, 106; *cf*. 16 C.F.R. § 312.2 ("In determining whether a website or online service, . . . is directed to children, the [FTC] will consider its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the website or online service, as well as whether advertising promoting or appearing on the website or online service is directed to children.").

The Court also finds no basis for Defendants' assertion that Plaintiffs must allege that Defendants "possessed . . . specific knowledge about Plaintiffs' accounts" to establish knowledge relevant to the offensiveness requirement. *See* MTD Reply at 12-13. On the contrary, in *Hubbard*, "several content creators" allegedly put Google on notice that "YouTube did not comply with [] COPPA" sufficient to establish the reasonable inference of knowledge that the *Hubbard* court found significant. *Hubbard*, 2025 WL 82211, at *5. These content creators were evidently not any of the plaintiffs, who were "children under the age of 13 who watched YouTube videos." *Id*. at *2.

requirement is "satisfied only where a plaintiff's identity is used to suggest approval of the goods
or services to the public," and cannot be met when it is used to market specifically to plaintiffs.
MTD Reply at 15. Plaintiffs argue this definition is too narrow. MTD Opp. at 12-13.

The NYCRL "is to be narrowly construed and strictly limited to nonconsensual commercial
appropriation of the name, portrait, picture or voice of a living person." *Barbetta v. NBCUniversal
Media, LLC*, 212 N.Y.S.3d 135, 139 (2024) (brackets and internal quotation marks omitted).
However, "courts have broadly construed what constitutes commercial misappropriation." *Davis
v. High Soc. Mag., Inc.*, 457 N.Y.S.2d 308, 313 (1982). "Use for 'advertising purposes' and use
'for the purposes of trade' are separate and distinct statutory concepts and violations." *Beverley
v. Choices Women's Med. Ctr., Inc.*, 78 N.Y.2d 745, 751 (1991). "A name, portrait or picture is
used 'for advertising purposes' if it appears in a publication which, taken in its entirety, was
distributed for use in, or as part of, an advertisement or solicitation for patronage of a particular
product or service, and is used for purposes of trade if it involves use which would draw trade to
the firm." *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 249 (2d Cir. 2021) (citations and
internal quotation marks omitted). A trade purpose under NYCRL is considered somewhat
"difficult to define." *Kane v. Orange Cnty. Publ'ns*, 649 N.Y.S.2d 23, 25 (1996); *Davis*, 457
N.Y.S.2d at 313 (noting the "publication or use of a name or picture" for a "profit motive or . . . to
encourage sales or distribution of [a] publication is a necessary, but hardly a sufficient, ingredient
in determining the existence of a trade purpose" in light of First Amendment considerations).

The Court agrees with Defendants that an advertising purpose requires a "publication" such
that targeted advertisements *to* Plaintiffs would not qualify. *See Electra*, 987 F.3d at 249.
However, advertising and trade purpose should not be collapsed together or interpreted
synonymously, *Beverley*, 78 N.Y.2d at 751, and the Court finds it more ambiguous as to whether
the more nebulous trade purpose requires a public commercial use. Given that Plaintiffs'
allegations are consistent with a nonconsensual commercial appropriation of their names and
likenesses, and that commercial appropriation may be construed broadly, *see Davis*, 457 N.Y.S.2d
at 313, the Court is not persuaded that a trade purpose necessarily must be public or directed at
encouraging sales by a third party.

Notably, neither of the cases cited by Defendants specifically define or distinguish a trade
purpose and an advertising purpose. In *Smith v. Chase Manhattan Bank*, the plaintiffs were Chase
customers whose information was sold to third-party vendors that created lists of individuals who

might be interested in their products or services, which were in turn given to telemarketers for direct solicitation. *Smith v. Chase Manhattan Bank, USA, N.A.*, 741 N.Y.S.2d 100, 102 (2002). Most of the *Smith* court's analysis was with respect to plaintiffs' cause of action under New York General Business Law § 349, finding that plaintiffs had failed to establish an injury, and the court concluded without further analysis that the plaintiffs "failed to state a cause of action under [NYCRL]" because NYCRL was "never intended to address the wrongs complained of by the plaintiffs." *Id*. at 103. The Court finds it unclear from this statement whether the *Smith* court was reiterating its position that plaintiffs were not wronged at all or offering an interpretation of the NYCRL. *Curtis v. City of New York* offers Defendants more support but in the context of considering whether New York City Administrative Code § 20-563.7 ("Customer Data Law") was preempted by the NYCRL. *Curtis v. City of New York*, 195 N.Y.S.3d 592, 598 (2023). The *Curtis* court found that it was not, because the Customer Data Law "contemplates a restaurant's use of its customers' names and addresses to market the restaurant to them through generic mailings and promotions," whereas the NYCRL encompasses "a business's dissemination of an individual's name and/or likeness to the public to promote a particular good or service or its commercial enterprise more generally." *Id*. However, the Court does not find this interpretation of the NYCRL – in relation to a different, narrower law – to be the final word on the NYCRL's scope.

The Court is mindful that the NYCRL is to be interpreted narrowly and notes that Plaintiffs are pursuing what appears to be a somewhat novel use of this limited law. However, at this stage, the Court is unconvinced that *Curtis* and *Smith* provide a sufficient basis for the Court to conclude that Plaintiffs' approach is legally foreclosed to them. *See In re Clearview AI, Inc., Consumer Priv. Litig.*, 585 F. Supp. 3d 1111, 1130 (N.D. Ill. 2022) (plaintiffs sufficiently alleged trade purpose to state NYCRL claim where they "repeatedly alleged the Clearview defendants developed technology to invade the privacy of the American public for their own profit").

The Court would therefore **DENY** the MTD insofar as it seeks dismissal of the NYCRL claim.

    c.  *Unfair Competition*

Plaintiffs' unfair competition claims variously require some form of ascertainable loss of money or property to establish statutory standing, and at least some specifically require an economic injury. *See, e.g.*, *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323 (2011) ("[A UCL

plaintiff] must demonstrate some form of economic injury."); MTD, Index A.  In California,[27]
"there are innumerable ways in which economic injury from unfair competition may be shown.  A
plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she
otherwise would have; (2) have a present or future property interest diminished; (3) be deprived
of money or property to which he or she has a cognizable claim; or (4) be required to enter into a
transaction, costing money or property, that would otherwise have been unnecessary."  *Id.*

Defendants argue that Plaintiffs' "four abstract theories of economic injury" fail to support
their claims under the unfair competition statutes under which they have brought claims "because
they do not allege that they ever paid Defendants for their services or otherwise lost money or
property as a result of Defendants' alleged conduct."  *See* MTD at 17.  Plaintiffs assert that there
is a recognized property interest in personal information amassed online and that "diminishment
of an individual's property interest in their personal information and the lost value of that
information constitute economic injury under the UCL and other state consumer-protection acts."
*See* MTD Opp. at 13.

i.  Loss of Control & Loss of Value[28]

Plaintiffs allege that they have suffered a "loss of control over their own personal property
which has a market value."  Compl. ¶¶ 212-13.  Defendants argue that Plaintiffs have not alleged
sufficient facts evincing a loss of control, such as alleging that they sought to regain control by
making data deletion requests.  *See* MTD at 18.  Moreover, Defendants assert that loss of control
is not an economic injury.  *Id.*  Plaintiffs contend that their allegations of nonconsensual data
collection and ignored data deletion requests sufficiently allege a loss of control of personal
information, and that because there is a property interest in such information, this suffices to
establish a cognizable unfair competition injury.  *See* MTD Opp. at 14-15.

Plaintiffs also assert that they have experienced a loss or diminishment of value in their
personal information.  Compl. ¶¶ 519, 612, 709, 770, 785, 880.  With respect to loss of value,
Defendants assert that Plaintiffs cannot generally allege a diminution of value but must plead
"something more concrete," showing not only a market for their information but that the

---

[27] The Court uses the UCL as a representative example of Plaintiffs' unfair competition claims.  The parties also
largely cited to cases concerning the UCL in their discussion of Plaintiffs' four theories of economic injury.

[28] Because these two theories are similar and courts often discuss them together, and both turn on the viability of
the asserted economic value in Plaintiffs' personal information, the Court discusses them together.

information has value to Plaintiffs specifically. *See* MTD at 19-20. Plaintiffs contend that the diminished value economic theory merely requires demonstrating that their information has value on the marketplace and that they derive potential economic value from it. *See* MTD Opp. at 15.

Courts in this circuit are divided as to whether loss of control of personal information or a diminution of its alleged value constitutes an economic injury for purposes of a UCL claim. "[T]he Ninth Circuit and a number of district courts . . . have concluded that plaintiffs who suffered a loss of their personal information suffered economic injury and had standing [to assert a UCL claim]." *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (collecting cases); *see also Brown v. Google LLC*, No. 20-cv-03664-LHK, 2021 WL 6064009, at *17 (N.D. Cal. Dec. 22, 2021) (finding economic injury because plaintiffs "provided valuable data to Google and ha[d] received no money in return" and diminished future property interest in data); *Doe v. Microsoft Corp.*, No. C23-0718-JCC, 2023 WL 8780879, at *13 (W.D. Wash. Dec. 19, 2023) (finding economic injury where plaintiffs demonstrated "active market for users' private data" and in light of "increasing recognition of the value of private data"); *Turner*, 737 F. Supp. 3d at 881-82. However, other courts have taken the narrower view that "loss of personal data is . . . not sufficient to demonstrate an economic injury." *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 845 (N.D. Cal. 2024); *Griffith*, 697 F. Supp. 3d at 977 (finding no economic injury where plaintiff alleged no "specific facts showing that she could have sold the limited data collected," had "ever attempted or intended to sell her data," or that the data collection had "impeded her ability to sell her data").

This Court generally agrees with the *Calhoun*/*Brown* reasoning for the principle that personal information has an economic value, as evinced by an asserted market for it, such that "[p]rivacy harms involving personal data can constitute an injury to money or property sufficient to provide standing under the UCL." *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1024 (N.D. Cal. 2024). Defendants question the legitimacy of a market for children's data given the restrictions imposed by COPPA. *See* MTD at 20. However, the Court does not find that the restrictions on Plaintiffs' personal data imposed by COPPA necessarily preclude it from having economic value. Indeed, the Court finds it significant that one of the only other cases thus far to address similar theories of economic injury predicated on allegations of data collection in violation of COPPA found that the plaintiffs had sufficiently done so. *See Turner*, 737 F. Supp. 3d at 881-82. Plaintiffs have alleged both how personal data is valuable generally and how their data is specifically valuable to Defendants. Compl. ¶¶ 215-26, 231-32. The Court finds such allegations

sufficient to demonstrate that there is a market for children's data at the pleading stage, one Defendants have allegedly found quite lucrative. *Id.* ¶¶ 85-87, 231-32.

Moreover, Defendants' argument that Plaintiffs must assert additional facts, such as an attempt to regain control of their data, to assert a loss of control theory of economic injury is not supported. Defendants cite just one case in which a court found that a plaintiff's login and password information, which were compromised in a data breach, were not "'lost' in the sense understood under the UCL," because they "did not cease to belong to him, or pass beyond his control." *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 863 (N.D. Cal. 2011). The Court has no trouble finding from Plaintiffs' allegations, however, that their personal information has passed beyond their control through its nonconsensual collection, disclosure to third parties, and a procedurally difficult and practically ignored data deletion process. The Court does not read *Claridge* to require Plaintiffs to have unsuccessfully requested to have their data deleted to assert standing under a loss of control theory and declines to impose such a requirement. Moreover, even if Plaintiffs requested and Defendants deleted the alleged data within their possession, this would do little to reassert control over the information at issue if it has already been widely disseminated to third parties as Plaintiffs have alleged. The Court therefore finds that Plaintiffs have adequately plead an economic injury under their loss of control theory.

However, it is not clear whether Plaintiffs have sufficiently articulated their loss of value theory to establish an economic injury. While the Court agrees with Plaintiffs that they have alleged that their personal information has economic value both in general and to Defendants, which is potentially diminished by Defendants' alleged nonconsensual use and disclosure of it to third parties, there is a question as to whether Plaintiffs have established a present or future intent to participate in the market for their data. Other courts have found an absence of such allegations fatal to UCL standing predicated on a loss of value theory of economic injury. *See Griffith*, 697 F. Supp. 3d at 977; *Facebook Profile*, 402 F. Supp. 3d at 784 (rejecting loss of value theory as "purely hypothetical," despite recognizing value of personal information to Facebook, where plaintiffs did "not plausibly allege that they intended to sell their non-disclosed personal information to someone else"); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 898-99, 904 (C.D. Cal. 2024) (rejecting injury theory based on lost economic value of personal information where plaintiffs had indicated that they "no interest in selling" it). At the hearing, Plaintiffs should address whether applicable law as to loss of value requires a showing of intention to monetize their

information; and, if so, whether they have alleged that element.

    ii. Benefit of the Bargain

  Plaintiffs assert that they suffered "'benefit-of-the-bargain' injuries and damages." Compl.
¶¶ 520, 935. Defendants argue such a theory fails because Plaintiffs "never paid for their use of
the TikTok platform," and moreover any "bargain" was predicated on Plaintiffs' misrepresentation
about their age. *See* MTD at 21-22. Plaintiffs respond that "they paid with their data and
attention," and that Defendants' enticement of minors to bypass the age gate renders them to blame
for Plaintiffs' age misrepresentations. *See* MTD Opp. at 16.

  "[A] 'benefit of the bargain' approach to establishing UCL standing is rooted in the
California Supreme Court's recognition that a plaintiff may demonstrate economic injury from
unfair competition by establishing he or she 'surrender[ed] in a transaction more, or acquire[d] in
a transaction less, than he or she otherwise would have.'" *Cappello v. Walmart Inc.*, 394 F. Supp.
3d 1015, 1019-20 (N.D. Cal. 2019) (quoting *Kwikset*, 51 Cal. 4th at 323). "Courts are split as to
whether plaintiffs must have paid money to a defendant to sustain their benefit of the bargain
theory." *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1055 (S.D. Cal. 2023) (collecting
cases). As in *Greenley*, "the Court need not [] resolve this split today," because neither of the
parties have identified a transaction or bargain between the parties, and the Court fails to see how
there could have been when the data collection at issue is alleged to have occurred without the
knowledge or consent of Plaintiffs or their guardians.[29] *Id.* "When a plaintiff never transacted with
a defendant, there can be no benefit-of-the-bargain injury under the UCL." *Id.* at 1054-55.

  Accordingly, the Court finds that Plaintiffs have not yet cognizably alleged a benefit-of-
the-bargain theory of economic injury.

    iii. Right to Exclude

  Finally, Defendants assert that Plaintiffs' right-to-exclude theory fails because there is no
property interest in their personal information, and Plaintiffs were not deprived of a right to exclude
others from their information because they voluntarily signed up to use TikTok and only did so by
misrepresenting their ages. *See* MTD at 22-23. Plaintiffs argue that there is a property interest in
their data, particularly certain "inherently exclusive" and "not voluntarily shared" information,
including "unique identifiers such as faceprints, voiceprints, and persistent device identifiers," and

---

  [29] *See, e.g.*, Compl. ¶¶ 107, 120, 128, 516, 609, 706, 767, 877, 931.

argue they were denied their right to exclude others from them.  *See* MTD Opp. at 16-17.

Courts are divided with respect to whether there is a property interest in personal information of the sort alleged here.  *See Calhoun*, 526 F. Supp. 3d at 635-36 (finding plaintiffs "adequately alleged that they were deprived of a property interest" in their personal information); *cf. Doe I*, 741 F. Supp. 3d at 845 (disagreeing with *Calhoun*).[30]  However, "the prevailing trend" is to recognize a property interest in personal information.  *Rodriguez v. ByteDance, Inc.*, No. 23 CV 4953, 2025 WL 672951, at *14 (N.D. Ill. Mar. 3, 2025); *see also Griffith*, 697 F. Supp. 3d at 976 ("[P]articularly given the evolving case law recognizing property interests in such information, Defendants have not shown as a matter of law that Plaintiff's allegation that she had a property right in the data Defendants collected is implausible."); *Meta Pixel*, 724 F. Supp. 3d at 1024-25 (noting that "certain kinds of personal data may directly constitute property under the UCL," and finding "no reason why [] a violation of plaintiffs' right to exclude would not constitute the diminishment of a 'present or future property interest' for purposes of *Kwikset*'s second prong").  The Court agrees with the growing number of courts that there may be a property interest in at least some of the personal information Defendants allegedly collected from Plaintiffs here.

At this stage, Plaintiffs have also alleged sufficient facts from which the Court may infer a deprivation of their right to exclude.  Even if they voluntarily signed up for the TikTok platform, Plaintiffs have indicated that they did not have adequate knowledge and consent of the extent of information being collected from them or that their information would be disclosed to third parties.  And as previously indicated, the Court does not find Plaintiffs' representations as to their age dispositive at this juncture.

The Court therefore finds that Plaintiffs have sufficiently demonstrated standing under the UCL.  Because the Court finds that Plaintiffs have adequately alleged at least two cognizable theories of economic injury, Plaintiffs have asserted at least one viable theory of injury sufficient to support standing for each remaining unfair competition statute under which they have asserted claims as Plaintiffs interpret them.  *See* MTD Opp. at 19-21.  Because Defendants have collapsed their unfair competition arguments and did not individually challenge Plaintiffs' assertions

---

[30] Defendants also cite *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1030 (N.D. Cal. 2012).  However, Judge Koh subsequently disavowed her rejection in *Low* of a property interest in personal information in recognition of evolving legal trends, *see Calhoun*, 526 F. Supp. 3d at 635, and other courts have similarly refused to rely upon *Low* for that proposition.  *See Griffith*, 697 F. Supp. 3d at 975-76.

regarding the viable theories of economic injury under those statutes, *see* MTD Reply at 14, the Court would **DENY** the MTD insofar as it seeks dismissal of all the unfair competition claims.[31]

### d.  Unjust Enrichment

Plaintiffs have asserted unjust enrichment claims under the laws of 44 states.[32]  Defendants assert that Plaintiffs' unjust enrichment claims fail because (1) they must not only show how Defendants profited, but "at Plaintiffs' expense," (2) Plaintiffs' assertions as to the value of their data or how it was lost are deficient, and (3) the factual allegations are insufficient to establish that Defendants unjustly profited off of Plaintiffs' personal information.  *See* MTD at 24-25.[33]  Plaintiffs counter that (1) some jurisdictions, including California, recognize a right to profits from unjust enrichment even if there is no corresponding loss, (2) their allegations that the information has value are sufficient as this juncture, and (3) their allegations that their data was illegally harvested are sufficient to show that Defendants unjustly profited.  *See* MTD Opp. at 21-24.[34]

As a threshold matter, neither of the parties have offered a state-by-state breakdown of the 44 distinct legal requirements of unjust enrichment claims, despite both parties' acknowledgement

---

[31] The Court notes that *Turner* found that plaintiffs "adequately pleaded that they suffered an economic injury" under FDUPTA where they had shown an economic injury under the UCL.  *Turner*, 737 F. Supp. 3d at 883.  The Court acknowledges that *Hubbard* found differences between some of the consumer protection laws at issue here; however, the *Hubbard* court reached different conclusions as to the viability of Plaintiffs' economic injury arguments from this Court such that those differences may not be dispositive here.  *See Hubbard*, 2025 WL 82211, at *8-13.  In any event, because Defendants did not make arguments dependent on differentiating between the unfair competition statutes, the Court declines to do so for them.  *See id*. at 6.

[32] Under the Court's tentative ruling on Article III standing, however, only claims under eight would survive.

[33] Defendants also make an argument that "Plaintiffs lack standing to assert their unjust-enrichment claim[s]."  *See* MTD at 25.  But the primary case Defendants cite for this proposition merely rejects the notion that "alleging a demand for disgorgement of profits or an unjust enrichment theory is, by itself, sufficient to establish Article III standing where plaintiffs have not otherwise pled sufficient facts establishing that they personally suffered a particular and concrete injury."  *Taylor v. Google LLC*, No. 20-cv-07956-VKD, 2021 WL 4503459, at *4 (N.D. Cal. Oct. 1, 2021).  The Court does not find this holding particularly relevant here, as Plaintiffs have not attempted to establish Article III standing based solely upon their unjust enrichment theory.  Rather, Plaintiffs allege privacy harms, which the Court has already found support Article III standing, *see* Section III.B.1.b *supra*, and economic injuries, which the Court has also discussed at length.  *See* Section III.B.3.c.

[34] The parties also dispute whether unjust enrichment is a cause of action in California.  The Court agrees with Plaintiffs that it need not determine whether an unjust enrichment claim is better characterized as a restitution or quasi-contract claim, because either way they are entitled to seek relief under California law provided they have sufficiently stated the requisite elements.  *See Astiana v. Hain Celestial Grp., Inc*., 783 F.3d 753, 762 (9th Cir. 2015); *see also Riganian v. LiveRamp Holdings, Inc*., No. 25-cv-00824-JST, 2025 WL 2021802, at *12 (N.D. Cal. July 18, 2025) ("California cases disagree as to whether unjust enrichment is a standalone claim," but "[r]egardless of whether the claim is labelled unjust enrichment or restitution, a plaintiff must allege the same two elements: receipt of a benefit and unjust retention of the benefit at the expense of another." (internal quotation marks omitted)).

that potentially significant differences exist between them. *See* MTD Opp. at 22 ("some jurisdictions, including California, 'recognize[] a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss'" (quoting *Facebook Tracking*, 956 F.3d at 599)); MTD Reply at 19 ("[m]ost states do require the plaintiff to plead facts demonstrating loss at their expense"). Defendants' index of the 44 state laws, while helpful, does not provide insight into the nuances of how states interpret key issues such as whether privacy losses are sufficient to establish an "expense" to a plaintiff. *See Vance v. Amazon.com Inc.*, 525 F. Supp. 3d 1301, 1315 (W.D. Wash. 2021) (deferring ruling on motion to dismiss unjust enrichment claim because parties had not addressed conflicts such as the fact that "a non-economic loss, such as a loss of privacy, is insufficient" to support Washington unjust enrichment claim, but privacy harms and loss of control over data is sufficient for Illinois unjust enrichment claim).[35] The Court has attempted to make some generalized findings while acknowledging discrepancies between state approaches to unjust enrichment claims but cannot offer more detailed state-specific rulings absent further individualized research. The Court will not engage in a 44-state survey on behalf of the parties *sua sponte*, particularly when many claims may be dismissed on standing.

Generally, "[t]o allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016); *see also In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 411-12 (E.D. Va. 2020) (finding substantive requirements of unjust enrichment claims in California, Florida, New York, Texas, Virginia, and Washington "largely consistent"); MTD, Index B. However, some jurisdictions "require[] disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable." *Facebook Tracking*, 956 F.3d at 600 (California). Others hold that where a plaintiff "has not suffered a loss, his claim of unjust enrichment cannot prevail." *N.K. Collins, LLC v. William Grant & Sons, Inc.*, 472 F. Supp. 3d 806, 833 (D. Haw. 2020) (Hawaii).

Relatedly, there is also a diversity of approaches as to whether personal information

---

[35] *See also In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1330 (N.D. Ga. 2019) (suggesting that Georgia unjust enrichment law is narrower than New York unjust enrichment law and finding that "personally identifiable information" could not support an unjust enrichment claim under Georgia law without a plausibly alleged expectation that defendant "would be responsible for the cost").

constitutes a benefit to a defendant and whether a privacy-related harm can amount to a detriment to a plaintiff for purposes of an unjust enrichment claim. In California, for instance, allegations that defendants tracked and profited from plaintiffs' internet activity without their knowledge or consent "'at the expense' of their privacy rights" sufficiently states a claim for unjust enrichment. *Riganian*, 2025 WL 2021802, at \*13.[36] Other states maintain that privacy harms "provide no basis for an unjust enrichment claim." *Boring v. Google Inc.*, 362 F. App'x 273, 282 (3d Cir. 2010) (rejecting Pennsylvania unjust enrichment claim because plaintiffs' allegations that Google took photographs of their property without their consent did not allege that they "gave or that Google took anything that would enrich Google at [plaintiffs'] expense"); *Cousineau v. Microsoft Corp.*, 992 F. Supp. 2d 1116, 1130 (W.D. Wash. 2012) ("loss of privacy" could not support unjust enrichment claim under Washington law without "some tangible economic loss").[37] In many jurisdictions, it is simply unclear.[38]

In the jurisdictions in which transmission of personal information of the kind at issue here confers a benefit, and privacy harms are themselves an "expense" to plaintiffs, the Court has no trouble finding that Plaintiffs have adequately alleged the benefit and expense elements of what is required to seek relief for unjust enrichment. For the remaining jurisdictions, the Court is less certain but presently satisfied for the reasons previously discussed with respect to unfair

---

[36] *See also Vance v. Int'l Bus. Machs. Corp.*, No. 20 C 577, 2020 WL 5530134, at \*5 (N.D. Ill. Sept. 15, 2020) (plaintiffs "adequately plead an unjust enrichment claim" under Illinois law where they alleged that defendant "unlawfully acquired their biometric information and profited from the dissemination of their biometric information"); *Halaburda v. Bauer Pub. Co., LP*, No. 12-cv-12831, 2013 WL 4012827, at \*8 (E.D. Mich. Aug. 6, 2013) (plaintiffs adequately plead unjust enrichment claim under Michigan law where they alleged that "defendants engaged in collection and illegal disclosure of their personal . . . information, and that the monetary and other benefits associated with such disclosure represents unjust enrichment of defendants"); *Lionetta v. InMarket Media, LLC*, No. 1:24-cv-11170-JEK, 2025 WL 2533787, at \*6-7 (D. Mass. Sept. 3, 2025) (plaintiffs "plausibly state[d] a [Massachusetts] claim of unjust enrichment by alleging that [defendant] knowingly profited from the plaintiffs' geolocation data without their permission"); *Garcia v. Character Techs., Inc.*, 785 F. Supp. 3d 1157, 1185 (M.D. Fla. 2025) (access to user data "could constitute a directly conferred benefit" sufficient to support claim under Florida unjust enrichment law).

[37] *See also Mount v. PulsePoint, Inc.*, 684 F. App'x 32, 36 (2d Cir. 2017) (plaintiffs failed to state unjust enrichment claim under New York law "based solely on injury stemming from the alleged misappropriation of their browsing information").

[38] *See Giasson v. MRA - Mgmt. Ass'n, Inc.*, 777 F. Supp. 3d 913, 940 (E.D. Wis. 2025) ("To the Court's knowledge, no Wisconsin court has answered the question of whether the conferral of [personal identifiable information] can itself constitute a benefit for purposes of unjust enrichment."); *Haney v. Charter Foods N., LLC*, 747 F. Supp. 3d 1093, 1113-14 (E.D. Tenn. 2024) (finding personal information exposed in data breach did not confer a benefit to defendants to support unjust enrichment claim under Tennessee law, but suggesting "consumer data" could because such data has "monetary value to a company").

competition that Plaintiffs have sufficiently alleged the economic value of their data, such that they have demonstrated a benefit, and a cognizable theory of economic injury, such that they have demonstrated an expense.  While some jurisdictions have expressed skepticism towards claims for unjust enrichment predicated on personal information, these cases have largely considered data breaches in which the collection of plaintiffs' data was ancillary to the purpose and the nature of the parties' relationship or plaintiffs otherwise failed to explain how defendants benefitted from their data, as opposed to how Plaintiffs have alleged how data harvesting is fundamental Defendants' business model here.  *See Haney*, 747 F. Supp. 3d at 1113-14; *cf. In re Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945, 968 (N.D. Cal. 2021) (plaintiffs stated unjust enrichment claim where they plausibly alleged that "Google was able to monetize Plaintiffs' unauthorized recordings via targeted advertising and by improving [service's] functionality"); Compl. ¶¶ 227-33.  Plaintiffs also allege a property interest in their data, unlike in cases where plaintiffs solely alleged a non-economic privacy loss.  *Cf. Cousineau*, F. Supp. 2d at 1130. Particularly without the benefit of jurisdiction-specific briefing or argument by the parties, the Court thus does not find Plaintiffs' unjust enrichment claims fail as a matter of law on this ground.

The Court also finds that Plaintiffs have sufficiently alleged that Defendants profited unjustly from Plaintiffs, as they have plausibly alleged that Defendants have profited from their mass data collection through targeted advertising in violation of federal law.  *See Turner*, 737 F. Supp. 3d at 885 ("[P]laintiffs have adequately pleaded that defendants were unjustly enriched by collecting plaintiffs' personal information and employing it to target advertisements to children.").

Accordingly, the Court would **DENY** the MTD insofar as it seeks dismissal of the unjust enrichment claims.

### e.  Negligence

Finally, Defendants argue that Plaintiffs have failed to state a negligence claim because they have not shown an "'appreciable, nonspeculative, present injury.'"  *See* MTD at 26 (quoting *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996)).  Both parties largely reiterate arguments already addressed regarding the sufficiency of Plaintiffs' allegations of injuries raised with respect to other causes of action.  Citing to data breach cases, Defendants suggest Plaintiffs must "identify specific present or future risks that their data will be misused" to meet the nonspeculative injury requirement.  *Id.* at 27.  Plaintiffs reply that they have sufficiently alleged a privacy injury under COPPA and that they need not allege future misuse because, under COPPA,

"the collection of children's private information in the first instance . . . is the harm." *See* MTD Opp. at 25.

The Court agrees with Defendants that "to state a negligence claim, Plaintiffs must allege an appreciable, nonspeculative, present injury." *R.C.*, 733 F. Supp. 3d at 897 (internal quotation marks omitted). However, the Court has already found *supra* that Plaintiffs have sufficiently alleged an injury to their substantive privacy rights and two plausible theories of an economic injury. The Court therefore finds that Plaintiffs have alleged an injury sufficient to support their negligence claims for all of the reasons previously discussed. *See Facebook Profile*, 402 F. Supp. 3d at 799 (plaintiffs "alleged present and non-speculative privacy injuries" sufficient to state negligence claim predicated on defendant's alleged collection and dissemination of sensitive user communications and information to third parties).[39]

## IV.    Conclusion

Based on the foregoing discussion, the Court would (1) **DENY** the Stay Motion; and (2) **GRANT** the MTD with respect to claims brought under the laws of states for which no Plaintiff is domiciled with leave to amend as previously indicated and **DENY** the remainder of the MTD.

---

[39] Defendants resist Plaintiffs' asserted privacy injury in reliance on *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012), which held that the unauthorized transmission of data alone is not sufficiently egregious to support an invasion of privacy claim. Defendants are wrong that *iPhone* is "material and controlling" here "despite the fact that it involved adults rather than children," *see* MTD Reply at 21, as the Court has already explained at length in its discussion of the Plaintiffs' intrusion upon seclusion and California constitutional causes of action why the context of children and their data are distinct at least where COPPA is implicated. *See* Section III.B.3.a.